# Exhibit 11

# Memorandum in Support of Motion for Summary Judgment and for an Award of Attorneys Fees and Costs by John E. Draim

SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
Civil Division

MOBILE COMMUNICATIONS )
HOLDINGS, INC. )
1133 21st Street, N.W. )
Washington, D.C. 20036 )
 )
ELLIPSO, INC. )
1133 21st Street, N.W. )
Washington, D.C. 20036 )
 )
VIRTUAL GEOSATELLITE, LLC )
1133 21st Street, N.W. ) Civil Action No. 01-0008202
Washington, D.C. 20036 )
 )
Plaintiffs, )
 )
        v. )
 )
JOHN E. DRAIM )
 )
Defendant. )
_____)

RECEIVED
Civil Clerk's Office
NOV 0 5 2001
Superior Court of the
District of Columbia

## VERIFIED COMPLAINT

This is an action for preliminary and permanent injunctive relief, as well as monetary damages, based on breach of a Noncompetition and Nondisclosure Obligations, breach of the duty of loyalty, violation of the District of Columbia Uniform Trade Secret Act, and misappropriation and conversion.

Plaintiffs Ellipso, Inc. ("Ellipso"), Mobile Communications Holdings, Inc. ("MCHI"), and Virtual Geosatellite, LLC ("Virtual Geo"), by counsel, for their Verified Complaint against Defendant John Draim ("Draim"), state as follows:

I. **Parties and Jurisdiction**

1. Ellipso is a Delaware corporation with its principal place of business at 1133 21st Street, N.W., Washington, D.C. 20036. Ellipso is the parent company of Mobile Communications Holdings, Inc. ("MCHI").

2. MCHI is a Delaware corporation with its principal place of business at 1133 21st Street, N.W., Washington, D.C. 20036.

3. Virtual Geo is a Delaware limited liability company with its principal place of business at 1133 21st Street, N.W., Washington, D.C. 20036.

4. Draim is a former Ellipso employee who, upon information and belief, resides at 9310 Telfer Court, Vienna, Virginia 22182.

5. VGS, Inc. ("VGS") is a Delaware corporation with its principal place of business at 800 Connecticut Avenue, NW, Suite 500, Washington, D.C. 20004.

6. Space Resource America Corporation ("SRAC") is a Delaware corporation and the successor in interest to VGS with its principal place of business at 1101 Pennsylvania Avenue, NW, Suite 600, Washington, D.C. 20004.

7. The Court has jurisdiction over the subject matter of this action pursuant to D.C. Code § 11-921. Venue is proper because MCHI and Ellipso each has its principal place of business in the District of Columbia, Draim was employed by Ellipso in the District of Columbia, and Draim and MCHI entered into a Consulting Agreement in the District of Columbia. The amount in controversy exceeds, exclusive of interests and costs, the sum of five thousand dollars ($5,000.00).

II.    Facts

### A. Relationship Among Ellipso, Virtual Geo, and Strategic Partners

8.    The Plaintiffs have designed and are implementing two patented satellite communications systems. The first is a narrowband mobile satellite system called the "Ellipso System." The Ellipso System is one of only four mobile satellite systems in the world with a license from the United States Federal Communications Commission ("FCC") to operate in the L-band frequency. Through MCHI, Ellipso filed its license application with the FCC in 1990. Seven years and tens of millions of dollars later, the FCC issued Order and Authorization, 12 FCC Rcd. 9663 (1997), authorizing Ellipso to construct and launch a first-generation constellation of at least sixteen (16) low-earth-orbit satellites and one (1) in-orbit spare satellite Ellipso Constellation[1]. The Ellipso System received yet another FCC license in July 2001 authorizing the Ellipso System to operate in the 2GHz frequency.

9.    The second system is a broadband satellite system called the "Virgo System." In March 1995 VGHI filed for a patent to protect aspects of the technology that form the basis of its Virtual Geo System. In late 1998, the first of many patents was issued to VGHI. On January 8, 1999, Virtual Geo filed its license application for the Virgo System with the FCC seeking authority to launch and operate a global, fixed-satellite service system employing non-geostationary satellites in sub-geosynchronous elliptical orbits in Ku-band and C-band frequencies.

---

[1] Although the FCC recently revoked the L-band license for alleged "failure to meet a construction milestone", Ellipso has filed a petition seeking reconsideration of that decision and has received the support of its shareholder and strategic partner, The Boeing Company.

