# Exhibit 12

Memorandum in Support of Motion for Summary Judgment and for an Award of Attorneys Fees and Costs by John E. Draim

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| MOBILE COMMUNICATIONS HOLDINGS, INC.<br>1133 21st Street, N.W.<br>Washington, D.C. 20036<br><br>ELLIPSO, INC.<br>1133 21st Street, N.W.<br>Washington, D.C. 20036<br><br>VIRTUAL GEOSATELLITE, LLC<br>1133 21st Street, N.W.<br>Washington, D.C. 20036<br><br>VIRTUAL GEOSATELLITE HOLDINGS, INC.<br>1133 21st Street, N.W.<br>Washington, D.C. 20036<br><br>Plaintiffs,<br><br>v.<br><br>JOHN E. DRAIM<br><br>Defendant. | ) | Civil Action No. 02-112A |

**VERIFIED AMENDED COMPLAINT**
**FOR MONETARY AND INJUNCTIVE RELIEF**

Introduction

This is an action for preliminary and permanent injunctive relief, as well as monetary damages, based on breach of a Noncompetition and Nondisclosure Agreement, breach of the duty of loyalty, in violation of the District of Columbia Uniform Trade Secret Act, and misappropriation and conversion.

## I. PARTIES AND JURISDICTION

1. Ellipso, Inc. ("Ellipso") is a Delaware corporation with its principal place of business at 1133 21st Street, N.W., Washington, D.C. Ellipso is the parent company of Mobile Communications Holdings, Inc.

2. Mobile Communications Holdings, Inc. ("MCHI") is a Delaware corporation with its principal place of business at 1133 21st Street, N.W., Washington, D.C.

3. Virtual Geosatellite Holdings, Inc. ("VGHI") is a Delaware corporation with its principal place of business at 1133 21st Street, N.W., Washington, D.C.; Virtual Geosatellite, LLC ("Virtual Geo") is a Delaware limited liability company with its principal place of business at 1133 21st Street, N.W., Washington, D.C.

4. John Draim is a former Ellipso employee who, upon information and belief, resides at 9310 Telfer Court, Vienna, Virginia 22182.

5. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. Sections 1332 and 1367, and D.C. Code Section 11-921. All plaintiffs have their principal place of business in the District of Columbia and all conduct that is the subject of this action took place in the District of Columbia. The amount in controversy exceeds, exclusive of interests and costs, the sum of seventy-five thousand dollars ($75,000.00).

## II. FACTS

### A. Relationship Among Plaintiffs and Strategic Partners

6. Ellipso and Virtual Geo are affiliated companies. Ellipso owns 75% percent of Virtual Geo. David Castiel, a resident of the District of Columbia, president and chief executive officer of Ellipso, holds controlling ownership interests in both Ellipso and VGHI. The remaining 25% percent of Virtual Geo is owned by Sahagen Satellite Technology Group, LLC, now known as SST Global Technology, LLC.

7. The Plaintiffs have designed and are implementing two patented satellite communications systems. The first is a narrowband mobile satellite system called the "Ellipso System." The Ellipso System is one of only four mobile satellite systems in the world with a license from the United States Federal Communications Commission ("FCC") to operate on the L-band frequency. Through MCHI, Ellipso filed its license application with the FCC in 1990. Seven years and tens of millions of dollars later, the FCC issued Order and Authorization, 12 FCC Rcd. 9663 (1997), authorizing Ellipso to construct and launch a first-generation constellation of at least sixteen (16) low-earth-orbit satellites and one (1) in-orbit spare satellite Ellipso Constellation[1]. The Ellipso System received yet another FCC license in July 2001 authorizing the Ellipso System to operate on the 2GHz frequency.

8. The second system is a broadband satellite system called the "Virtual Geo System." In March 1995, VGHI filed for a patent to protect aspects of the technology that form the basis of its Virtual Geo System. In late 1998, the first of many patents was issued to VGHI. On January 8, 1999, Virtual Geo submitted a license application to the FCC for authority to launch and operate the Virtual Geo System, a global, fixed-satellite service system employing non-geostationary satellites in sub-geosynchronous elliptical orbits on Ku-band and C-band frequencies.

