Exhibit 1: Settlement Agreement Between Ellipso and SRA, executed July 20, 2005 (with subsequent third-party executions).

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Settlement Agreement") dated as of July 20, 2005 is made by and among:

PETER D. SAHAGEN ("Sahagen"); SST GLOBAL TECHNOLOGY, LLC ("SST"), a Delaware limited liability company formerly known as SAHAGEN SATELLITE TECHNOLOGY GROUP, LLC ("SSTG"), a Delaware limited liability company; SPACE RESOURCE CORPORATION ("Space Resource"), a Delaware corporation; SPACE RESOURCE INTERNATIONAL ("Space Resource International"), a Bermuda corporation; SPACE RESOURCE AMERICA CORP., a Delaware corporation; VGS, INC. ("VGS"), a Delaware corporation, all of the above c/o Ardustry Entertainment, LLC, 9255 Sunset Boulevard, Suite 1000, West Hollywood, California 90069; JOHN DRAIM ("Draim"), residing at 9310 Telfer Court, Vienna, Virginia 22182; NEEL HOWARD ("Howard"), residing at 200 Skidmore Boulevard, Gaithersburg, Maryland 20877; TOM H. QUINN ("Quinn"), residing at 1217 28th Street, N.W., Washington, D.C. 200007; RICHARD A. INCIARDI ("Inciardi"), residing at 19800 Helmond Way, Montgomery Village, Maryland 20886 (all of the above individuals and corporations collectively, the "Sahagen Parties");

and

DAVID CASTIEL ("Castiel"), residing at 4819 Indian Lane, N.W., Washington, D.C. 20016; ELLIPSO, INC. ("Ellipso"), a Delaware corporation with a principal place of business located at 4410 Massachusetts Avenue, N.W., No. 385, Washington, D.C. 20016; VIRTUAL GEOSATELLITE, LLC ("Virtual Geo"), a Delaware limited liability company with a principal place of business located at 4410 Massachusetts Avenue, N.W., No. 385, Washington, D.C. 20016; MOBILE COMMUNICATIONS HOLDINGS, INC. ("MCHI"), a Delaware



corporation with a principal place of business located at 4410 Massachusetts Avenue, N.W., No. 385, Washington, D.C. 20016; VIRTUAL GEOSATELLITE HOLDINGS, INC. ("Virtual Geo Holdings"), a Delaware corporation with a principal place of business located at 4410 Massachusetts Avenue, N.W., No. 385, Washington, D.C. 20016; JILL STERN ("Stern"), residing at 4846 Glenbrook Road, N.W., Washington, D.C. 20016; and JANE K. CHAPMAN ("Chapman"), as executrix of the Estate of John Chapman, deceased, residing at 316 Pine Creek Avenue, Fairfield, Connecticut 06430 (collectively, the "Castiel Parties")(each, and all of them individually, a "Party" and collectively, the "Parties"). Individuals Draim, Howard, Inciardi, Quinn, Stern and Chapman, while parties to one or more of the lawsuits identified below, are not necessary parties to this Settlement, but only to the settlement of the individual cases in which they are parties, and they will sign, or counsel for them will sign, only the Release (in the form of Appendices C-J hereto) and the Stipulation of Dismissal With Prejudice in the case in which they appear, as appropriate.

## W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲:

WHEREAS, several of the Parties to this Settlement Agreement are currently parties to, and participants in, the actions entitled <u>SST Global Technology, LLC v. Chapman, et al.</u>, 02 Civ. 7687 (CSH)(S.D.N.Y.); <u>Draim v. Virtual Geosatellite, LLC, et al.</u>, Case No. 01-1588-A (JR)(D.C.D.C.); <u>MCHI, et al. v. Draim</u>, Case No. 01-08202 (JR)(D.C. D.C.); <u>Ellipso, Inc., et al. v. Inciardi</u>, Case No. 02-0433 (JR)(D.C.D.C.); and/or <u>Virtual Geosatellite, LLC, et al. v. Sahagen, et al.</u>, Case No. 3286-00 (Super. Ct., D.C.) (each an "Action" and collectively, the "Actions"); and

WHEREAS, one or more of the Sahagen Parties claims ownership of the

intellectual property set forth and described in Exhibit A to this Settlement Agreement; and

WHEREAS, one or more of the Castiel Parties claims ownership of the intellectual property set forth and described in Exhibit B to this Settlement Agreement; and

WHEREAS, Sahagen currently owns stock and/or membership interests in Ellipso and Virtual Geo; and

WHEREAS, the Sahagen Parties, on the one hand, and the Castiel Parties, on the other, desire to settle and compromise all claims and disputes between them in accordance with the provisions of this Settlement Agreement, including, without limitation, any and all claims that were or could have been raised in the Actions or in any other litigation in which they participated in the past, any and all claims relating to, or arising as a consequence of, their claim of ownership of the intellectual property set forth and described in Exhibits A and B to this Settlement Agreement, and any and all claims relating to, or arising as a consequence of, Sahagen's ownership of stock and/or membership interests in Ellipso and Virtual Geo;

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged by each Party, it is agreed as follows:

## ARTICLE I

### Settlement and Dismissal of the Actions

1.1. Incident to the execution of this Settlement Agreement, each and every Party to this Settlement Agreement who is also a party in one or more of the Actions shall, through their counsel of record in said Action, execute Stipulations of Dismissal With Prejudice in the form deemed appropriate by their counsel. Counsel of record for defendants in each Action

- 3 -



shall, within five (5) business days of the execution of this Settlement Agreement, file said stipulation with the court in which said Action is pending and shall, simultaneous therewith, request that said stipulation be "so ordered" by the Court.

1.2. Sahagen represents and warrants that in connection with, and as a condition precedent to, this Settlement Agreement, SPACE RESOURCE INTERNATIONAL / SPACE RESOURCE CORPORATION shall satisfy any and all claims and/or demands that were and/or could have been asserted by Draim against the Castiel Parties, whether asserted in any Action or otherwise.

1.3. Sahagen represents and warrants that in connection with, and as a condition precedent to, this Settlement Agreement, he shall personally satisfy any and all claims and/or demands that were and/or could have been asserted by Inciardi against the Castiel Parties, whether asserted in any Action or otherwise. Inciardi has agreed to, and by signing his Release, does thereby waive and release any and all claims and/or demands that were and/or could have been asserted by Inciardi against the Castiel Parties and/or the Sahagen Parties, or any of them, whether asserted in any Action or otherwise.

1.4. There shall be no monetary payment from any of the Castiel Parties to any of the Sahagen Parties, or from any of the Sahagen Parties to any of the Castiel Parties, in connection with the consummation of this Settlement Agreement. Each Party shall bear its own expenses, costs and attorneys' fees in the Actions, as well as in the negotiation and execution of this Settlement Agreement.



## Article II

## Transfer of Stock Interests in Ellipso and Virtual Geo

2.1. Sahagen hereby agrees to transfer and assign to Ellipso and Virtual Geo any and all stock and/or membership interests he currently holds in said entities. In connection with the foregoing, Sahagen agrees that he shall, within five (5) business days of the execution of this Settlement Agreement, return to Ellipso and/or Virtual Geo any and all certificates or other evidences of his ownership interest in said entities. Should Sahagen fail to locate and return such certificates or evidences of ownership within said period, the Parties agree that all such certificates or other evidences shall be deemed cancelled and withdrawn, the intent being that Sahagen shall have no ownership interest in either such entity following the consummation of this Settlement Agreement.

2.2. Notwithstanding the foregoing, should Sahagen reach an agreement with John Keough, or New England Phoenix, and should Sahagen request that Ellipso issue shares pursuant to the letter which appears as Exhibit C hereto, that request shall be honored. Following the cancellation on the corporation's books of the shares or membership interests owned by Sahagen, Ellipso (but not Vitural Geo) shall re-issue an equal number of shares (24,716) to John Keough or New England Phoenix without further action; if John Keough requests transfer to another entity, the Ellipso Board will have to approve that entity as a transferee.

## ARTICLE III

## Acknowledgment of Ownership

3.1. The Castiel Parties, and each of them, hereby acknowledge and agree that one or more of the Sahagen Parties is, to the extent that the Patent Office confers ownership, the



lawful owner of the patents, claims and protectable improvements set forth and described in

Exhibit A to this Settlement Agreement. In connection with the foregoing, the Castiel Parties,

and each of them, hereby covenant and agree that they will not make commercial use of said

technologies or improvements without the express written consent of the relevant Sahagen

Parties.

       3.2. The Sahagen Parties, and each of them, hereby acknowledge and agree that

one or more of the Castiel Parties is, to the extent that the Patent Office confers ownership, the

owner of the patents, claims and protectable improvements set forth and described in Exbibit B

to this Settlement Agreement. In connection with the foregoing, the Sahagen Parties, and each

of them, hereby covenant and agree that they will not make commercial use of said technologies

or improvements without the express written consent of the relevant Castiel Parties.

## ARTICLE IV.

### Releases; Covenant Not To Sue

       4.1. Incident to the execution of this Settlement Agreement, the Castiel Parties,

and each of them, shall execute and deliver to Wayne S. Williams, Esq. general releases of all

claims in favor of said parties as against the Sahagen Parties, and each of them, in the form

annexed hereto as Exhibit H. It is understood and agreed that said releases are intended to, and

shall, fully release and discharge the Sahagen Parties, and each of them, from all actions, causes

of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties,

covenants, contracts, controversies, agreements, promises, variances, trespasses, damages,

judgments, extents, executions, claims, and demands whatsoever, whether know or unknown,

and whether in law, admiralty or equity, which the Castiel Parties, or any one of them, ever had,



may now have or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of the execution of this Settlement Agreement including, without limitation, any and all claims that were or could have been raised in the Actions, any and all claims relating to, or arising as a consequence of, the Parties' claim of ownership of the intellectual property set forth and described in Exhibits A and B to this Settlement Agreement, and any and all claims relating to, or arising as a consequence of, Sahagen's ownership of stock and/or membership interests in Ellipso and Virtual Geo.