10. The Virgo System license application remains pending before the FCC. Using their patented elliptical orbits and designs (additional patents were awarded in the intervening time, and others were applied for and are still pending), the Plaintiffs intend to provide wireless voice, data, facsimile, paging, geolocation, video, and Internet services to subscribers around the world. The unique elliptical-orbit architectures allow the Plaintiffs to tailor satellite coverage to match population distribution, and/or to "follow" the continents for better market coverage. In addition, Virtual Geo technology allows an unprecedented reuse of spectrum, making a variety of applications possible, including military and broadband on-demand video.

11. Because of this reuse by potentially several competitors, an opportunity exists for Ellipso/Virtual Geo to license its technology to leading and most influential aerospace companies, as well as service operators.

12. Information related to the Ellipso and Virgo Systems is highly technical, sensitive, and confidential. The information – like the Ellipso and Virgo Systems themselves – took years to develop and constitutes trade secrets in a highly competitive field. Any exposure of the information to the Plaintiffs' competitors or potential competitors will cause the Plaintiffs irreparable harm.

13. Ellipso and Virtual Geo are affiliated companies. Ellipso owns 11.54% percent of Virtual Geo. Virtual Geosatellite Holdings, Inc. ("VGHI") owns 63.46% percent of Virtual Geo. David Castiel, the President and Chief Executive Officer of Ellipso, holds controlling ownership interests in both Ellipso and Virtual Geo Holdings. Plaintiffs hereby incorporate the Affidavit of David Castiel by reference as is fully set forth herein. The remaining 25% percent of Virtual Geo is owned by Sahagen Satellite Technology Group,

LLC, now known as Sahagen Global Technology, LLC ("Sahagen Satellite") and controlling shareholder and bankroller of SRA, Draim's current employer.

14. Ellipso and VGHI conceived and developed the Virgo System. On January 6, 1999, VGHI and Ellipso established Virtual Geo. VGHI gained a controlling interest in Virtual Geo by contributing to it patents and pending patents pertaining to the Virgo System. On January 8, 1999, Ellipso gained its 11.54% interest in Virtual Geo by contributing its rights, title, and interests to the Virgo System and patents. The Plaintiffs' relationships with strategic partners, such as The Boeing Company ("Boeing"), Lockheed Martin Corporation ("Lockheed Martin"), Teledyne Brown Engineering, Inc. ("Teledyne Brown"), Israel Aircraft Industries ("IAI"), EMS Technologies, Arianespace, S.A., Harris Corporation, and L-3 Communications("L-3"), and others were crucial to their ability to successfully complete their satellite systems. Among other things, these strategic partners contributed to the design, construction, and implementation of the constituent components of each satellite system. For example, Boeing has been under contract to provide the space segment of the Ellipso System, in collaboration with Harris, L-3 and IAI. Lockheed Martin had made an initial commitment related to the construction and launch of the Virgo System. Lockheed Martin submitted a proposal to develop the ground segment for the Ellipso System. The Plaintiffs also looked to their strategic partners to make financial contributions through vendor and equity financing.

B. Draim's Employment with Ellipso

15. On November 1, 1992, Draim entered into a consulting agreement with MCHI.

16. Draim's Consulting Agreement is attached as Exhibit A and incorporated herein by reference. The operative portion of the Agreement states in sections 8 and 9 as follows:

> **8. Consultant Not to Engage in Conflicting Activities.**
>
> During the time of this Agreement, Consultant shall not enter into any activity, employment, or business arrangement which conflicts with Client's interest or Consultant's obligations under this Agreement. In view of the sensitive nature of Consultant's status, Client shall have the option of terminating this Agreement at any time if, in its sole judgment, a conflict of interest exists or is imminent. Upon such termination Client shall reimburse Consultant for all services rendered, pursuant to paragraph 4 of this Agreement, either directly or with a promissory note. Consultant shall advise Client of its position with respect to any activity, employment, or business arrangement contemplated by Consultant which may be relevant to this Paragraph. For this purpose Consultant agrees to disclose any such plans to Client prior to implementation.
>
> **9. Trade Secrets and Inventions.**
>
> Consultant shall treat as proprietary any information belonging to Client, its affiliated companies, or third parties, disclosed to Consultant in the course of Consultant's services. Consultant assigns and agrees to assign to Client or its nominee all rights in inventions or other proprietary information conceived by Consultant during the term of this Agreement with respect to any work which Consultant performs, and is financially compensated for by Client or the Corporation, under this Agreement. In addition, the Corporation will pay Consultant an amount not to exceed $2,000 as a bonus upon the completion of successful filing for any one patent. The actual amount will be determined in inverse proportion to the number of co-inventors listed in the patent application(s). If Consultant is the sole inventor, the full $2,000 will be paid. Likewise, upon successful issuance of any one patent, the Corporation will pay Consultant an additional bonus not to exceed $10,000, the actual amount of the bonus being determined in inverse proportion to the number of co-inventors listed in the patent(s).