9. Although the Virtual Geo license application remains pending, the FCC has stated in writing that a license will be issued with the exact terms and conditions to be determined. Using their patented elliptical orbits and designs (additional patents were awarded in the meantime, and others were applied for and are still pending), Plaintiffs intend to provide wireless voice, data, facsimile, paging, geolocation, video, and Internet services to subscribers

---

[1] Although the FCC recently revoked the L-band license for alleged "failure to meet a construction milestone", Ellipso has filed a petition seeking reconsideration of that decision and has received the support of its shareholder and strategic partner, The Boeing Company.

around the world. The unique elliptical-orbit architectures allow the Plaintiffs to tailor satellite coverage to match population distribution, and/or to "follow" the continents for better market coverage. In addition, Virtual Geo technology allows an unprecedented reuse of spectrum, making a variety of applications possible, including military and broadband on-demand video.

10. Because of its reuse potential, there exists an opportunity for Ellipso and Virtual Geo to license their technology to leading aerospace companies, as well as service operators, and others.

11. Information related to the Ellipso and Virtual Geo Systems is highly technical, sensitive, and confidential. This information – like the Ellipso and Virtual Geo Systems, themselves – took years to develop and constitutes trade secrets in a highly competitive field. Any leakage of the information to Plaintiffs' competitors or potential competitors will cause the Plaintiffs irreparable harm.

12. Ellipso and VGHI conceived and developed the Virtual Geo System. On January 6, 1999, VGHI and Ellipso established Virtual Geo. Initially, VGHI gained a controlling interest in Virtual Geo by contributing to it patents and pending patents pertaining to the Virtual Geo System, and Ellipso received a minority interest by contributing money and other assets. In late 2001, Ellipso acquired VGHI's interest in Virtual Geo through a stock swap. The Plaintiffs' relationships with strategic partners, such as The Boeing Company ("Boeing"), Lockheed Martin Corporation ("Lockheed Martin"), Teledyne Brown Engineering, Inc. ("Teledyne Brown"), Israel Aircraft Industries ("IAI"), EMS Technologies, Arianespace, S.A., Harris Corporation, and L-3 Communications ("L-3"), and others are crucial to their ability to successfully complete their satellite systems. Among other things, these strategic partners contribute to the design, construction, and implementation of the constituent components of each satellite system. For example, Boeing has been under contract to provide the space segment of the Ellipso System, in collaboration with Harris, L-3 and IAI. The Plaintiffs also

look to their strategic partners to make financial contributions through vendor and equity financing.

B. Draim's Employment with Ellipso

13. On November 1, 1992, Draim entered into a Consulting Agreement with MCHI.

14. The operative portion of this Agreement states in sections 8 and 9 as follows:

> **8. Consultant Not to Engage in Conflicting Activities.**
>
> During the time of this Agreement, Consultant shall not enter into any activity, employment, or business arrangement which conflicts with Client's interest or Consultant's obligations under this Agreement. In view of the sensitive nature of Consultant's status, Client shall have the option of terminating this Agreement at any time if, in its sole judgment, a conflict of interest exists or is imminent. Upon such termination Client shall reimburse Consultant for all services rendered, pursuant to paragraph 4 of this Agreement, either directly or with a promissory note. Consultant shall advise Client of its position with respect to any activity, employment, or business arrangement contemplated by Consultant which may be relevant to this Paragraph. For this purpose Consultant agrees to disclose any such plans to Client prior to implementation.
>
> **9. Trade Secrets and Inventions.**
>
> Consultant shall treat as proprietary any information belonging to Client, its affiliated companies, or third parties, disclosed to Consultant in the course of Consultant's services. Consultant assigns and agrees to assign to Client or its nominee all rights in inventions or other proprietary information conceived by Consultant during the term of this Agreement with respect to any work which Consultant performs, and is financially compensated for by Client or the Corporation, under this Agreement. In addition, the Corporation will pay Consultant an amount not to exceed $2,000 as a bonus upon the completion of successful filing for any one patent. The actual amount will be determined in inverse proportion to the number of co-inventors listed in the patent application(s). If Consultant is the sole inventor, the full $2,000 will be paid. Likewise, upon successful issuance of any one patent, the Corporation will pay Consultant an additional bonus not to exceed $10,000, the actual amount of the bonus being determined in inverse proportion to the number of co-inventors listed in the patent(s).