4.2.  Incident to the execution of this Settlement Agreement, the Sahagen Parties, and each of them, shall execute and deliver to Tighe Patton Armstrong Teasdale, PLLC, LLP general releases of all claims in favor of said parties as against the Castiel Parties, and each of them, in the form annexed hereto as Exhibit I.  It is understood and agreed that said releases are intended to, and shall, fully release and discharge the Castiel Parties, and each of them, from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, whether know or unknown, and whether in law, admiralty or equity, which the Sahagen Parties, or any one of them, ever had, may now have or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of the execution of this Settlement Agreement including, without limitation, any and all claims that were or could have been raised in the Actions, any and all claims relating to, or arising as a consequence of, the Parties' claim of ownership of the intellectual property set forth and described in Exhibits A and B to this Settlement Agreement, and any and all claims relating to,



or arising as a consequence of, Sahagen's ownership of stock and/or membership interests in Ellipso and Virtual Geo.

4.3. Separate from, and in addition to, the general releases set forth and described in Articles 4.1 and 4.2., supra, the Castiel Parties and the Sahagen Parties, and each of them, hereby agree and covenant not to sue the other, or any one of the others, by reason of the practice by said other party, its successors or assigns, of inventions covered by the claims of patents owned by way of assignment or otherwise, by said other party, its successors or assigns, in a patent infringement or declaratory judgment action, suit or proceeding in any United States District Court or state court challenging the intellectual property owned by the other party (it being understood that state court actions are not permitted for patent infringement under the Constitution and federal patent statutes, but it being agreed that no state court action shall be commenced by any party hereto against any other party hereto in the nature of a patent infringement suit).

Each party agrees on behalf of itself and on behalf of its successors and assigns, that with the exception of infringements that may arise out of, in connection with, or incidental to the practice of inventions covered by the claims of patents it owns, by assignment or otherwise, it shall not infringe patents owned by the other party, its successors or assigns.

In the event a third party takes a controlling interest in a Sahagen Party or a Castiel Party which is the owner, by assignment or otherwise, of patents covered hereunder, this covenant not to sue shall run to such new controlling-interest Party, except for intentional and malicious patent infringement.



This covenant shall apply to any court of competent jurisdiction worldwide, and shall not be construed as a license, nor affect any remedies available under Articles 3.1 or 3.2, supra. This covenant shall apply to any company, partnership or other legal entity, even if not a party hereto, which is owned or controlled by David Castiel or by Peter D. Sahagen.

## ARTICLE V

### Miscellaneous Provisions

5.1. **No Admission.** Each Party to this Settlement Agreement agrees that this Settlement Agreement is not intended as, and does not constitute, an admission by any Party of any fault, liability, or wrongdoing.

5.2. **Further Assurances.** The Parties agree to perform (or procure the performance of) all further acts and things, and execute and deliver (or procure the execution and delivery of) such further documents as may be required by law or as the other Parties may reasonably require to implement and/or give effect to this Settlement Agreement and the transactions contemplated by it.

5.3. **Representations And Warranty As To Authority.** Each of the Parties represents and warrants to the other Parties that such Party has full power and authority to enter into and perform the acts contemplated to be performed pursuant to this Settlement Agreement. The Parties acknowledge and agree that this Settlement Agreement constitutes a valid and legally binding obligation of the Parties, enforceable in accordance with its terms and conditions. The Parties represent and warrant that they need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in

- 9 -



order to consummate the transactions contemplated by this Settlement Agreement. The Parties

further represent and warrant that there is no right, agreement, or law that limits its and/or their

ability to enter into this Settlement Agreement or that would be violated by its entering into this

Settlement Agreement. The execution, delivery and performance of this Settlement Agreement

and all other agreements contemplated hereby have been duly authorized by the Parties.

    5.4. **Non-Contravention**. Each of the Parties represents and warrants that

neither the execution and delivery of this Settlement Agreement, nor the consummation of the

transactions contemplated hereby, will violate any constitution, statute, regulation, rule,

injunction, judgment, order, decree, ruling, charge, or other restriction of any government,

governmental agency, or court to which the Parties are subject, or conflict with, result in a

breach of, or constitute a default under any agreement, contract, lease, license, instrument, or

other arrangement to which the Parties are a party.

    5.5. **Notices.** All notices, requests, demands and other communications hereunder

shall be in writing and shall be deemed to have been duly given if delivered by hand or mailed,

registered or certified mail, return receipt requested, postage prepaid, to the following

representatives:

    (a)    If to Castiel (or any Castiel Party):

        Thomas Earl Patton, Esq. or
        David J. Taylor, Esq.
        Tighe Patton Armstrong Teasdale, PLLC
        1747 Pennsylvania Ave., N.W. Suite 300
        Washington, DC 20006

    (b)    If to Sahagen (or any Sahagen Party):

        Wayne S. Williams, Esq.
        c/o Ardustry Entertainment, LLC



9255 Sunset Boulevard
Suite 1000
West Hollywood, CA 90069

(c)     If to Draim, with additional notice to:
John F. Anderson, Esq.
Troutman Sanders, LLP
1660 International Drive, Suite 600
McLean, Virginia 22102

Any party may designate a new representative for the receipt of notices under this Settlement Agreement by giving notice to the above representatives in accordance with this article.

5.6. **Binding Effect.** This Agreement shall be binding upon, and shall inure to the benefit of, the Parties, their respective parent entities, subsidiaries and affiliates, and their respective directors, officers, employees, principals, shareholders, owners, agents, representatives, predecessors, successors, administrators and assigns, to the full extent permitted by law.

5.7. **Modifications Must Be In Writing.** This Settlement Agreement, including exhibits, embodies the entire agreement and understanding of the Parties hereto and terminates and supersedes all prior independent agreements and understandings between and among them. This Settlement Agreement shall not be modified or amended except in a writing signed by all the Parties to this Settlement Agreement.

5.8. **Severability.** If any provision of this Settlement Agreement is held to be invalid, void, illegal, or unenforceable for any reason by a court of competent jurisdiction, the validity, legality and enforceability of the remaining provisions of this Settlement Agreement shall not in any way be affected or impaired and shall continue in full force and effect, and the provisions of this Settlement Agreement shall be construed and interpreted, to the fullest extent

- 11 -



legally possible, to give effect to the intent of any provision held invalid, void, illegal, or unenforceable.

  5.9. **No Waiver.** Any waiver of any provision contained in or right provided by this Settlement Agreement is ineffective unless in writing. The failure of any Party to this Settlement Agreement to insist on strict compliance with any of the terms, covenants, or conditions of this Settlement Agreement by any other Party shall not be deemed a waiver of such term, covenant, or condition and any waiver or relinquishment of any right or power under this Settlement Agreement at anyone time shall not be deemed a waiver or relinquishment of any right or power for all or any other times.

  5.10. **Counterparts.** This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute a single instrument.

  5.11. **Headings.** Headings in this Settlement Agreement are for purposes of reference and convenience only, and shall not be considered in the interpretation of the language herein.

  5.12. **Interpretation.** The Parties to this Settlement Agreement acknowledge that each of them has been represented by counsel of their own choice throughout all of the negotiations which preceded the execution of this Settlement Agreement and in connection with the preparation and execution of this Settlement Agreement. None of the Parties hereto, nor their counsel, shall be deemed the drafter of this Settlement Agreement for purposes of construing the provisions hereof. The language in all parts of this Agreement shall be in all cases construed according to its fair meaning, not strictly for or against any of the Parties hereto.



5.13. **Voluntary Agreement: No Duress.** This Settlement Agreement is executed voluntarily and without any duress or undue influence on the Parties or their employees, agents, or attorneys, and no party is relying upon any inducements, promises, or oral or written representations not contained herein made by any other Party or otherwise. Each Party has had a full opportunity to review and understand this Settlement Agreement and to receive the advice of independent legal counsel regarding the terms, meaning and execution of this Settlement Agreement.

5.14. **Confidentiality.** The Parties to this Settlement Agreement shall not disclose to any person, directly or indirectly, any information concerning the terms of this Agreement except to its attorneys, accountants or other professionals who have been advised of the confidential nature of this Settlement Agreement, for the purposes of obtaining necessary professional advice, or as may be required by law, except that nothing herein shall preclude the disclosure of such information on a need to know basis to actual or potential investors in a legal entity which is, or is a successor to, a Party hereto.

5.15. **Governing Law.** This Agreement and its application shall be governed by the laws of the District of Columbia.

IN WITNESS WHEREOF, the Parties hereto have executed or caused this Settlement Agreement to be executed by their duly authorized representatives as of the date first above written.

PETER D. SAHAGEN


SST GLOBAL TECHNOLOGY, LLC

by: _____

Peter D. Sahagen, Chairman


SAHAGEN SATELLITE TECHNOLOGY GROUP

by: _____

Peter D. Sahagen, Chairman


SPACE RESOURCE CORPORATION

by: _____

Peter D. Sahagen, Chairman


SPACE RESOURCE INTERNATIONAL

by: _____

Peter D. Sahagen, Chairman


SPACE RESOURCE AMERICA CORP.


by: _____

Peter D. Sahagen, Chairman

VGS, INC.

by: _____

Peter D. Sahagen, Chairman


_____

DAVID CASTIEL


ELLIPSO, INC.

by: _____

David Castiel, President and CEO


VIRTUAL GEOSATELLITE, LLC

by: _____

David Castiel, Chairman and CEO

MOBILE COMMUNICATIONS

HOLDINGS, INC.

by: _____

David Castiel, President


VIRTUAL GEOSATELLITE HOLDINGS,
INC.

by: _____

David Castiel, President

# GENERAL RELEASE

**TO ALL TO WHOM THESE PRESENTS SHALL COME OR MAY CONCERN, KNOW THAT**

**DAVID CASTIEL, as Releasor,**

for good and valuable consideration, receipt of which is hereby acknowledged, hereby releases and discharges

**PETER D. SAHAGEN, SST GLOBAL TECHNOLOGY, LLC, SAHAGEN SATELLITE TECHNOLOGY GROUP, LLC, SPACE RESOURCE CORPORATION, SPACE RESOURCE INTERNATIONAL, VGS, INC., JOHN DRAIM, NEEL HOWARD, TOM QUINN, and RICHARD A. INCIARDI, as Releasees,**

from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which against the Releasees, the Releasor, Releasor's successors and assigns ever had, now have or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever, whether known or unknown, from the beginning of the world to the day of the date of this release.

The words "Releasor" and "Releasee" include all releasors and all releasees under this Release.