17. On or about August 1997, Draim became an employee of MCHI. Although certain terms of his Consulting Agreement were modified to reflect that Draim was no longer merely an independent contractor, the terms of his employment were essentially identical to the terms of his Consulting Agreement. So while Draim, as an employee, received employee benefits such as stock options, insurance, and paid vacation time, the underlying terms of his Consulting Agreement remained in effect. For example, not only did Draim's patent bonuses remain effective throughout his employment, they were actually increased several times such that his final patent bonuses were $2,500 in cash for every patent application and $12,500 for every patent awarded. Draim received close to $100,000, in addition to his consulting fees and/or salaries as applicable.

18. During his affiliation with MCHI and Ellipso, Draim was entrusted with Ellipso's and Virtual Geo's most sensitive and confidential information.

19. Throughout his various positions with MCHI and Ellipso, Draim was responsible for developing and refining the orbital architecture and associated design of the Ellipso System and the Virtual Geo System and optimizing satellite launch strategies.

20. On May 24, 2000, Draim abruptly resigned from employment with Ellipso without any mention of his intention to join a competitor of Ellipso and Virtual Geo.

21. On May 25, 2000, Draim became employed by VGS. A correct and complete copy of Draim's employment agreement with VGS is attached hereto as Exhibit B. VGS was created on April 14, 2000 in an effort to steal control of Ellipso and Virtual Geo away from Castiel so that VGS and its principals could exploit the assets of the Plaintiffs. VGS's takeover attempt was engineered by (a) Sahagen Satellite, through Peter D. Sahagen, a member of the Board of Managers of Virtual Geo; (b) Thomas Quinn, whom

Virtual Geo Holdings appointed to the Board of Managers of Virtual Geo; and (c) Neel H. Howard, the President of VGS and a former Ellipso officer who resigned from Ellipso shortly *after* establishing VGS. The Chancery Court of the State of Delaware held that VGS's attempted takeover was illegal and, accordingly, the Chancery Court invalidated the purported takeover and enjoined VGS from asserting ownership and control over the assets of the Plaintiffs. The Supreme Court of the State of Delaware affirmed the Chancery Court's ruling in all respects. Through Draim and others, VGS attempted and continues to attempt to interfere with the Plaintiffs' business relationships and to steal the Plaintiffs' Ellipso System, Virgo System, intellectual property, proprietary technology, and other assets.

22. Draim, in concert with others, contacted several companies soliciting them to work with VGS instead of Ellipso and Virtual Geo. Since joining VGS, Draim has been in contact with the Aerospace Corporation, Draper Laboratories, Lockheed Martin, and Boeing, including the Sea Launch division of Boeing, encouraging each company to work with VGS rather than with Ellipso and Virtual Geo. His efforts resulted in the cancellation of an important meeting in June 2000 with Sea Launch, during which Virtual Geo and Sea Launch were going to discuss Sea Launch's role in the deployment of Virgo. Similarly, Lockheed Martin abandoned its MOU with Ellipso and Virtual Geo as a result of Draim's interference with Ellipso's and Virtual Geo's relationship with Lockheed Martin. That MOU contemplated an investment in Ellipso and Virtual Geo in the amount of $250,000,000.

### C. Draim's Duplicitous Activities

23. Draim understood that his relationship with Ellipso and Virtual Geo was intended as a long-term relationship. For example, on March 9, 1996 Draim wrote a letter to Dr. Castiel in which Draim assigns to Virtual Geo "all Patents and Intellectual Property Rights relating to the creation, development and implementation of the Virtual Geosatellite system." Draim's letter of March 9, 1996 to David Castiel is attached as Exhibit C.

24. Draim abruptly resigned from MCHI and immediately joined VGS in a maneuver designed to aid VGS in stealing and misappropriating the technology of MCHI, Ellipso and Virtual Geo. After hastily cleaning out his office at MCHI, Draim extracted and transported the materials he would need to assist VGS in competing with MCHI, Ellipso, and Virtual Geo.

25. When Draim joined VGS, his salary almost doubled and he was granted a significant equity interest in his new employer, which is now known as SRAC.

26. After joining VGS, Draim retained a laptop computer that had been illegally removed from the Ellipso's and Virtual Geo offices by Lori Lincoln, another former MCHI employee who also defected to join VGS's attempted coup. The laptop contained valuable computer software, including the Satellite Orbital Analysis Program ("SOAP"), as well as other orbital dynamics presentations. MCHI and Virtual Geo each purchased a license from Aerospace for the SOAP software.