15. In July, 1997, Draim became a full-time employee of MCHI. As an employee, Draim received additional benefits from MCHI, including stock options,

insurance, and paid vacation time; however, the underlying terms of his Consulting Agreement continued in effect. For example, he continued to receive patent bonuses throughout his employment. Altogether, Draim received more than $100,000 in the form of bonuses, in addition to his consulting fees, salary and benefits which were in excess of $800,000.

16. During his affiliation with Plaintiffs, Draim was entrusted with the most sensitive and confidential information concerning, inter alia, the Ellipso and Virtual Geo Systems.

17. Throughout his tenure with MCHI, Draim was responsible for assisting in the development and refinement of the orbital architecture and associated design of the Ellipso and Virtual Geo Systems, and optimizing satellite launch strategies.

18. On April 14, 2000, VGS, Inc. ("VGS") was incorporated in Delaware, with its principal place of business located in Washington, D.C., in order to implement a scheme to wrest control of Ellipso and Virtual Geo from Castiel so that VGS and its principals could effectively steal and then exploit Plaintiffs' assets. VGS's takeover attempt was engineered by: (a) Peter D. Sahagen, a member of the Board of Managers of Virtual Geo who had a controlling interest in VGS; (b) Thomas Quinn, whom VGHI appointed to the Board of Managers of Virtual Geo; and (c) Neel H. Howard, a former Ellipso officer who left Ellipso within days after helping to establish, and becoming the President of, VGS. The essence of the scheme was to surreptitiously merge Virtual Geo into VGS, without Castiel's knowledge, such that Peter Sahagen would then own a controlling interest of Virtual Geo.

19. On May 24, 2000, Draim abruptly resigned from MCHI with neither mention, nor notice of his intention to join a competitor.

20. The following day, May 25, 2000, Draim became employed by VGS.

21. On August 31, 2000, the Chancery Court of the State of Delaware held that VGS's attempted takeover was illegal; the Court invalidated the purported merger and

enjoined VGS from asserting ownership and control over Plaintiffs' assets. The Supreme Court of the State of Delaware subsequently affirmed the Chancery Court's ruling in all respects. Nonetheless, on information and belief, Draim and others, including VGS and its successor in interest, continue to interfere with the Plaintiffs' business relationships and to steal Plaintiffs' Ellipso and Virtual Geo Systems, intellectual property, proprietary technology, and other assets.

C. Draim's Duplicitous Activities

22. Draim, in concert with others, has contacted several of Plaintiffs' strategic partners, seeking to have them work with VGS instead of Ellipso and Virtual Geo. These partners include the Aerospace Corporation, Draper Laboratories, Lockheed Martin, and Boeing and its Sea Launch Division. His efforts resulted in the cancellation of an important meeting in June 2000 with Sea Launch, during which Virtual Geo and Sea Launch were going to discuss Sea Launch's role in the deployment of the Virtual Geo System.

23. Draim understood that his relationship with Plaintiffs was intended to be a long-term relationship. For example, on March 9, 1996, Draim wrote a letter to Dr. Castiel in which he assigned to VGHI "all Patents and Intellectual Property Rights relating to the creation, development and implementation of the Virtual Geosatellite system."

24. Draim's resignation from MCHI and his immediate reemployment by VGS was intended to aid VGS to steal and misappropriate Plaintiffs' technology. After hastily cleaning out his office at MCHI, Draim extracted and transported the materials he would need to enable VGS to compete successfully with Plaintiffs.