This Release may not be changed orally.

IN WITNESS WHEREOF, the Releasor has hereunto set Releasor's hand and seal on the 20 day of July, 2005.

/David Castiel

# ACKNOWLEDGMENT

STATE OF   _Washington_   )

~~COUNTY OF~~ _District of Columbia_   )   ss:

On July _20th_, 2005 before me, the undersigned, personally appeared David Castiel, personally known to me or proved on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his personal capacity, and that by affixing his signature on the instrument, executed the instrument.

_Notary Public_

My commission expires:    Juanita M. Spears
Notary Public, District of Columbia
My Commission Expires 01-31-2008

## <u>GENERAL RELEASE</u>

   TO ALL TO WHOM THESE PRESENTS SHALL COME OR MAY CONCERN, KNOW THAT

   PETER D. SAHAGEN, as Releasor,

for good and valuable consideration, receipt of which is hereby acknowledged, hereby releases and discharges

   DAVID CASTIEL, ELLIPSO, INC., VIRTUAL GEOSATELLITE, LLC, MOBILE COMMUNICATIONS HOLDINGS, INC., VIRTUAL GEOSATELLITE HOLDINGS, INC., JILL STERN, and JANE K. CHAPMAN, as Releasees,

from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which against the Releasees, the Releasor, Releasor's successors and assigns ever had, now have or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever, whether known or unknown, from the beginning of the world to the day of the date of this release.

   The words "Releasor" and "Releasee" include all releasors and all releasees under this Release.

   This Release may not be changed orally.

   IN WITNESS WHEREOF, the Releasor has hereunto set Releasor's hand and seal on the ___ day of July, 2005.

                                          _Peter D. Sahagen_
                                          Peter D. Sahagen

## ACKNOWLEDGMENT

STATE OF *California* )

COUNTY OF *Los Angeles* )   ss:


On July *20* 2005 before me, the undersigned, personally appeared Peter D. Sahagen, personally known to me or proved on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his personal capacity, and that by affixing his signature on the instrument, executed the instrument.


Notary Public

My commission expires: *6-11-2008*

JULIE A. ELLISON
Commission # 1489446
Notary Public - California
Los Angeles County
My Comm. Expires Jun 11, 2008

# GENERAL RELEASE

**TO ALL TO WHOM THESE PRESENTS SHALL COME OR MAY CONCERN, KNOW THAT**

**RICHARD A. INCIARDI, as Releasor,**

for good and valuable consideration, receipt of which is hereby acknowledged, hereby releases and discharges

**DAVID CASTIEL, ELLIPSO, INC., VIRTUAL GEOSATELLITE, LLC, MOBILE COMMUNICATIONS HOLDINGS, INC., VIRTUAL GEOSATELLITE HOLDINGS, INC., JILL STERN, and JANE K. CHAPMAN, as Releasees,**

from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which against the Releasees, the Releasor, Releasor's successors and assigns ever had, now have or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever, whether known or unknown, from the beginning of the world to the day of the date of this release.

The words "Releasor" and "Releasee" include all releasors and all releasees under this Release.

This Release may not be changed orally.

IN WITNESS WHEREOF, the Releasor has hereunto set Releasor's hand and seal on the 28th day of July, 2005.

Richard A. Inciardi

# ACKNOWLEDGMENT

STATE OF MARYLAND )

                            ss:

COUNTY OF MONTGOMERY )

        On June __ July 28, 2005 before me, the undersigned, personally appeared Richard A. Inciardi, personally known to me or proved on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his personal capacity, and that by affixing his signature on the instrument, executed the instrument.

                                        Notary Public

My commission expires:       IBTISSAM RAAD
                          NOTARY PUBLIC STATE OF MARYLAND
                          My Commission Expires October 1, 2008

# GENERAL RELEASE

**TO ALL TO WHOM THESE PRESENTS SHALL COME OR MAY CONCERN, KNOW THAT**

**NEEL HOWARD, as Releasor,**

for good and valuable consideration, receipt of which is hereby acknowledged, hereby releases and discharges

**DAVID CASTIEL, ELLIPSO, INC., VIRTUAL GEOSATELLITE, LLC, MOBILE COMMUNICATIONS HOLDINGS, INC., VIRTUAL GEOSATELLITE HOLDINGS, INC., JILL STERN, and JANE K. CHAPMAN, as Releasees,**

from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which against the Releasees, the Releasor, Releasor's successors and assigns ever had, now have or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever, whether known or unknown, from the beginning of the world to the day of the date of this release.

The words "Releasor" and "Releasee" include all releasors and all releasees under this Release.

This Release may not be changed orally.

IN WITNESS WHEREOF, the Releasor has hereunto set Releasor's hand and seal on the 2?day of July, 2005.

_Neel Howard_



**ACKNOWLEDGMENT**

STATE OF Maryland }

                ss:

COUNTY OF Montgomery }

        July

On ~~June 29~~, 2005 before me, the undersigned, personally appeared Neel Howard, personally known to me or proved on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his personal capacity, and that by affixing his signature on the instrument, executed the instrument.

_____

Notary Public

My commission expires:      HAESUN CHANG
                      NOTARY PUBLIC STATE OF MARYLAND
                      My Commission Expires May 29, 2006

## GENERAL RELEASE

**TO ALL TO WHOM THESE PRESENTS SHALL COME OR MAY CONCERN, KNOW THAT**

**JILL STERN, as Releasor,**

for good and valuable consideration, receipt of which is hereby acknowledged, hereby releases and discharges

**PETER D. SAHAGEN, SST GLOBAL TECHNOLOGY, LLC, SAHAGEN SATELLITE TECHNOLOGY GROUP, LLC, SPACE RESOURCE CORPORATION, SPACE RESOURCE INTERNATIONAL, VGS, INC., JOHN DRAIM, NEEL HOWARD, TOM QUINN, and RICHARD A. INCIARDI, as Releasees,**

from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which against the Releasees, the Releasor, Releasor's successors and assigns ever had, now have or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever, whether known or unknown, from the beginning of the world to the day of the date of this release.

The words "Releasor" and "Releasee" include all releasors and all releasees under this Release.

This Release may not be changed orally.

IN WITNESS WHEREOF, the Releasor has hereunto set Releasor's hand and seal on the /st day of August, 2005.

Jill Stern

## ACKNOWLEDGMENT

*District of Columbia*

STATE OF ~~~~~~~ )
                            ) ss:
COUNTY OF ~~~~~ )

On August 14, 2005 before me, the undersigned, personally appeared Jill Stern, personally known to me or proved on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his personal capacity, and that by affixing his signature on the instrument, executed the instrument.

MARY W. JACKSON
Notary Public, District of Columbia
My Commission Expires November 14, 2008

                                        _____
                                                Notary Public

My commission expires:

Exhibit 2: Selected transcript pages from *Draim v. Virtual Geosatellite LLC.* (Draim cross-examination)

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

1

2

3   John E. Draim               Docket No. CA 01-2690 JMF

4         Plaintiff

                            Washington, D.C.

5      vs.                 Tuesday, April 18, 2006

                            9:38 a.m.

6   Virtual Geosatellite

     Holdings, et al.

7

8         Defendants

9

10               Transcript of Bench Trial

          Before the Honorable John M. Facciola

11           United States Magistrate Judge

12

13  APPEARANCES:

14

   For the Plaintiff:      John F. Anderson, Esq.

15

   For the Defendant:      David Taylor, Esq.

16                         Thomas E. Patton, Esq.

17

18  Reporter:             WILLIAM D. MC ALLISTER, CVR-CM

19                         Official Court Reporter

                            Room 4806-B

20                        333 Constitution Avenue, N.W.

                         Washington, D.C. 20001-8306

21                        (202) 371-6446

22

23  Reported by Voice Writing and transcribed using SpeechCAT

24

25  Pages 1 through 171

42

1    date.

2              MR. PATTON:   I will have this marked as exhibit

3    number 17 for identification.

4         (Defendant's Exhibit 17 marked for identification.)

5    BY MR. PATTON:

6    Q.   Take a look at exhibit number 17 for identification.

7    A.   (Perusing Documents.)

8    Q.   Sir, does this document refresh your recollection that the

9    interfering patent was filed on November 2nd, 2000, shortly

10   after your letter?

11   A.   Yes, that appears to be the filing date.

12   Q.   When you joined VGA, later SRA, you signed an employment

13   agreement with them, did you not, sir?

14   A.   Yes, I did.

15   Q.   And in that employment agreement you assigned all of the

16   patents that you applied for while there, to VGA/SRA, did you

17   not, sir, just like you had done with the Castiel companies?

18   A.   Yes, I did.

19              MR. ANDERSON:   I object.

20              THE COURT:   Rephrase the question.   It assumes the

21   fact not in evidence.

22   BY MR. PATTON:

23   Q.   You assigned it to VGS and SRA in your employment

24   agreement your patents developed while employed there, correct?

25   A.   Yes, I did.

43

1  Q.    And so that would have included this patent that was filed

2  in November 2nd of 2000, correct?

3  A.    Yes.

4  Q.    So let's get this straight, sir.  In November, in October

5  and November of 2000 you processed and filed as sole inventor a

6  patent that you had assigned to SRA intended to interfere with

7  the patent that you had co-invented previously when you were

8  with Dr. Castiel's company, correct, sir?

9  A.    Yes.

10  Q.    SRA, by that time, sir, November of 2000, was a competitor

11  of the Castiel companies, wasn't it?

12  A.    No.

13  Q.    It was not.  Okay.  Weren't they both developing virtual

14  Geo stationary orbital systems?

15  A.    Yes.  But we were intending to only license patents not

16  apply for SEC license for operation of them.

17  Q.    To the extent of operating satellites, SRA was not a

18  competitor?

19  A.    That's right.

20  Q.    It had not applied for an SEC license, correct?

21  A.    That's correct.

22  Q.    But to the extent of developing and using virtual Geo

23  stationary orbital technology, they were competitors, weren't

24  they, sir?