27. Upon information and belief, Draim used Ellipso's and Virtual Geo's laptop computer to prepare presentations during the Summer of 2000, which were directed at various investors and government agencies, particularly the Department of Defense.

28. Draim has used and continues to use information unlawfully taken from MCHI, Ellipso, and Virtual Geo to develop a space design that emulates and mimics the technology of Virtual Geo.

29. In October 2000 - months quitting from MCHI and in contravention of the Delaware Chancery Court's August 31, 2000 ruling - Draim participated in a conference in Rio de Janeiro during which he conducted a presentation on the Virgo System and its technology.

30. In March 2001 – almost a year after leaving MCHI – Draim participated in a conference in Toulouse, France during which he conducted a presentation on the Virgo System and its technology.

31. Since leaving MCHI and participating in the failed takeover of Virtual Geo, Draim has filed several patent applications based upon purported inventions that are actually based upon the proprietary technology of the Ellipso System and the Virgo System.

32. Draim attempted to retain the services of a patent attorney formerly employed by MCHI and Virtual Geo. Because this patent attorney recognized that Draim's applications obviously interfered with the technology of MCHI, Ellipso, and Virtual Geo, he declined to file the applications on Draim's behalf.

33. Draim's Consulting Agreement and employment relationship both required him to assign to MCHI and Virtual Geo, as applicable, the rights to all inventions and concepts conceived by Draim or in which Draim participated which pertain to the Virgo System. Nonetheless, in or about December 2000 Draim refused to sign a form that Virtual Geo was required to file with the United States Patent and Trademark Office ("PTO") in connection with its prosecution of a patent application for the Virgo System filed months

*before* Draim's departure. Draim's refusal caused undue delay and expense to MCHI and Virtual Geo. By refusing to assign rights to inventions, Draim is attempting to create confusion as to the ownership of the intellectual property developed and owned by MCHI, Ellipso, and/or Virtual Geo. Ellipso and VGHI conceived and developed the Virgo System. On January 6, 1999, VGHI and Ellipso established Virtual Geo. VGHI gained a controlling interest in Virtual Geo by contributing to it patents and pending patents pertaining to the Virgo System.

On January 8, 1999, Ellipso gained its 11.54% interest in Virtual Geo by contributing its rights, title, and interests to the Virgo System and patents. The Plaintiffs' relationships with strategic partners, such as The Boeing Company ("Boeing"), Lockheed Martin Corporation ("Lockheed Martin"), Teledyne Brown Engineering, Inc. ("Teledyne Brown"), Israel Aircraft Industries ("IAI"), EMS Technologies, Arianespace, S.A., Harris Corporation, and L-3 Communications("L-3"), and others are crucial to their ability to successfully complete their satellite systems.

Among other things, these strategic partners contribute to the design, construction, and implementation of the constituent components of each satellite system. For example, Boeing has been under contract to provide the space segment of the Ellipso System, in collaboration with Harris, L-3 and IAI. Lockheed Martin had made an initial commitment related to the construction and launch of the Virgo System. Lockheed Martin submitted a proposal to develop the ground segment for the Ellipso System. The Plaintiffs also look to their strategic partners to make financial contributions through vendor and equity financing.

III.  Counts

## COUNT I

### Breach of Noncompetition and Nondisclosure Obligations

34.  The Plaintiffs reallege Paragraphs 1 through 33 and incorporate them herein by reference.

35.  The noncompetition and nondisclosure restrictions in Draim's Consulting Agreement are narrowly drawn in time, area, and manner to reasonably protect the legitimate business interests of MHCI and its affiliate Virtual Geo.

36.  Draim's need to work for VGS/SRAC, and therefore to compete with the Plaintiffs, is outweighed by the economic hardship this has caused to the Plaintiffs and the likely injury to the Plaintiffs and to the public.

37.  Through his employment with VGS/SRAC, Draim is using the Plaintiffs' confidential information, such as the Plaintiffs' strategic plans for launching the Ellipso System and Virgo System, as well as the Plaintiffs' relationships with customers, potential investors, and strategic suppliers, for the benefit of himself and VGS/SRAC.

38.  As a result of Draim's breach of his Consulting Agreement, the Plaintiffs have suffered or will suffer irreparable injury for which there is no adequate remedy at law.