25. When Draim joined VGS, his salary almost doubled and he was granted a significant equity interest in his new employer, which is now known as Space Resource America Corporation ("SRAC"), another Delaware corporation doing business in Washington, D.C., as the successor in interest to VGS.

26. When leaving MCHI and joining VGS, Draim retained a laptop computer that had been illegally removed from the Plaintiffs' offices. The laptop contained valuable

computer software, including the Satellite Orbital Analysis Program ("SOAP"), as well as other orbital dynamics presentations. MCHI and Virtual Geo each purchased a license from Aerospace for the SOAP software.

27. On information and belief, during the summer of 2000, Draim used this laptop computer to prepare presentations which were directed at various investors and government agencies, including the Department of Defense.

28. On information and belief, Draim has used and continues to use information unlawfully taken from Plaintiffs to develop a space design that emulates and mimics the technology of Virtual Geo.

29. On information and belief, Draim participated in a conference in Rio de Janeiro in October, 2000, during which he made a presentation on the Virtual Geo System and its technology.

30. On information and belief, Draim participated in a conference in Toulouse, France, in March 2001, during which he made a presentation on the Virtual Geo System and its technology.

31. On information and belief, Draim has, since leaving MCHI and participating in the failed takeover of Virtual Geo, filed several patent applications based on inventions that emulate the proprietary technology of the Ellipso and/or Virtual Geo Systems.

32. Draim consulted with a patent attorney formerly employed by MCHI and Virtual Geo. Because this attorney recognized that Draim's applications infringed upon Plaintiffs' technology, he declined to file the applications on Draim's behalf.

33. Draim's Consulting Agreement, his March 9, 1996 letter, and his employment relationship all required him to assign to MCHI and VGHI, as applicable, the rights to all inventions and concepts conceived by Draim which pertain to the Virtual Geo System.

System.

34. On February 3, 2000, Defendant Draim co-signed with Dr. David Castiel a Provisional Patent Application concerning the utilization of the Virtual Geo technology and its application to multiple constellations of elliptical orbits using two-degree spacing; in accordance with his Agreement with Plaintiffs, Draim was paid a bonus for this filing.

35. On information and belief, following his departure from MCHI and his employment by VGS, Draim laid claim to the technology that was the subject of the February 3, 2000 Provisional Patent Application.

36. On information and belief, Draim has claimed to have developed a technology which he calls "Communications Orbiting Broadband Repeating Array" ("Cobra") which is, in essence, Virtual Geo technology.

37. In or around December, 2000, Draim refused to sign a form that Virtual Geo was required to file with the U.S. Patent and Trademark Office ("PTO") in connection with its patent application for the Virtual Geo System filed months *before* Draim's departure. Draim's refusal has caused undue delay and expense to Plaintiffs.

38. By refusing to assign rights to inventions, Draim is attempting to create confusion as to the ownership of the intellectual property developed and owned by Plaintiffs.

**<u>COUNT I</u> -- <u>Breach of Noncompetition and Nondisclosure Obligations</u>**

39. Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

40. The noncompetition and nondisclosure restrictions in Draim's Agreement, together with the commitments he made in his March 9, 1996 letter to Dr. Castiel, are narrowly drawn in time, area, and manner so as reasonably to protect Plaintiffs' legitimate business interests.

41. Through his employment with VGS/SRAC, Draim is using the Plaintiffs'

confidential information, such as the Plaintiffs' strategic plans for launching the Ellipso and Virtual Geo Systems, as well as the Plaintiffs' relationships with customers, potential investors, strategic partners and suppliers, for the benefit of himself and VGS/SRAC.

42. As a result of Draim's breach of his contractual commitments, Plaintiffs have suffered and will suffer irreparable injury for which there is no adequate remedy at law.

**COUNT II – Breach of Duty of Loyalty**

43. Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

44. Through his consultancy and employment with MCHI, there existed a fiduciary relationship of trust, loyalty, and confidence between Plaintiffs and Drain.

45. As a result of this fiduciary relationship, Plaintiffs provided Draim with knowledge of their most sensitive, confidential, and proprietary information so that Draim could use his skills to enhance Plaintiffs' business.