25  A.    I suppose they were.

Exhibit 3: USPTO ReExamination Order 90/007974 dated May 18, 2006

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,974 | 03/18/2006 | 6701126 | MISC.R001 | 2512 |

|  |  |  |
|---|---|---|
| 7590 | 05/16/2006 | EXAMINER |

RABIN & BERDO PC
1101 14TH STREET NW, SUITE 500
WASHINGTON, DC 20005

| ART UNIT | PAPER NUMBER |
|---|---|

DATE MAILED: 05/16/2006

Please find below and/or attached an Office communication concerning this application or proceeding.



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

DORT, DAVID

Rubinstein Law Group, Professional Corporation

1700 Diagonal Road

Suite 300

Alexandria, VA  22314

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/007,974*.

PATENT NO. *6701126*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| | Control No. | Patent Under Reexamination |
|---|---|---|
| ***Order Granting / Denying Request For Ex Parte Reexamination*** | 90/007,974 | 6701126 |
| | Examiner | Art Unit | |
| | Kwang B. Yao | 3992 | |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>18 March 2006</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments:  a)☐ PTO-892,    b)☒ PTO-1449,    c)☐ Other: _____

1. ☒   The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐   The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)).  Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181 ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE  REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

    a) ☐  by Treasury check or,

    b) ☐  by credit to Deposit Account No. _____ ,  or

    c) ☐  by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

cc:Requester ( if third party requester )

Application/Control Number: 90/007,974                                          Page 2

Art Unit: 3992

## DECISION ON REQUEST FOR REEXAMINATION

### *Summary*

Substantial new questions of patentability affecting Claims 1-27 of United States Patent

Number 6,701,126 are raised by the request of ex parte reexamination based on the following

prior art reference:

US patent No. 6,954,613 issued on October 11, 2005 to Castiel et al. (hereinafter Castiel

et al.)

### *Issues Raised by Requester*

The Requester asserts that the cited references raised substantial new questions of

patentability when interpreted in the following manner:

Claims 1-27 are anticipated by Castiel et al. (US 6,954,613).

### *Analysis of Issues*

With regard to Castiel et al., it is generally agreed that the item-matching claim chart of

pages 2-8 of the Request shows, for example, corresponding teachings for a satellite

communication system with a ground station, including communications equipment and an

antenna, located at a position on earth (see FIGS. 1-9. Col. 9,lines 10-21).  These teachings are

not cumulative to the teachings of the prior art applied or discussed on the record in the

examination of the United States Patent Number 6,701,126 or subject to a final holding of

Application/Control Number: 90/007,974                                      Page 3

Art Unit: 3992

invalidity by Federal Courts, and a reasonable examiner would consider the teachings to be

important in deciding whether or not to allow the aforesaid claims.

All claims are subject to reexamination.

### *Conclusion*

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding. Additionally, 35 U.S.C. 305 requires that reexamination proceedings

"will be conducted with special dispatch" (37 CFR 1.550(a)). Extension of time in reexamination

proceedings are provided for in 37 CFR 1.550(c).

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

U.S. Patent No. 6,701,126 throughout the course of this reexamination proceeding. The third

party requester is also reminded of the ability to similarly apprise the Office of any such activity

or proceeding throughout the course of this reexamination proceeding. See MPEP § 2207, 2282

and 2286.

Please mail any communications to:

Attn: Mail Stop "Ex Parte Reexam" Central Reexamination Unit

Commissioner for Patents

P. O. Box 1450

Alexandria VA 22313-1450

Please FAX any communications to:

Application/Control Number: 90/007,974                                    Page 4

Art Unit: 3992

    (571) 273-9900

    Central Reexamination Unit

Please hand-deliver any communications to:

    Customer Service Window

    Attn: Central Reexamination Unit

    Randolph Building, Lobby Level

    401 Dulany Street

    Alexandria, VA 22314

    Any inquiry concerning this communication or earlier communications from the

Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should be

directed to the Central Reexamination Unit at telephone number (571) 272-7705.

Kwang B. Yao
Primary Examiner
(571) 272-3182

SPRE CRU 3992
Conferee

Conferee

PTO/SB/08A (07-05)
Approved for use through 07/31/2008. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

Substitute for form 1449/PTO

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT
*(Use as many sheets as necessary)*

Sheet | 1 | of | 1

**Complete if Known**

| | |
|---|---|
| Application Number | 09/709,280 |
| Filing Date | November 13, 2000 |
| First Named Inventor | John E Draim |
| Art Unit | 2684 |
| Examiner Name | Edan ORGAD |
| Attorney Docket Number | |

## U. S. PATENT DOCUMENTS

| Examiner Initials* | Cite No.¹ | Document Number — Number-Kind Code² (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| KBH | | US- 6,954,613 | 10-11-2005 | Castiel et al. | all |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.¹ | Foreign Patent Document — Country Code³ Number⁴ Kind Code⁵ (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages Or Relevant Figures Appear | T⁶ |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| Examiner Signature | [signature] | Date Considered | 5/11/06 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. ¹ Applicant's unique citation designation number (optional). ² See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. ³ Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). ⁴ For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. ⁵ Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. ⁶ Applicant is to place a check mark here if English language Translation is attached.
This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

EXHIBIT 4

Finding of Fact, Conclusion of Law and Order, May 15, 2006 (J. Facciola), in *Draim v. Virtual Geosatellite Holdings, Inc. et al.* (1:01 cv 2690) in support of OPPOSITION TO DEFENDANT'S MOTION FOR ATTORNEY'S FEES AND COSTS

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **JOHN E. DRAIM,** | |
| **Plaintiff,** | |
| **v.** | |
| | **Civil Action No. 01-2690 (JMF)** |
| **VIRTUAL GEOSATELLITE HOLDINGS, INC.,** *et al.,* | |
| **Defendants.** | |
| **MOBILE COMMUNICATIONS HOLDINGS, INC.,** *et al.,* | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 02-0775 (JMF)** |
| **JOHN E. DRAIM,** | |
| **Defendant.** | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

These consolidated cases were referred to me, upon consent of the parties, for all purposes including trial.  Prior to the trial, the parties agreed to the dismissal of all claims except plaintiff John Draim's claim that he is entitled to the payment of bonuses for patents issued after he resigned from the corporate defendants' employ and in which he was a named inventor.  A bench trial was held on April 18, 2006 and, after considering the testimony of the witnesses, the exhibits, and the arguments of the parties, I reach the following findings of fact and conclusions

of law.

**FINDINGS OF FACT**

1.    In 1992, plaintiff John Draim ("Draim") began working for defendant Mobile
      Communications Holdings, Inc. ("MCHI") as a consultant.  Draim and the
      president of MCHI, David Castiel ("Castiel") signed a Consulting Agreement
      under which Draim agreed to assign to MCHI all rights in his inventions
      conceived during the term of the Consulting Agreement and MCHI agreed to pay
      Draim a $2,000 bonus upon the filing of a patent application, and a $10,000 bonus
      upon the successful issuance of any one patent.  According to the Consulting
      Agreement, the actual amount of the bonus would be determined in inverse
      proportion to the number of co-inventors listed on the patent application.  Draim
      worked for MCHI as a consultant through June 1997.

2.    In July 1997, Draim became an employee of MCHI, but a written employment
      agreement was never drafted or signed.  During Draim's employment, the parties
      continued to operate under the understanding that Draim's inventions would be
      assigned to MCHI, or to other Castiel affiliated entities, and that he would be paid
      $2,000 for each patent application and $10,000 for each successful issuance of a
      patent.

3.    While employed at MCHI, Draim also performed work for affiliated Castiel
      companies (*e.g.*, Defendant Virtual Geosatellite Holdings, Inc. and Ellipso, Inc.)
      (collectively the "Castiel entities").

4.    At some point during Draim's employment, the bonus for filing a patent

2

application increased from $2,000 to $2,500, and the bonus for the issuance of a patent increased from $10,000 to $12,500.

5.    In May 2000, Draim terminated his employment and began working for a company named VGS, Inc. ("VGS"), which later became known as Space Resource America Corporation ("SRA").

6.    At the time Draim terminated his employment with the Castiel entities, there were numerous outstanding patent applications in which he was a named inventor. These applications have since resulted in the issuance of eleven patents. The patents name various Castiel entities as the assignees. In some of these patents Draim is listed as the sole inventor, and in some he is listed as one of three or four inventors.

7.    Draim has not been paid a bonus for the issuance of any of these eleven patents.

8.    When the patent office decides that a patent application should be divided into multiple patents, the resulting patents are called "divisional patents." Two of these eleven patents were divisional patents.

9.    In February 2000, three months before Draim resigned, Draim and Castiel filed a provisional patent application for an invention that the parties referred to as the "168 slot" invention. In this provisional application, Castiel and Draim were listed as co-inventors. Provisional applications function as "place holders" and are generally not reviewed by the patent board. The applicant has one year from filing the provisional application to file the actual patent application.

10.   In November 2000, SRA filed an "interfering" patent application for the "168

3

slot" invention, naming Draim as the sole inventor. Subsequently, in February

2001, Castiel filed an application for the "168 slot" invention, but did not name

Draim as an inventor. Ultimately, the patent was issued to Virtual Geosatellite,

LLC, a Castiel company, as assignee and Draim was not listed as an inventor.

11.    Draim was never paid a bonus for the issuance of the "168 slot" patent.

12.    Around the time of Draim's resignation, several other Castiel employees also left

the Castiel entities to work for VGS. At trial, defendants presented testimony

about VGS having tried to take over the Castiel entities, steal the Castiel entities'

property, and use the Castiel entities' marketing materials as its own.

## CONCLUSIONS OF LAW

13.    The parties do not dispute that there was a contract between the Castiel entities

and Draim under which Draim was to be paid bonuses for the filing of patent

applications and for the issuance of patents. Defendants did not argue that, under

the contract, Draim was not entitled the payment of bonuses for patents issued

after the termination of his employment in which he was a named inventor and the

application was filed while he was still employed with the Castiel entities.

Accordingly, I find that there was an enforceable contract and, under that contract,

Draim was entitled to bonuses for the issuance of patents, in which he was a

named inventor, that were based on applications filed during his employment,

regardless of whether the patents were issued after his employment ended.

14.    In defense of the enforcement of this contract, defendants raised three arguments.

First, defendants argued that Draim has already been paid more then he was

4

entitled to receive under the contract.  However, defendants presented no evidence at trial that Draim was paid more than he was entitled to under the employment contract and, therefore, I will not deny enforcement of the contract on that ground.