## COUNT II

### Breach of Duty of Loyalty

39.  The Plaintiffs reallage Paragraphs 1 through 38 and incorporate them herein by reference.

40.  Through his employment with MHCI, Draim occupied a fiduciary relationship of trust and confidence with MHCI.

41. As a result of this fiduciary relationship of trust and confidence, MCHI provided Draim with knowledge of its most sensitive, confidential, and proprietary information so that Draim could use his skills to enhance MHCI's business.

42. With the use of this knowledge and information acquired through his employment with MHCI, Draim has attempted – on behalf of himself and VGS/SRAC – to divert business transactions with third parties that he originally had undertaken on Ellipso's behalf, thus directly competing with Ellipso.

43. The actions by Draim are a breach of the duty of loyalty he owes to his former employer, MHCI.

44. As a result of Draim's breach of the duty of loyalty, MCHI, Ellipso and Virtual Geo have suffered or will suffer irreparable injury for which there is no adequate remedy at law.

## COUNT III

### Violation of District of Columbia Uniform Trade Secret Act

45. The Plaintiffs reallege Paragraphs 1 through 44 and incorporate them herein by reference.

46. Through his Consulting Agreement of November 2, 1992, Draim agreed to treat any information provided to him during the scope of his employment with MCHI as proprietary information belonging to MCHI, its affiliated companies or any third parties.

47. In reliance upon Draim's representations in his Consulting Agreement that he would protect MCHI's proprietary trade secrets, MCHI provided Draim with knowledge of its most sensitive and confidential information.

48. Draim has used the proprietary knowledge he acquired while employed with MCHI to complete business transactions through VGS/SRAC, thus competing directly with MCHI, Ellipso, and Virtual Geo while using its trade secrets.

49. The actions of Draim are a breach of his Consulting Agreement and a violation of the Uniform Trade Secrets Act, D.C. Code 48-501 et seq. (1990) ("Trade Secrets Act").

50. As a result of Draim's breach of his Consulting Agreement and a violation of the Trade Secrets Act, MCHI, Ellipso and Virtual Geo have suffered irreparable harm for which there is no adequate remedy at law.

## COUNT IV

### Misappropriation and Conversion

51. The Plaintiffs reallege Paragraphs 1 through 50 and incorporate them herein by reference.

52. Draim misappropriated and converted the property of MCHI, Ellipso, and Virtual Geo, including certain software, hardware, and intellectual property, for his own benefit and the benefit of his new employer, VGS/SRAC.

53. Draim utilized the stolen computer and MCHI's SOAP software package to develop a concept he refers to as "Continuous Orbital Broadband Repeating Arrays" or "COBRA." Draim's use of property that belongs to MCHI, Ellipso, and Virtual Geo for the benefit of himself and VGS/SRAC constitutes conversion of MCHI's property.

IV. **Jury Demand**

54. The Plaintiffs hereby request a trial by jury of all claims and issues on which the Plaintiffs have a right to trial by jury.

## V. Request for Relief

55.     For the foregoing reasons, Draim has breached his Agreement, seriously threatening the Plaintiffs with irreparable harm. The harm to the Plaintiffs without an injunction would overwhelm the injury to Draim should an injunction be granted. The public has an interest in such a preliminary order, which the Plaintiffs request the Court to issue as follows:

   a)    Enjoin Draim from releasing, communicating, utilizing or transferring any and all proprietary information which was acquired by Draim during the scope of his employment with Ellipso;

   b)    Enjoin Draim from using or disclosing the Plaintiffs' confidential information related to the Ellipso System and Virgo System;

   c)    Enjoin Draim from further breaching any provision of his Consulting Agreement he signed on November 2, 1992;

   d)    Schedule a prompt hearing to determine the appropriate compensatory and punitive damages against Draim.

Respectfully submitted,

By:    *Pierre Barkats*
Pierre-Philippe Barkats (DC Bar # 381166)
Barkats & Associates, *Chartered*
1250 Eye Street, N.W.
Washington, D.C. 20005
Tel: (202) 682-1396
Fax: (202) 789-0895

ATTORNEYS FOR PLAINTIFFS
MOBILE COMMINUCATIONS
HOLDINGS, INC., ELLIPSO, INC. and
VIRTUAL GEOSATELLITE, LLC

Pierre Philippe Barkats (D.C. Bar. No. 381166)
Barkats & Associates, *Chartered*
1250 Eye Street, NW
Washington, D.C. 20005
Tel: (202) 682-1395
Fax: (202) 789-0895

### CERTIFICATE OF SERVICE

I certify that the foregoing Verified Complaint were served by hand this 5th day of November, 2001 on:

John Draim
9310 Telfer Court
Vienna, VA 22182-3438

*Delphine Paris*