46. With this knowledge and information, acquired through his relationship with Plaintiffs, Draim has attempted, on behalf of himself and VGS/SRAC, to misappropriate Plaintiffs' intellectual property and to complete business transactions with third parties that he had originally undertaken on Plaintiffs' behalf, in direct competition with Plaintiffs.

47. Draim's conduct was not only in violation of his duty of loyalty owed to Plaintiffs, but also constituted tortious interference with Plaintiffs' contractual relationships and economic expectancy.

48. As a result of Draim's breach of the duty of loyalty, Plaintiffs have suffered or will suffer irreparable injury for which there is no adequate remedy at law.

**COUNT III – Violation of the District of Columbia Uniform Trade Secret Act**

49. Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

50. Through his Consulting Agreement, Draim agreed to treat any information provided to him during the scope of his employment with MCHI as proprietary information belonging to MCHI, its affiliated companies or any third parties.

51. In reliance upon Draim's representations in his Agreement that he would protect MCHI's proprietary trade secrets, MCHI provided Draim with knowledge of its most sensitive and confidential information.

52. Draim has used the proprietary knowledge he acquired while working for Plaintiffs to complete business transactions through VGS/SRAC, thus competing directly with Plaintiffs by using their trade secrets.

53. Draim's actions constitute a breach of his Consulting Agreement and violate the D.C. Uniform Trade Secrets Act. D.C. Code §§ 48-501, et seq. (1990) ("Trade Secrets Act").

54. These violations of the Trade Secrets Act have, and will continue to inflict on Plaintiffs irreparable harm for which there is no adequate remedy at law.

**COUNT IV – Misappropriation and Conversion**

55. Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

56. Draim misappropriated and converted Plaintiffs' property, including certain computer software, hardware, and intellectual property, for his own benefit and the benefit of his new employer, VGS/SRAC.

57. Draim utilized the stolen computer and MCHI's SOAP software package to develop a concept refered to as "Cobra." Draim's use of Plaintiffs' property to benefit himself and VGS/SRAC constitutes an unlawful conversion of Plaintiffs' property in violation, inter alia, of his March 9, 1996 commitment to assign to plaintiff VGHI "all patents and Intellectual Property Rights relating to the creation, development and

implementation of the Virtual Geosatellite system."

**COUNT V – Breach of Contract**

58. Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

59. During the period Draim was a consultant to, and employee of MCHI, Draim was paid compensation in the form of consulting fees, salary, bonuses for patents and patent applications, and employee benefits, including stock options, insurance and paid vacation; the monetary value of the compensation he received is $806,533.

60. Draim's compensation was contingent upon his honoring his duty of loyalty and his compliance with his contractual commitments. By breaching his duty of loyalty and contractual commitments, Draim forfeited his entitlement to this compensation.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court award the following relief:

(A) A preliminary and permanent injunction forbidding Draim from appropriating, using, releasing, communicating, or transferring any and all proprietary information acquired by him during the scope of his consultancy and employment by plaintiffs;

(B) A preliminary and permanent injunction forbidding Draim from using or disclosing the Plaintiffs' confidential information related to the Ellipso System and Virgo Systems, together with any other technologies or systems derived thereupon, regardless of their denomination;

(C) A preliminary and permanent injunction forbidding Draim from breaching any provision of his November 2, 1992, Consulting Agreement and requiring him to perform all commitments contained in his March 9, 1996 letter;

(D) Appropriate compensatory and punitive damages against Draim in amounts

to be determined including, but not limited to, the $806,533 compensation paid by Plaintiffs to Draim for his services, plus interest;

(E) Such further relief as may be just and appropriate, including plaintiffs' attorney fees and costs.

Respectfully submitted,

Arthur L. Fox, II ( Bar No. 2022)
Henry M. Banta
Martin Lobel

LOBEL, NOVINS & LAMONT
1275 K Street, N.W., Suite 770
Washington, D.C. 20005
(202) 371-6626

Attorneys for Plaintiffs

March 4, 2002