15.    Second, defendants argued that Draim is not entitled to the payment of bonuses for the issuance of divisional patents.  Two of the twelve patents at issue are divisional patents.  The only written guidance on this issue is the Consulting Agreement, which states that Draim will be paid a bonus "upon successful issuance of any one patent." Plaintiff's Exhibit # 1.  That language indicates that Draim was to paid a bonus upon the issuance of any one patent, regardless of whether or not it was a divisional patent.  In contradiction of this language, defendants argued that it was not Castiel's practice to pay bonuses for divisional patents.  According to Castiel's testimony, he remembers only two prior divisional patents.  No evidence was presented at trial as to whether or not bonuses were paid on these two divisional patents.  Accordingly, I do not find sufficient evidence of a past practice of not paying bonuses for divisional patents and I will not deny enforcement of the contract, in whole or in part, on the ground that two of the patents were divisional patents.

16.    Third, defendants argued that Draim breached a fiduciary duty to the Castiel entities by going to work for VGS and by participating in a conspiracy to take over the Castiel entities and steal their property and that, therefore, Draim is not entitled to the patent bonuses.  I do not find that it is more likely than not that Draim participated in a conspiracy to destroy or steal from the Castile entities.

5

Defendants presented little to no evidence linking Draim to the alleged VGS conduct, let alone evidence that Draim agreed to take part in an unlawful action. See, e.g., Hall v. Clinton, 285 F.3d 73, 83 (D.C. Cir. 2002) (the two essential elements of civil conspiracy [under District of Columbia law] are (1) an agreement to take part in an unlawful action or a lawful action in an unlawful manner and (2) an overt tortious act in furtherance of the agreement that causes injury). To the contrary, I find that Castiel's anger at the behavior of his former employees, like Draim, who went to work for VGS, led him not to pay Draim for the bonuses. Therefore, even if Draim owed a fiduciary duty to the Castiel entities, I find that enforcement of the contract cannot be denied on the ground that Draim breached any such fiduciary duty by participating in a conspiracy.

17.    Accordingly, I find that Draim is entitled to the payment of bonuses based on the $12,500 rate and in an amount in inverse proportion to the number of co-inventors listed on the patent for each of the eleven patents in which he is a named inventor. Specifically, Draim is entitled to the following bonuses:

    a.    United States Patent # 6102335; four inventors; bonus = $3,125

    b.    United States Patent # 6227497; one inventor; bonus = $12,500

    c.    United States Patent # 6263188; three inventors; bonus = $4,166.67

    d.    United States Patent # 6457678; one inventor; bonus = $12,500

    e.    United States Patent # 6487476; one inventor; bonus = $12,500

    f.    United States Patent # 6577864; three inventors; bonus = $4,166.67

    g.    United States Patent # 6611683; three inventors; bonus = $4,166.67

6

      h.      United States Patent # 6678519; three inventors; bonus = $4,166.67

      i.      United States Patent # 6766166; one inventor; bonus = $12,500

      j.      United States Patent # 6795687; three inventors; bonus = $4,166.67

      k.      United States Patent # 6954613; three inventors; bonus = $4,166.67

18.      With regard to the "168 slot" patent, Draim was not named as an inventor in either the patent application or in the resulting patent; Draim was only named as an inventor in the *provisional* application.  Under the Consulting Agreement, Draim was entitled to a bonus upon "the completion of successful filing for any one patent." Plaintiff's Exhibit # 1.  Based on the testimony at trial, I find that it was the parties' understanding that, with regard to the assignment of patent rights and the payment of bonuses, the terms of the Consulting Agreement carried over into Draim's oral employment agreement.  No evidence or argument was presented at trial regarding the expansion of that language to include provisional applications, nor did plaintiff present any evidence that he had been paid bonuses for the filing of provisional applications in the past.  Therefore, I find that Draim is not entitled to a bonus for the issuance of patent number 6695260 (*i.e.*, the "168 slot" patent).

19.      Draim is also entitled to pre-judgment interest on the patent bonuses, to be calculated from the date each patent was issued and at the statutory rate of six-percent per annum. See D.C. Code § 15-108[1]; Bragdon v. Twenty-Five Twelve

---

[1] All citations to the District of Columbia Code are to the electronic versions available through Westlaw and Lexis.

Assocs. Ltd. P'ship, 856 A.2d 1165 (D.C. 2004) (awarding pre-judgment interest under D.C. Code § 15-508 because it was customary to pay interest on funds that are withheld and not paid when due and that prejudgment interest is an element of complete compensation); D.C. Code § 28-3302; District of Columbia v. Pierce Assocs., Inc., 527 A.2d 306, 311 (D.C. 1987) ("the trial court cannot award interest at a rate greater than 6% under § 15-508 . . . unless an express contractual provision is to the contrary.")

## CONCLUSION

Based on the proceeding findings of fact and conclusions of law, plaintiff shall be awarded $78,125.02 plus prejudgment interest, calculated from the date of the issuance of each patent through the date of judgment at the rate of six-percent per annum, and costs.  To that end, the parties are, hereby, **ORDERED** to submit, within ten days of this order, a joint praecipe detailing the prejudgment interest calculation through the date of the filing of the praecipe.  By agreeing to the joint praecipe, the parties do not concede any arguments or waive any rights on appeal.

       **SO ORDERED.**

_____
JOHN M. FACCIOLA

Dated:                         UNITED STATES MAGISTRATE JUDGE

Exhibit 5: USPTO Office Action from ReExamination Control No. 90/007974 dated March 12, 2007



UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

$\omega$

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,974 | 03/18/2006 | 6701126 | MISC.R001 | 2512 |

7590          03/12/2007

RABIN & BERDO PC
1101 14TH STREET NW, SUITE 500
WASHINGTON, DC  20005

| EXAMINER |
|---|
| Joseph R. Pokrzywa |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | IFW |

DATE MAILED: 03/12/2007

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

DAVID BOGART DORT
RUBINSTEIN LAW GROUP PC
1700 DIAGONAL ROAD, SUITE 300
ALEXANDRIA, VA  22314

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/007,974*.

PATENT NO. *6701126*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| Ex Parte R xamination Communication | Contr l No. 90/007,974 | Patent Und Reexamination 6701126 | |
|---|---|---|---|
| | Examiner | Art Unit | |
| | Joseph R. Pokrzywa | 3992 | |

**A SHORTENED STATUTORY PERIOD FOR RESPONSE TO THIS ACTION IS SET TO EXPIRE $\underline{2}$ MONTH(S) FROM THE MAILING DATE OF THIS LETTER. EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).** If the specified period for response is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Joseph R. Pokrzywa
Primary Examiner
Art Unit: 3992

cc: Requester (if third party requester)

| *Office Action in Ex Parte R   xamination* | C  trol No.<br>90/007,974 | Patent Under Re  xamination<br>6701126 |
|---|---|---|
| | Examiner<br>Joseph R. Pokrzywa | Art Unit<br>3992 | |

*-- The MAILING DATE of this communication appears on th  cover sheet with the correspondenc  address --*

a ☐ Responsive to the communication(s) filed on _____ .        b ☐ This action is made FINAL.

c ☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination
certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days
will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1.  ☐  Notice of References Cited by Examiner, PTO-892.        3.  ☐  Interview Summary, PTO-474.

2.  ☐  Information Disclosure Statement, PTO/SB/08.        4.  ☐  _____ .

Part II    SUMMARY OF ACTION

1a.  ☒  Claims *1-27* are subject to reexamination.

1b.  ☐  Claims _____ are not subject to reexamination.

2.  ☐  Claims _____ have been canceled in the present reexamination proceeding.

3.  ☐  Claims _____ are patentable and/or confirmed.

4.  ☒  Claims *1-27* are rejected.

5.  ☐  Claims _____ are objected to.

6.  ☐  The drawings, filed on _____ are acceptable.

7.  ☐  The proposed drawing correction, filed on _____ has been  (7a) ☐  approved  (7b) ☐  disapproved.

8.  ☐  Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All  b) ☐ Some*  c) ☐ None      of the certified copies have

      1 ☐  been received.

      2 ☐  not been received.

      3 ☐  been filed in Application No. _____ .

      4 ☐  been filed in reexamination Control No. _____ .

      5 ☐  been received by the International Bureau in PCT application No. _____ .

    * See the attached detailed Office action for a list of the certified copies not received.

9.  ☐  Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal
    matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D.
    11, 453 O.G. 213.

10.  ☐  Other: _____

*Joseph R Phym*

JOSEPH R. POKRZYWA
PRIMARY EXAMINER

cc: Requester (if third party requester)

Application/Control Number: 90/007,974                                        Page 2

Art Unit: 3992

## DETAILED ACTION

### *Reexamination*

1.    Currently, **claims 1-27** of U.S. Patent Number 6,701,126 are subject to reexamination.

### *Claim Rejections - 35 USC § 102*

2.    The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

3.    **Claims 1-27** are rejected under 35 U.S.C. 102(e) as being anticipated by Castiel *et al*.

(U.S. Patent Number 6,954,613, hereafter "Castiel")

The applied reference has a common inventor with the instant application that became the

'126 Patent.  Based upon the earlier effective U.S. filing date of the reference "Castiel", it

constitutes prior art under 35 U.S.C. 102(e).  This rejection under 35 U.S.C. 102(e) might be

overcome either by a showing under 37 CFR 1.132 that any invention disclosed but not claimed

in the reference was derived from the inventor of this application that became the '126 Patent,

and is thus not the invention "by another," or by an appropriate showing under 37 CFR 1.131.

Application/Control Number: 90/007,974                                    Page 3
Art Unit: 3992

Regarding *claim 1*, Castiel discloses a satellite communications system, comprising:

a ground station, including communications equipment and an antenna, located at a

position on the earth [see col. 1, lines 34-47; also see 3, line 53-col. 4, line 16];

a plurality of satellites in orbits around the earth having apogees and perigees [see Figs. 1

and 3, see col. 2, lines 20-51],

each of the satellites having communications equipment thereon configured to

communicate with the ground station only during a predetermined portion of the satellite's orbit

proximate to apogee [col. 2, lines 48-51, and col. 17, lines 34-42],

the orbits of the plurality of satellites being configured to form at least two ground tracks

on the earth displaced from each other longitudinally [see col. 17, lines 11-52; also see Table 1 in

col. 18, lines 1-32; also see Fig. 9],

each of the ground tracks repeating daily and having a number of active arcs [see col. 5,

lines 3-8; also see Table 2 in col. 18, lines 30-48, being the "Locations of the VIRGO Active

Arcs"],

each active arc corresponding to the portion of the orbit of each satellite during which the

communications equipment on the satellite is enabled to communicate with the ground station

[col. 17, lines 11-57],

the orbits of the plurality of satellites being further configured such that at all times there

are at least two of the satellites in each of the active arcs [col. 17, lines 34-42, wherein "*This

requires three satellites out of a total of five to be active at any time.*"] and such that at all times

each of the satellites in any one of the active arcs is separated by at least a predetermined angle,

as observed from the ground station, from each other satellite in the same active arc and from

any satellite in any other active arc [col. 17, lines 34-42; also see Table 3 in col. 18, line 48-col.

19, line 13, whereby the satellites are shown to be separated by the angles in the Mean Anomaly

"MA"].


Regarding *claim 2*, Castiel discloses the system discussed above in claim 1, and further

teaches that the orbit of each of the plurality of satellites has a mean motion that is one of 2, 3

and 4 [see col. 5, lines 19-23; also see col. 6, lines 5-10, whereby "12-hour satellites" have a

mean motion of 2; also see col. 12, lines 25-30].


Regarding *claim 3*, Castiel discloses the system discussed above in claim 1, and further

teaches that the orbits of each of the plurality of satellites is inclined at critical inclination [see

Table 3 on col. 18, line 48-col. 19, line 13].


Regarding *claim 4*, Castiel discloses the system discussed above in claim 1, and further

teaches that the argument of perigee of the orbits of each of the plurality of satellites is in the

range of 195 degrees to 345 degrees for apogees in the northern hemisphere and in the range of

15 degrees to 165 degrees for apogees in the southern hemisphere [see Table 1 in col. 18, lines 1-

25, whereby the Aurora I and II, which are in the northern hemisphere, have an "Argument of

Perigee" of 270 degrees, while the Australis, being in the southern hemisphere, has an

"Argument of Perigee" of 90 degrees, each of which are within the claimed range].

Application/Control Number: 90/007,974                                                Page 5

Art Unit: 3992

     Regarding *claim 5*, Castiel discloses the system discussed above in claim 1, and further

teaches that each of the plurality of satellites has throughout its orbit an orbital height lower than

a height necessary for geostationary orbits [see col. 3, lines 26-33, wherein "these satellites

according to the disclosed system orbit at about half the altitude of the geo systems."].

     Regarding *claim 6*, Castiel discloses the system discussed above in claim 1, and further

teaches that the plurality of satellites are equally spaced in mean anomaly within their respective

ground tracks [see Table 3 on col. 18, line 48-col. 19, line 13, whereby the mean anomaly "MA"

of the satellites are seen to be equally spaced].

     Regarding *claim 7*, Castiel discloses the system discussed above in claim 1, and further

teaches that the orbits of the plurality of satellites are further configured such that the portion of

the orbits during which the communications equipment on the satellites is enabled to

communicate, is separated from the equatorial plane of the earth by at least a predetermined

amount [see col. 1, lines 34-48; also see col. 5, lines 24-59].

     Regarding *claim 8*, Castiel discloses the system discussed above in claim 1, and further

teaches that the communications equipment on the plurality of satellites is further configured to

communicate at frequencies allocated to geostationary satellites [col. 3, line 53-col. 4, line 16].

     Regarding *claim 9*, Castiel discloses the system discussed above in claim 1, and further

teaches that each of the plurality of satellites has a power system configured to generate a first

Application/Control Number: 90/007,974                                    Page 6

Art Unit: 3992

amount of power when the communications equipment on the satellite is enabled and a second

amount of power more than the first amount of power when the communications equipment is

not enabled [col. 2, lines 39-64; also see col. 4, lines 23-43], to store excess power generated

when the communications equipment is not enabled [col. 2, lines 39-64], and to enable the

communications equipment with both the stored excess power and the generated first amount of

power [col. 2, lines 52-64].


Regarding *claim 10*, Castiel discloses a constellation of satellites, comprising:

a plurality of satellites in orbits around the earth having apogees and perigees [see Figs. 1

and 3, see col. 2, lines 20-51],

each of the satellites having communications equipment thereon configured to

communicate only during a predetermined portion of the satellite's orbit proximate to apogee

[col. 2, lines 48-51, and col. 17, lines 34-42],

the orbits of the plurality of satellites being configured to form at least two ground tracks

on the earth displaced from each other longitudinally [see col. 17, lines 11-52; also see Table 1 in

col. 18, lines 1-32; also see Fig. 9],

each of the ground tracks repeating daily and having a number of active arcs [see col. 5,

lines 3-8; also see Table 2 in col. 18, lines 30-48, being the "Locations of the VIRGO Active

Arcs"],

each active arc corresponding to the portion of the orbit of each satellite during which the

communications equipment on the satellite is enabled to communicate [col. 17, lines 11-57],

the orbits of the plurality of satellites being further configured such that at all times there

are at least two of the satellites in each of the active arcs [col. 17, lines 34-42, wherein *"This*

*requires three satellites out of a total of five to be active at any time."*] and such that at all times

each of the satellites in any one of the active arcs is separated by at least a predetermined angle,

as observed from the earth, from each other satellite in the same active arc and from any satellite

in any other active arc [col. 17, lines 34-42; also see Table 3 in col. 18, line 48-col. 19, line 13,

whereby the satellites are shown to be separated by the angles in the Mean Anomaly "MA"].

Regarding *claim 11*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the orbit of each of the plurality of satellites has a mean motion that is one of

2, 3 and 4 [see col. 5, lines 19-23; also see col. 6, lines 5-10, whereby "12-hour satellites" have a

mean motion of 2; also see col. 12, lines 25-30].

Regarding *claim 12*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the orbit of each of the plurality of satellites is inclined at critical inclination

[see Table 3 on col. 18, line 48-col. 19, line 13].

Regarding *claim 13*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the argument of perigee of the orbits of each of the plurality of satellites is in

the range of 195 degrees to 345 degrees for apogees in the northern hemisphere and in the range

of 15 degrees to 165 degrees for apogees in the southern hemisphere [see Table 1 in col. 18, lines

1-25, whereby the Aurora I and II, which are in the northern hemisphere, have an "Argument of

Application/Control Number: 90/007,974                                    Page 8

Art Unit: 3992

Perigee" of 270 degrees, while the Australis, being in the southern hemisphere, has an

"Argument of Perigee" of 90 degrees, each of which are within the claimed range].

Regarding *claim 14*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that each of the plurality of satellites has throughout its orbit a orbital height

lower than a height necessary for geostationary orbits [see col. 3, lines 26-33, wherein "these

satellites according to the disclosed system orbit at about half the altitude of the geo systems."].

Regarding *claim 15*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the satellites in each of the two or more ground tracks are equally spaced in

mean anomaly [see Table 3 on col. 18, line 48-col. 19, line 13, whereby the mean anomaly

"MA" of the satellites are seen to be equally spaced].

Regarding *claim 16*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the orbit of each of the plurality of satellites is further configured such that

the portion of the orbits during which the communications equipment on the satellites is enabled

to communicate, is separated from the equatorial plane of the earth by a least a predetermined

amount [see col. 1, lines 34-48; also see col. 5, lines 24-59].

Regarding *claim 17*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the communications equipment on each of the plurality of satellites is further

Application/Control Number: 90/007,974                                      Page 9

Art Unit: 3992

configured to communicate at frequencies allocated to geostationary satellites [col. 3, line 53-col. 4, line 16].


Regarding *claim 18*, Castiel discloses the constellation discussed above in claim 10, and further teaches that each of the plurality of satellites has a power system configured to generate a first amount of power when the communications equipment on the satellite is enabled and a second amount of power more than the first amount of power when the communications equipment is not enabled [col. 2, lines 39-64; also see col. 4, lines 23-43], to store excess power generated when the communications equipment is not enabled [col. 2, lines 39-64], and to enable the communications equipment with both the stored excess power and the generated first amount of power [col. 2, lines 52-64].


Regarding *claim 19*, Castiel discloses a method for satellite communications, comprising:

orbiting a plurality of communications satellites about the earth, the orbits having apogees and perigees [see Figs. 1 and 3, see col. 2, lines 20-51]; and

enabling each of the plurality of communications satellites to communicate only during a predetermined portion of the orbits proximate to apogee [col. 2, lines 48-51, and col. 17, lines 34-42];

wherein the orbits of the plurality satellites form at least two ground tracks on the earth displaced from each other longitudinally [see col. 17, lines 11-52; also see Table 1 in col. 18, lines 1-32; also see Fig. 9],

Application/Control Number: 90/007,974                                       Page 10
Art Unit: 3992

each of the ground tracks repeating daily and having a number of active arcs [see col. 5, lines 3-8; also see Table 2 in col. 18, lines 30-48, being the "Locations of the VIRGO Active Arcs"],

each active arc corresponding to the portion of the orbit of each satellite during which the communications equipment on the satellite is enabled to communicate [col. 17, lines 11-57]; and

wherein the satellites are orbited such that at all times at least two of the satellites are in each of the active arcs [col. 17, lines 34-42, wherein *"This requires three satellites out of a total of five to be active at any time."*] and such that at all times each of the satellites in any one of the active arcs is separated by at least a predetermined angle, as observed from the earth, from each other satellite in the same active arc and from any satellite in any other active arc [col. 17, lines 34-42; also see Table 3 in col. 18, line 48-col. 19, line 13, whereby the satellites are shown to be separated by the angles in the Mean Anomaly "MA"].

Regarding *claim 20*, Castiel discloses the method discussed above in claim 19, and further teaches of configuring the orbits of each of the plurality of satellites to have a mean motion that is one of 2, 3 and 4 [see col. 5, lines 19-23; also see col. 6, lines 5-10, whereby "12-hour satellites" have a mean motion of 2; also see col. 12, lines 25-30].

Regarding *claim 21*, Castiel discloses the method discussed above in claim 19, and further teaches of configuring the orbits of each of the plurality of satellites to be inclined at critical inclination [see Table 3 on col. 18, line 48-col. 19, line 13].

Application/Control Number: 90/007,974                                    Page 11
Art Unit: 3992

Regarding *claim 22*, Castiel discloses the method discussed above in claim 19, and
further teaches of configuring the argument of perigee of the orbits of each of the plurality of
satellites to be in the range of 195 degrees to 345 degrees for apogees in the northern hemisphere
and in the range of 15 degrees to 165 degrees for apogees in the southern hemisphere [see Table
1 in col. 18, lines 1-25, whereby the Aurora I and II, which are in the northern hemisphere, have
an "Argument of Perigee" of 270 degrees, while the Australis, being in the southern hemisphere,
has an "Argument of Perigee" of 90 degrees, each of which are within the claimed range].

Regarding *claim 23*, Castiel discloses the method discussed above in claim 19, and
further teaches of configuring the orbits of each of the plurality of satellites to have throughout
its orbit an orbital height lower than a height necessary for geostationary orbits [see col. 3, lines
26-33, wherein "these satellites according to the disclosed system orbit at about half the altitude
of the geo systems."].

Regarding *claim 24*, Castiel discloses the method discussed above in claim 19, and
further teaches of configuring the orbits of the plurality of satellites such that the satellites are
equally spaced in mean anomaly within their respective ground tracks [see Table 3 on col. 18,
line 48-col. 19, line 13, whereby the mean anomaly "MA" of the satellites are seen to be equally
spaced].

Regarding *claim 25*, Castiel discloses the method discussed above in claim 19, and
further teaches of configuring the orbits of the plurality of satellites such that the portion of the

orbits during which the satellites are enabled for communication, is separated from the equatorial

plane of the earth by at least a predetermined amount [see col. 1, lines 34-48; also see col. 5,

lines 24-59].


Regarding *claim 26*, Castiel discloses the method discussed above in claim 19, and

further teaches of communicating with the plurality of satellites at frequencies allocated to

geostationary satellites [col. 3, line 53-col. 4, line 16].


Regarding *claim 27*, Castiel discloses the method discussed above in claim 19, and

further teaches that each of the plurality of satellites has a power system generating a first

amount of power when the communications equipment on the satellite is enabled and a second

amount of power more than the first amount of power when the communications equipment is

not enabled [col. 2, lines 39-64; also see col. 4, lines 23-43], and further comprising:

storing excess power generated when the communications equipment is not enabled [col.

2, lines 39-64]; and

enabling the communications equipment with both the stored excess power and the

generated first amount of power [col. 2, lines 52-64].

Application/Control Number: 90/007,974                                    Page 13

Art Unit: 3992

### *Conclusion*

4.      Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination

proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)).  Extensions of time in

*ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).


5.      The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

Patent No. 6,701,126 throughout the course of this reexamination proceeding.


6.      ALL correspondence relating to this ex parte reexamination  proceeding  should  be

directed  as follows:


**Please mail any communications to:**

Attn: Mail Stop "Ex Parte Reexam"
Central Reexamination Unit
Commissioner for Patents
P. O. Box 1450
Alexandria VA 22313-1450


**Please FAX any communications to:**

(571) 273-9900
Central Reexamination Unit

Application/Control Number: 90/007,974                              Page 14

Art Unit: 3992

**Please hand-deliver any communications to:**

Customer Service Window
Attn: Central Reexamination Unit
Randolph Building, Lobby Level
401 Dulany Street
Alexandria, VA 22314

Any inquiry concerning this communication or earlier communications from the Reexamination
Legal Advisor or Examiner, or as to the status of this proceeding, should be directed to the
Central Reexamination Unit at telephone number (571) 272-7705.

Signed:

JOSEPH R. POKRZYWA
PRIMARY EXAMINER

Joseph R. Pokrzywa
Central Reexamination Unit 3992
(571) 272-7410

Conferees :

ROLAND G. FOSTER
CRU EXAMINER-AU 3992

Sue Lao

| Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|
| 90/007,974 | 6701126 |
| **Examiner** | **Art Unit** |
| Joseph R. Pokrzywa | 3992 |

| √ | Rejected | | – | (Through numeral) Cancelled | | N | Non-Elected | | A | Appeal |
|---|---|---|---|---|---|---|---|---|---|---|
| = | Allowed | | ÷ | Restricted | | I | Interference | | O | Objected |

| Final | Original | Date | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 3/5/07 | | | | | | |
| (1) | 1 | √ | | | | | | |
| | 2 | √ | | | | | | |
| | 3 | √ | | | | | | |
| | 4 | √ | | | | | | |
| | 5 | √ | | | | | | |
| | 6 | √ | | | | | | |
| | 7 | √ | | | | | | |
| | 8 | √ | | | | | | |
| | 9 | √ | | | | | | |
| (10) | 10 | √ | | | | | | |
| | 11 | √ | | | | | | |
| | 12 | √ | | | | | | |
| | 13 | √ | | | | | | |
| | 14 | √ | | | | | | |
| | 15 | √ | | | | | | |
| | 16 | √ | | | | | | |
| | 17 | √ | | | | | | |
| | 18 | √ | | | | | | |
| 19 | 19 | √ | | | | | | |
| | 20 | √ | | | | | | |
| | 21 | √ | | | | | | |
| | 22 | √ | | | | | | |
| | 23 | √ | | | | | | |
| | 24 | √ | | | | | | |
| | 25 | √ | | | | | | |
| | 26 | √ | | | | | | |
| | 27 | √ | | | | | | |
| | 28 | | | | | | | |
| | 29 | | | | | | | |
| | 30 | | | | | | | |
| | 31 | | | | | | | |
| | 32 | | | | | | | |
| | 33 | | | | | | | |
| | 34 | | | | | | | |
| | 35 | | | | | | | |
| | 36 | | | | | | | |
| | 37 | | | | | | | |
| | 38 | | | | | | | |
| | 39 | | | | | | | |
| | 40 | | | | | | | |
| | 41 | | | | | | | |
| | 42 | | | | | | | |
| | 43 | | | | | | | |
| | 44 | | | | | | | |
| | 45 | | | | | | | |
| | 46 | | | | | | | |
| | 47 | | | | | | | |
| | 48 | | | | | | | |
| | 49 | | | | | | | |
| | 50 | | | | | | | |

| Final | Original | Date | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 51 | | | | | | | |
| | 52 | | | | | | | |
| | 53 | | | | | | | |
| | 54 | | | | | | | |
| | 55 | | | | | | | |
| | 56 | | | | | | | |
| | 57 | | | | | | | |
| | 58 | | | | | | | |
| | 59 | | | | | | | |
| | 60 | | | | | | | |
| | 61 | | | | | | | |
| | 62 | | | | | | | |
| | 63 | | | | | | | |
| | 64 | | | | | | | |
| | 65 | | | | | | | |
| | 66 | | | | | | | |
| | 67 | | | | | | | |
| | 68 | | | | | | | |
| | 69 | | | | | | | |
| | 70 | | | | | | | |
| | 71 | | | | | | | |
| | 72 | | | | | | | |
| | 73 | | | | | | | |
| | 74 | | | | | | | |
| | 75 | | | | | | | |
| | 76 | | | | | | | |
| | 77 | | | | | | | |
| | 78 | | | | | | | |
| | 79 | | | | | | | |
| | 80 | | | | | | | |
| | 81 | | | | | | | |
| | 82 | | | | | | | |
| | 83 | | | | | | | |
| | 84 | | | | | | | |
| | 85 | | | | | | | |
| | 86 | | | | | | | |
| | 87 | | | | | | | |
| | 88 | | | | | | | |
| | 89 | | | | | | | |
| | 90 | | | | | | | |
| | 91 | | | | | | | |
| | 92 | | | | | | | |
| | 93 | | | | | | | |
| | 94 | | | | | | | |
| | 95 | | | | | | | |
| | 96 | | | | | | | |
| | 97 | | | | | | | |
| | 98 | | | | | | | |
| | 99 | | | | | | | |
| | 100 | | | | | | | |

| Final | Original | Date | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 101 | | | | | | | |
| | 102 | | | | | | | |
| | 103 | | | | | | | |
| | 104 | | | | | | | |
| | 105 | | | | | | | |
| | 106 | | | | | | | |
| | 107 | | | | | | | |
| | 108 | | | | | | | |
| | 109 | | | | | | | |
| | 110 | | | | | | | |
| | 111 | | | | | | | |
| | 112 | | | | | | | |
| | 113 | | | | | | | |
| | 114 | | | | | | | |
| | 115 | | | | | | | |
| | 116 | | | | | | | |
| | 117 | | | | | | | |
| | 118 | | | | | | | |
| | 119 | | | | | | | |
| | 120 | | | | | | | |
| | 121 | | | | | | | |
| | 122 | | | | | | | |
| | 123 | | | | | | | |
| | 124 | | | | | | | |
| | 125 | | | | | | | |
| | 126 | | | | | | | |
| | 127 | | | | | | | |
| | 128 | | | | | | | |
| | 129 | | | | | | | |
| | 130 | | | | | | | |
| | 131 | | | | | | | |
| | 132 | | | | | | | |
| | 133 | | | | | | | |
| | 134 | | | | | | | |
| | 135 | | | | | | | |
| | 136 | | | | | | | |
| | 137 | | | | | | | |
| | 138 | | | | | | | |
| | 139 | | | | | | | |
| | 140 | | | | | | | |
| | 141 | | | | | | | |
| | 142 | | | | | | | |
| | 143 | | | | | | | |
| | 144 | | | | | | | |
| | 145 | | | | | | | |
| | 146 | | | | | | | |
| | 147 | | | | | | | |
| | 148 | | | | | | | |
| | 149 | | | | | | | |
| | 150 | | | | | | | |

U.S. Patent and Trademark Office

Part of Paper No.  20070302

Exhibit 6: Declaration of John Draim for US Patent 6,701,126.



Docket No.: 3700-02

# DECLARATION AND POWER OF ATTORNEY

As a below named inventor, I hereby declare that:

My residence, post office and citizenship are as stated below next to my name.

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter claimed and for which a patent is sought on the invention entitled "An Improved System and Method for Implementing a Constellation of Non-Geostationary Satellites That Does Not Interfere With the Geostationary Satellite Ring" , the specification of which

[X] is attached hereto.     [ ] was filed on _____ as Application Serial No. _____ and was amended on _____ (if applicable) .

I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is known to me to be material to patentability in accordance with Title 37, Code of Federal Regulations, Section 1.56(a).

I hereby claim foreign priority benefits under Title 35, United States Code, Section 119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

|  | | | Priority Claimed | |
|---|---|---|---|---|
| Prior Foreign Application(s): | | | Yes | No |
| Number | Country | Day/Month/Year filed | | |

I hereby claim the benefit under Title 35, United States Code, Section 120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, Section 112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, Section 1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

Prior U. S. Application(s):

| Serial No. | Filing Date | Status: Patented, Pending, Abandoned |
|---|---|---|

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true, and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

I hereby appoint the following attorney(s) and/or agent(s): Alfred A. Stadnicki, Reg. No. 30,226; Peter N. Lalos, Reg. No. 19,789; Francis A. Keegan, Reg. No. 19,245; Phillip G. Avruch, Reg. No. 46,076; Michael N. Lau, Reg. No. 39,479; Ron Snider, Reg. No. 24,962 all of:

LALOS & KEEGAN
1146 Nineteenth Street, N.W.
Fifth floor
Washington, D.C. 20036-3703

with full power of substitution and revocation, to prosecute this application and to transact all business in the Patent and Trademark Office connected therewith, and all future correspondence should be addressed to Alfred A. Stadnicki @ LALOS & KEEGAN, 1146 Nineteenth Street, N.W., Washington, D.C. 20036-3703

Docket No.. 3700-02

Full name of sole or first inventor: John E. Drain    (JOHN EMERY DRAIM)

Inventor's signature: _John E. Drain_    Date: 13 Nov. 2000

Residence: 9310 Telfer Court, Vienna, Virginia 22182

Citizenship: USA

Post Office Address: Same as Residence

Exhibit 7: Selected Pages from US Patent 6,701,126

(12) **United States Patent**     (10) Patent No.:     **US 6,701,126 B1**

Draim     (45) Date of Patent:     **Mar. 2, 2004**

(54) **SYSTEM AND METHOD FOR IMPLEMENTING A CONSTELLATION OF NON-GEOSTATIONARY SATELLITES THAT DOES NOT INTERFERE WITH THE GEOSTATIONARY SATELLITE RING**

(75) Inventor:     **John E. Draim**, Vienna, VA (US)

(73) Assignee:     **Space Resource International Ltd.,** Washington, DC (US)

( * ) Notice:     Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 470 days.

(21) Appl. No.: **09/709,280**

(22) Filed:     **Nov. 13, 2000**

(51) Int. Cl.[7] .......................... **H04B 7/185**; H04B 7/19; H04Q 7/20

(52) U.S. Cl. .................. **455/13.1**; 455/12.1; 455/13.2; 455/427

(58) Field of Search .............................. 455/12.1, 13.1, 455/7, 13.2, 13.3, 427, 428, 429, 430, 403; 342/350, 352, 355

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,845,206 A | 12/1998 | Castiel et al. .............. | 455/13.4 |
| 6,333,924 B1 * | 12/2001 | Porcelli et al. ............. | 370/331 |
| 2001/0045494 A1 * | 11/2001 | Higgins .................. | 244/158 R |
| 2002/0017593 A1 * | 2/2002 | Castiel et al. ............. | 244/158 R |
| 2002/0160710 A1 * | 10/2002 | Castiel et al. .............. | 455/12.1 |
| 2002/0177403 A1 * | 11/2002 | LaPrade et al. ........... | 455/12.1 |

OTHER PUBLICATIONS

Giovanni et al, "Development of the INTELSAT–IX Satellite System", Space Systems/Loral, Palo Alto, CA, Sep. 1997.*

Internet Article from "Online!", <URL:http://www.virgual-geo.com/orbits_plain_print.htm>: "Virtual Geosattellite LLC: Virtual Geosatellite Orbits Better for New Satellite Systems Using the 'K' Frequency Band", Mar. 4, 1999.

* cited by examiner

*Primary Examiner*—Nay Maung
*Assistant Examiner*—Edan Orgad
(74) *Attorney, Agent, or Firm*—Rabin & Berdo, P.C.; Philip G. Avruch

(57)     **ABSTRACT**

Provided is an improved system and method for implementing a constellation of satellites in inclined elliptical orbits. The satellites are operated during the portion of their orbits near apogee to emulate the characteristics of geostationary satellites. The orbits are configured to form a number of closely spaced repeating ground tracks around the earth. In each ground track the satellites operate only in arcs well above or below the equator to provide a large number of non-geostationary orbital slots that substantially increase global satellite capacity without interfering with the existing geostationary satellite ring. Minimum spacing is maintained between satellites in each active arc and between satellites in the active arcs of adjacent ground tracks to ensure that the satellites in the non-geostationary constellation do not interfere with each other.

**27 Claims, 15 Drawing Sheets**



US 6,701,126 B1

3

of geo satellites. An example is the Russian Molniya system, which employed satellites in elliptical 12-hour orbits to provide coverage to the northern latitudes in the Soviet Union. The Iridium and Globalstar systems use satellites in low circular orbits to significantly reduce transmission delay. Generally, non-geostationary systems operate in inclined orbits, and pose a potential for interference with satellites operating at the same frequencies as they cross the geo ring.

In January 1999, an application was filed before the Federal Communications Commission (FCC) by Virtual Geosatellite LLC for the construction of a global broadband satellite communications system based on the teachings of U.S. Pat. Nos. 5,845,206 and 5,957,409, issued to the inventor of the present invention and two other individuals on Dec. 21, 1998 and Sep. 28, 1999, respectively. The system proposed in the FCC application employs three arrays of satellites in elliptical orbits, two arrays covering the northern hemisphere and one covering the southern hemisphere, each array having five 8-hour satellites emulating many of the characteristics of geo satellites. The satellites appear to "hang" in the sky because their angular velocity at or near apogee approximates the rotation rate of the earth. Nine so-called "active arcs" are created with centers located at the apogee points of the satellite orbits. The satellites in each of the three arrays move in a repeating ground track from one active arc to the next, so that there is always one active satellite available in each active arc. Satellites are deactivated between arcs. The active arcs occupy a different portion of the sky than any of the geo satellites located near the equator. As a result, the virtual geo satellites are visible from most parts of the northern and southern hemispheres, but do not interfere with satellites in the geo arc. Even with the prior art virtual geo satellite constellation described above, the present inventor recognizes that capacity issues will continue to become more pressing as communication traffic needs, both in terms of bandwidth and capacity, grow. There will be a need for non-geostationary satellite constellations that provide greater capacity than has already been contemplated in the prior art.

OBJECTIVES

Therefore, it is an object of the present invention to provide a system of satellites that substantially increases global communications satellite capacity without interfering with the existing geostationary satellite ring.

It is another objective of the present invention to provide a global system of communications satellites with higher average elevation angles and lower transmission delay than existing geostationary satellites.

It is a further objective of the present invention to provide a global system of communications satellites with lower construction and launch costs than existing geostationary satellites.

It is yet a further objective of the present invention to provide a global system of communications satellites capable of effectively reusing existing geostationary satellite spectrum allocations.

The above-stated objectives, as well as other objectives, features and advantages, of the present invention will become readily apparent from the following detailed description, which is to be read in conjunction with the appended drawings.

SUMMARY OF THE INVENTION

The present invention is directed to a constellation of non-geostationary satellites that may be deployed and uti-

4

lized in a matter the substantially increases global communications capacity and does not interfere with satellites in the existing geostationary ring around the earth's equator. A system embodiment includes a ground station, including communications equipment and a steerable antenna, located at a point on the earth, a plurality of satellites in inclined elliptical orbits that forms at least two repeating ground tracks that are displaced from each other in longitude, but all have the same shape. The repeating ground tracks bring the satellites the over the same points on the earth everyday. In the preferred embodiment the satellites have a mean motion of 3, meaning they orbit the earth three times per day, but other integer values of mean motion, such as 2 and 4 have potential applicability.

Each orbiting satellite has communications equipment on board for communicating with ground stations. The communications equipment on each satellite in the constellation is enabled only during a portion of the orbit when the satellite is near apogee, the point in the orbit where the satellite altitude is greatest and the satellite is moving most slowly from the viewpoint of the earth station. In the preferred embodiment, with mean motion 3, each of the satellites is enabled near its apogee for duration of 4 hours, which is 50 percent of total orbit period.

Each of the satellite ground tracks has a number of active arcs corresponding to the portion of the satellite orbits during which the communications equipment on the satellites is enabled to communicate. The orbits of the plurality of satellites are configured such that there are at all times at least two satellites in each active arc enabled to communicate. At the same time, the orbits of the satellites forming each ground track are configured such that the separation between enabled satellites in the same ground track is not less than a predetermined amount considered necessary to prevent interference. Preferably, the satellites in each ground track are equally spaced in mean anomaly to achieve the greatest number of satellites enabled at the same time. In the preferred embodiment, continuous communication at a 50 percent duty cycle requires a minimum of six satellites spaced evenly in mean anomaly. As one satellite of the array leaves an active arc, another satellite enters the active arc to take its place. Adding more arrays of six equally spaced satellites to each ground track in the preferred embodiment creates additional orbital slots. Actually, each group of six satellites, in the preferred embodiment, also provides orbital slots to other positions in the ground track spaced at 120-degree intervals around earth. In the preferred embodiment, the orbital parameters allow up 20 satellites to be placed in each active arc of the ground track while maintaining a minimum angular spacing between satellites of at least 2 degrees.

To avoid potential interference between satellites in different ground tracks, the orbits of the satellites in the two or more ground tracks are also configured such that each satellite enabled to communicate in one of the active arcs is separated by at least a predetermined angle from each of the satellites enabled to communicate in the other ground tracks. In the preferred embodiment, the argument of perigee is adjusted to make the elliptical orbits lean over, allowing the active portions of adjacent ground tracts to be brought close together without interference. The argument of perigee in the present invention preferably ranges from 195 degrees to 345 degrees for apogee is in the northern hemisphere and from 15 degrees to 165 degrees for apogee is in the southern hemisphere.

In another aspect of the invention, each of the satellites in the constellation has an orbital height lower than the height