# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ELLIPSO, INC.,
A Delaware Corporation,

and

VIRTUAL GEOSATELLITE LLC, a
Delaware Limited Liability Company,

Plaintiffs

v.

John E. DRAIM, an individual,

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**OPPOSITION TO MOTION FOR
ATTORNEYS FEES AND COSTS**

Case No. 1:06cv01373 (JR)

The Plaintiff hereby respectfully requests that this court deny the Defendant's Motion for Attorney's Fees and Costs under DC Code 36-404(1), in the above-captioned case, as the present action was filed in good faith.  A Memorandum in Opposition to Attorney's Fees and Costs is hereby submitted.  Please note the Memorandum in Opposition submitted to this court on July 9, 2007 attached as Appendix A.

BY: counsel

/s/ David Bogart Dort

David Bogart Dort, DC. Bar No. 465,728

**Dort IP PLLC
(Rubinstein Law Group, P.C.)**
2020 14th Street N, Suite 700
Arlington, VA 22201
Telephone:    (202)-423-1085
Facsimile:    (202)-318-7729
Email: ddort@dort.com; ddort@rublaw.com
Attorneys for Plaintiff,
Ellipso, Inc.
Virtual Geosatellite LLC

-1-

Opposition to Defendant's Motion for Attorney's Fees and Costs and Memorandum in Support: 1:06cv01373

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ELLIPSO, INC.,
A Delaware Corporation,

and

VIRTUAL GEOSATELLITE LLC, a
Delaware Limited Liability Company,

                    Plaintiffs

            v.

John E. DRAIM, an individual,

                    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**MEMORANDUM IN SUPPORT OF
OPPOSITION TO MOTION FOR
ATTORNEYS FEES AND COSTS**

Case No. 1:06cv01373 (JR)

## MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION FOR ATTORNEYS FEES AND COSTS

Defendant, John E. Draim, is not entitled to Attorney's fees or costs in the above
captioned case because the claim of misappropriation in the present action was not
made in bad faith.  DC Code §36-404(1) states that a court may award reasonable
attorney's fees to the prevailing party if "a claim of misappropriation is made in bad faith."
As shown by the arguments and evidence discussed below, Ellipso did not bring this
present action in bad faith, as evidenced by the following:

1) Each and every claim of the Defendant's patent US Patent 6,701,126, (the '126
patent), issued March 2, 2004, and currently assigned to a third party, was initially
rejected in Reexamination as anticipated (disclosed) by Ellipso's US Patent
6,954,613 (the '613 patent) (see Plaintiff's Exhibit 1), indicating that any trade
secrets included in the '613 patent and its parent provisional application (the '280
application) may have been misappropriated and claimed by the Defendant in his
'126 patent and subsequently assigned to a third party.

1

2) On April 18, 2006, in a trial in a previous case, *Draim v. Virtual Geosatellite Holdings, Inc. et al.* (1:01 cv 2690), the Defendant admitted under oath to subsequently assigning technical subject matter that he had previous assigned to Ellipso, to a third party.

2

3

4

5

3) Ellipso asserts that the action was brought in good faith, and was not time-barred by the three-year statute of limitations, even though this court has found otherwise.

6

7

8

4) No previous litigation between the parties resolved the intellectual property trade secret dispute(s) brought by this action.

9

10

11

Therefore, the court must deny the Defendant's Motion for Attorneys Fees and Costs.

12

**BACKGROUND AND RELEVANT FACTS**

13

In a complaint filed in DC Superior Court on July 20, 2006 ("the Complaint") the Ellipso parties (herein "Ellipso") alleged that the Defendant's actions, primarily in the form of claiming intellectual property belonging to Ellipso as his own, and transferring that intellectual property to a third party, constituted trade secret misappropriation under DC Code §36-404 ("the Act"). Thus, independent of any actions of a third party, the Defendant's alleged trade secret misappropriation of Ellipso's intellectual property has forced Ellipso to perform worldwide "locate and recover operations" for its misappropriated intellectual property, at great expense.[1] Further, Ellipso has lost business opportunities due to the Defendant's alleged trade secret misappropriation.

14

15

16

17

18

19

20

21

In response to a denied Motion to Dismiss, the Defendant was invited by this Court to file a Motion for Summary Judgment to expedite the matters that had been asserted in the Defendant's Motion to Dismiss. In summary, in the Motion for Summary Judgment, the Defendant asserted that: a) the technical subject matter set forth in the Complaint was not a "trade secret" under the Act; b) that even if the subject matter set forth in the Complaint was a trade secret, Ellipso was barred by the statute of limitation of three years from discovery of the misappropriation or

22

23

24

25

26

27

28

1
2
3
4
5

reasonable diligence.  Further, the Defendant asserted that: c) he had been released by Ellipso in a settlement agreement of July 20, 2005 with third parties, and d) that the trade secret cause of action had been dismissed with prejudice in a previous case between the parties.  The Defendant stated that each one of the Defendant's assertions was related to Ellipso's good faith filing of the present action.

6
7
8
9

On November 19, 2007, this Court granted the Defendant's Motion for Summary Judgment of May 15, 2007 because the action was found to be barred by the three-year statute of limitations and Ellipso should have known of the causes of action prior to July 20, 2003.  The Plaintiff previously submitted to this court an Opposition to Fees and Costs on July 9, 2007. (Herein attached as Appendix A).

10
11
12
13
14

For the reasons stated below, the Defendant is not entitled to Attorney's fees and costs in the present case, pursuant to DC Code §36-404(1) as the above-captioned case was filed and prosecuted in good faith.  Even though the court granted the Defendant's Motion for Summary Judgment the defendant is not entitled to fees or costs in this case.

15
16
17

**I.  Ellipso believed it had a Clear, Good Faith Cause of Action against Draim for Misappropriation of Trade Secrets under DC Code §36-404 that was not barred by the Statute of Limitations.**

18
19
20

a. Proceedings in US Reexamination 90/007974, of US Patent 6,701,126 indicate that trade secret material in the '126 patent (as well as other patent applications) may have been inappropriately "copied" from Ellipso's (confidential) patent applications, including material from Ellipso's 6,954,613 patent.

21
22
23
24
25
26
27

On August 30, 2006, the '126 patent which had been issued to the Defendant, and assigned to a third party, was ordered re-examined by the USPTO, in view of the '613. On March 12, 2007, the Examiner initially rejected each and every claim of the '126 patent as anticipated by Ellipso's '613 patent under 35 USC §102(e).  The rejection in the form of a Patent Office "Office Action" is included as Plaintiff's Exhibit .
Plaintiff's Exhibit 1(in Appendix A) shows that each and every claim of the Defendant's '126 Application was (initially) rejected in Reexamination as anticipated by Ellipso's '613 patent, indicating that (the alleged) trade secrets included in the '613 patent (the '215

28

application) may have been misappropriated, claimed by the Defendant, and then assigned to a third party.

Further, Exhibit 2 (in Appendix A) shows that the Defendant declared (under penalties defined in 28 USC §1001) that he was the "first, sole and original inventor"…"of the subject matter *claimed"* (not "disclosed," emphasis added) in the '126 patent.

Ellipso asserts that the initial Reexamination decision and subsequent rejection of each and every claim of the '126 patent under a prior-filed Ellipso patent application, is clearly illustrative that a genuine material fact existed in the present case as to whether the Defendant misappropriated material that should be considered as trade secrets, namely the content of Ellipso's confidential patent applications, in the form of both technical subject matter (disclosure) and claimed subject matter (the claims). The decision(s) by Commissioner for Patents are illustrative that Ellipso clearly had a reason to have a good faith belief that its trade secrets had been misappropriated by the Defendant, fraudulently **claimed** for himself as sole inventor under US Patent law (Exhibit 2), and subsequently **assigned** to a third party.

b. The '289 and '215 patent applications include material that included trade secrets as defined by the Act.

The Defendant mistakenly asserts that the FCC Application of January 8, 1999 included all of the material that was included in the '289 provisional (and subsequent '215 non-provisional) applications, namely, that the files themselves and content of those applications were valuable trade secrets. The Act defines a trade secret as "information that derived actual or potential independent economic value from not being generally known to another and the information is the subject of reasonable efforts to maintain secrecy." Clearly, the '289 provisional and subsequent '215 non-provisional qualify as trade secrets independently of the material in the FCC application.

The Declaration of John Anderson, filed May 15, 2007, states that "Plaintiffs took no efforts to maintain the secrecy of their inventions once a patent application had been filed and their allegation of "trade secret" protection for those inventions is baseless." The Defendant improperly asserts that Ellipso made the patent applications themselves public and that Ellipso lost their entire trade secret value in the confidential patent application, by applying for an FCC application and attracting investment and academic interest,

Thus, the Defendant clear has failed to recognize that the disclosure and claimed subject matter of Ellipso's confidential patent application(s), clearly meets the definition of a trade secret as defined by the Act.

The Defendant states that "in fact, plaintiffs undertook concerted, public efforts to disclose and market the invention claims [sic] in those applications (P. 16, ¶2). And further "plaintiff's disclosed that system in the FCC filing in January, 1999." (P.16, ¶3). Ellipso does not deny its efforts to procure FCC licenses and investment prior to September 10, 1999 (the day of the filing of '289 provisional application) for related technologies and inventions. However, that does not mean: a) that Ellipso intended for the technical and claimed subject matter of the '289 provisional application and the '215 non-provisional application, to lose their status as a trade secret; and that: 2) all technical subject matter in the form of a trade secret in those applications was lost by the FCC application.

The Defendant appears to ignore the definition of a trade secret as defined in the Act, to argue that material related to the inventions that may be claimed in a patent application, of the fact that an unpublished patent application is clearly a trade secret. The "trade secret value" of the technical and claimed subject matter of a confidential patent application can only be ferociously apparent to the owner of a patent application who discovers that a former employee has subsequently **claimed** (not merely disclosed) and patented those inventions all for himself. In the present case, the trade secret value, as defined by the Act, is made more apparent by considering the astronomical odds that each and every element of all 27 claims of the Defendant's '280 application would be fully anticipated by a single Ellipso patent application that happened to be filed 7-1/2 months before the Defendant's departure. Thus, Ellipso clearly has a good faith reason to believe that its confidential patent applications, in the form of the '289 provisional and the '215 non-provisional, included trade secrets that had not been made public.

c. The Plaintiff did not believe that it's Cause of Action under DC Code §36-404 was barred by the three-year statute of limitations.

     i. Ellipso did not believe it was barred from bringing the present action by the three-year statute of limitations as it was unaware of the particulars and extent of the Defendant's alleged misappropriation until at least March 2, 2004.

1
2
3
4
5
6
7
8
9
10

Defendant is correct that it provided documents to Plaintiff's Counsel in a previous case between the parties on April 24, 2003 (see Defendant's Exhibits 3-9) and Ellipso has not made any "blatantly false allegations" regarding such disclosure.  In contrast, Ellipso asserts that: a) the Defendant is clearly incorrect as to the implications of providing "attorney's eyes only" documents to the Plaintiff's counsel in a previous case; and 2) that the extent and particularity of the Defendant's trade secret misappropriation could not have been discovered prior to the issuance of the '126 patent on March 2, 2004, as the Defendant had until the issuance of the '126 patent to remedy the mistake that Ellipso has now had to undertake to recover its intellectual property and pursue compensation from the Defendant for such an undertaking.

11
12
13
14
15
16

First, Ellipso would not have been able to "copy" or otherwise use the claims of the Defendant's '280 application, from the documents provided to Ellipso attorneys in the previous case, as "attorneys eyes only" would clearly have not allowed Ellipso to see the files, nor pursue any administrative remedy (e.g. interference, protest, etc.) to recover its own intellectual property that had been misappropriated, *inter alia*, in the Defendant's '280 application.

17
18
19
20
21
22
23
24

The court found that Ellipso was on constructive notice of the trade secret misappropriations as of July 20, 2003.  Ellipso may have known of **a misappropriation by the Defendant,** but not the particular misappropriation(s) set forth in the complaint of July 20, 2006.  A cause of action does not accrue until a party knows, or should have known, of a particular injury.  Here, Ellipso did not become aware of any injury because the '126 patent had not issued (and the Defendant could have still corrected the situation), and could not have been aware of any such injury, prior to July 20, 2003.  The court has found otherwise in dismissing the action.

25
26

ii) Defendant misstates that "the patent applications filed by Mr. Draim in 2000 and 2002 were *all* publicly available in 2002.

27
28

The nature and extent of the Defendant's trade secret misappropriation due to the publication of the PCT applications in May, 2002.   A PCT application *may* be based on, but need not be, the same as, an (United States) application to which it claims priority.

1
2
3
4

Further, the claims of a PCT application may be completely different than those of a corresponding or priority US Application.  As the Defendant may well be aware, the PCT publications of May 2002, clearly may not have been informative as to the extent of the Defendant's misappropriation.

5
6
7
8

Further, a PCT application does not confer patent ownership and/or rights, as it is not a patent application in any particular country but rather a method for preparation for filing in many countries.  A Published PCT application is therefore only *disclosure and does not confer ownership rights on the Applicant until* a "national stage entry" application has been filed in a specific country (see footnote 1).

9
10

   iii)     The Defendant's Exhibits 10 and 12-14 illustrate that the Plaintiff was not aware of the particular misappropriation and extent of the Defendant's trade secret misappropriation as late as April 24, 2003.

11
12
13
14
15
16
17
18
19
20
21
22
23
24

The Defendant's own Exhibits numbered 10 and 12-14 clearly undercut his argument that Ellipso knew exactly *which* trade secrets, in both the form of disclosed and claimed technical subject matter, had been misappropriated the Defendant.  Defendant's Exhibit 10 (letters from David Castiel to John Draim, December 2002) illustrates that Ellipso had thought that the Defendant had misappropriated technical subject matter from *US Patent 5,957,409 (*issued September 28, 1999*)*, an allegation that has clearly not been asserted in the present action.   Defendant's Exhibits 12, 13 and 14 also support that conclusion that Ellipso thought that the Defendant had misappropriated technical subject matter from US Patent 5,957,409.  US Patent 5,957,409 issued on September 28, 1999, and was filed based on a priority dating back to March, 1995.  Whether or not the Defendant was entitled to appropriate material from the '409 patent in his own patent application(s) is not the subject of the present action, was not set forth in the Complaint, and therefore must be considered irrelevant to the determination of whether Ellipso filed this action within the required three-year statute of limitations of discovery or discovery with reasonable diligence.

25
26
27
28

Therefore, clearly Ellipso had a good faith belief that the: 1) Defendant misappropriated trade secrets in the form of confidential patent applications that: 2) Ellipso had taken steps to keep confidential in the form of the '289 and '215 patent applications, and that 3) Ellipso filed the Complaint within three years of the discovery (or discovery with diligence) of the Defendant's alleged misappropriation and that documents provided by counsel in a

previous case did not impart the particular knowledge to Ellipso to know the particular trade secrets that had been misappropriated.

**II. Ellipso's cause of action has not been released by any prior adjudication**

As shown in Judge Facciola's Conclusion of Facts and Law of May 15, 2006 in a previous case between the parties, (**Exhibit 4**) there simply was no conclusion of any kind related to any allegations of Trade Secret misappropriation.   Judge Facciola only reached conclusions of fact and law with regard to the patent bonus issue and the civil conspiracy defense.

**Conclusion**

Ellipso asserts that the above arguments, the Plaintiff's Exhibits, are supportive of the Ellipso's position that the present action was brought in good faith against the Defendant.


                                                        BY: counsel

                                                        /s/ David Bogart Dort

                                        David Bogart Dort, DC. Bar No. 465,728

                                                **Dort IP PLLC**
                                        **(Rubinstein Law Group, P.C.)**
                                        2020 14th Street N, Suite 700
                                                Arlington, VA 22201
                                        Telephone:   (202)-423-1085
                                        Facsimile:   (202)-318-7729
                                Email: ddort@dort.com; ddort@rublaw.com
                                                Attorneys for Plaintiff,
                                        Ellipso, Inc.,Virtual Geosatellite LLC

Appendix A

Opposition to Attorney's Fees and Costs Submitted July 9, 2007

**David Bogart Dort**

| | |
|---|---|
| **From:** | DCD_ECFNotice@dcd.uscourts.gov |
| **Sent:** | Monday, July 09, 2007 11:43 PM |
| **To:** | DCD_ECFNotice@dcd.uscourts.gov |
| **Subject:** | Activity in Case 1:06-cv-01373-JR ELLIPSO, INC. et al v. DRAIM Memorandum in Opposition |

<span style="color:red">**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**</span>
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### District of Columbia

### Notice of Electronic Filing

The following transaction was entered by Dort, David on 7/9/2007 at 11:43 PM and filed on 7/9/2007
**Case Name:**      ELLIPSO, INC. et al v. DRAIM
**Case Number:**    1:06-cv-1373
**Filer:**      ELLIPSO, INC.
**WARNING: CASE CLOSED on 06/28/2007**
**Document Number:** 17

**Docket Text:**
Memorandum in opposition to re [10] MOTION for Summary Judgment *and* MOTION for Attorney Fees filed by ELLIPSO, INC.. (Attachments: # (1) Exhibit Exhibits 1-4)(Dort, David)

**1:06-cv-1373 Notice has been electronically mailed to:**

John F. Anderson     john.anderson@troutmansanders.com

David Bogart Dort     ddort@rublaw.com

**1:06-cv-1373 Notice will be delivered by other means to::**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\Documents and Settings\Administrator\My Documents\ELLP-Response\06cv01373-opposition-070907v final.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=7/9/2007] [FileNumber=1489291-0]
[40ed27249bcfd337a1ea41bd9efb4f40656c39df19ba4383a12d132b03220aa3c0e8b
87f1cce9a3e37b5345546000f46aaf630fda79a8d5130d15a120bb8b5b3]]
**Document description:**Exhibit Exhibits 1-4

**Original filename:**C:\Documents and Settings\Administrator\My Documents\ELLP-Response\exhibits
0709.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=7/9/2007] [FileNumber=1489291-1]
[83d8591f4aeabf9468cdf76f5de024710e0812c2641afc7fe4966cf2a1bc4f5b5f005
9ce8dc989d7230de6c8d3a4a01b01082f8e1a93cc7a2e253b19738c6ad8]]

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ELLIPSO, INC.,
A Delaware Corporation,

and

VIRTUAL GEOSATELLITE LLC, a
Delaware Limited Liability Company,

Plaintiffs

v.

John E. DRAIM, an individual,

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**OPPOSITION TO MOTION FOR
ATTORNEYS FEES AND COSTS**

Case No. 1:06cv01373 (JR)

The Plaintiff hereby respectfully requests that this court deny the Defendant's Motion for Attorney's Fees and Costs under DC Code 36-404(1), in the above-captioned case, as the present action was filed in good faith.  A Memorandum in Opposition to Attorney's Fees and Costs is hereby submitted.

BY: counsel

/s/ David Bogart Dort

David Bogart Dort, DC. Bar No. 465,728

**Dort IP PLLC
(Rubinstein Law Group, P.C.)**
2020 14th Street N, Suite 700
Arlington, VA 22201
Telephone:   (202)-423-1085
Facsimile:    (202)-318-7729
Email: ddort@dort.com; ddort@rublaw.com
Attorneys for Plaintiff,
Ellipso, Inc.
Virtual Geosatellite LLC

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ELLIPSO, INC.,
A Delaware Corporation,

and

VIRTUAL GEOSATELLITE LLC, a
Delaware Limited Liability Company,

           Plaintiffs

    v.

John E. DRAIM, an individual,

           Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**MEMORANDUM IN SUPPORT OF
OPPOSITION TO MOTION FOR
ATTORNEYS FEES AND COSTS**

Case No. 1:06cv01373 (JR)

---

**MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION FOR ATTORNEYS
FEES AND COSTS**

Defendant, John E. Draim, is not entitled to Attorney's fees or costs in the above
captioned case because the claim of misappropriation in the present action was not
made in bad faith.  DC Code §36-404(1) states that a court may award reasonable
attorney's fees to the prevailing party if "a claim of misappropriation is made in bad faith."
As shown by the arguments and evidence discussed below, Ellipso did not bring this
present action in bad faith, as evidenced by the following:

1) Each and every claim of the Defendant's patent US Patent 6,701,126, (the '126
   patent), issued March 2, 2004, and currently assigned to a third party, was initially
   rejected in Reexamination as anticipated (disclosed) by Ellipso's US Patent
   6,954,613 (the '613 patent) (see Plaintiff's Exhibit 1), indicating that any trade
   secrets included in the '613 patent and its parent provisional application (the '280
   application) may have been misappropriated and claimed by the Defendant in his
   '126 patent and subsequently assigned to a third party.

2) Ellipso's action for Trade Secret misappropriation again the Defendant would have survived the Defendant's Motion for Summary Judgment had the Plaintiff been given an opportunity to respond (see previously filed Motion to Vacate).

3) On April 18, 2006, in a trial in a previous case, *Draim v. Virtual Geosatellite Holdings, Inc. et al.* (1:01 cv 2690), the Defendant admitted under oath to subsequently assigning technical subject matter that he had previous assigned to Ellipso, to a third party.

4) The Defendant has not been released by any settlement agreement (Defendant's Exhibit  and/or previous judgments or litigation (Exhibit 4).

Therefore, the court must deny the Defendant's Motion for Attorneys Fees and Costs.

## BACKGROUND AND RELEVANT FACTS

In a complaint filed in DC Superior Court on July 20, 2006 ("the Complaint") the Ellipso parties (herein "Ellipso") alleged that the Defendant's actions, primarily in the form of claiming intellectual property belonging to Ellipso as his own, and transferring that intellectual property to a third party, constituted trade secret misappropriation under DC Code §36-404 ("the Act").  Thus, independent of any actions of a third party, the Defendant's alleged trade secret misappropriation of Ellipso's intellectual property has forced Ellipso to perform worldwide "locate and recover operations" for its misappropriated intellectual property, at great expense.[1]  Further, Ellipso has lost business opportunities due to the Defendant's alleged trade secret misappropriation.

In response to a denied Motion to Dismiss, the Defendant was invited by this Court to file a Motion for Summary Judgment to expedite the matters that had been asserted in the Defendant's Motion to Dismiss.  In summary, in the Motion for Summary Judgment, the Defendant asserted that: a) the technical subject matter set

---

[1] Indeed, thanks to its investigative efforts, Ellipso learned that Draim or his assignee sought to obtain a patent, which is a companion to the '126 patent, through the European Patent Office.  This patent application, and subsequent denial by the European Patent Office, does not appear to have been disclosed to Ellipso during discovery of the *Draim v. Virtual Geosatellite Holdings, Inc. et al.* case.

1
2
3
4
5
6
7
forth in the Complaint was not a "trade secret" under the Act; b) that even if the subject matter set forth in the Complaint was a trade secret, Ellipso was barred by the statute of limitation of three years from discovery of the misappropriation or reasonable diligence.  Further, the Defendant asserted that: c) he had been released by Ellipso in a settlement agreement of July 20, 2005 with third parties, and d) that the trade secret cause of action had been dismissed with prejudice in a previous case between the parties.  The Defendant stated that each one of the Defendant's assertions was related to Ellipso's good faith filing of the present action.

8
9
10
11
12
13
14
15
On June 28, 2007, this Court granted the Defendant's Motion for Summary Judgment of May 15, 2007 "as conceded" by the Plaintiff, due to the Court's Order that the Plaintiff would not be granted additional time to answer the Defendant's Motion for Summary Judgment in the expanded thirty day period agreed to by the parties on April 12, 2007.   This Opposition is being filed simultaneously (previously filed) with a Motion to Vacate the Order of June 28, 2007, in which the Plaintiff has provided evidence of non-receipt of the Motion of May 15, 2007.   However, the court allowed Ellipso until July 9, 2007 to respond to the Request for Attorney's Fees and Costs by Defendant.

16
17
18
19
20
For the reasons stated below, the Defendant is not entitled to Attorney's fees and costs in the present case, pursuant to DC Code §36-404(1) as the above-captioned case was filed and prosecuted in good faith.  Even if the court grants the Defendant's Motion for Summary Judgment (and denies the previously filed Plaintiff's Motion to Vacate), the defendant is not entitled to fees or costs in this case.

21
22
**I.   Ellipso has a Clear, Good Faith Cause of Action against Draim for Misappropriation of Trade Secrets under DC Code §36-404 that is not barred by the Statute of Limitations.**

23
24
25
a. Proceedings in US Reexamination 90/007974, of US Patent 6,701,126 indicate that trade secret material in the '126 patent (as well as other patent applications) may have been inappropriately "copied" from Ellipso's (confidential) patent applications, including material from Ellipso's 6,954,613 patent.

26
27
28
On August 30, 2006, the '126 patent which had been issued to the Defendant, and assigned to a third party, was ordered re-examined by the USPTO, in view of the '613. On March 12, 2007, the Examiner initially rejected each and every claim of the '126

patent as anticipated by Ellipso's '613 patent under 35 USC §102(e). The rejection in the form of a Patent Office "Office Action" is included as Plaintiff's Exhibit 1.

Plaintiff's Exhibit 1 shows that each and every claim of the Defendant's '126 Application was (initially) rejected in Reexamination as anticipated by Ellipso's '613 patent, indicating that (the alleged) trade secrets included in the '613 patent (the '215 application) may have been misappropriated, claimed by the Defendant, and then assigned to a third party.

Further, Exhibit 2 shows that the Defendant declared (under penalties defined in 28 USC §1001) that he was the "first, sole and original inventor"…"of the subject matter **claimed"** (not "disclosed," emphasis added) in the '126 patent.

Ellipso asserts that the initial Reexamination decision and subsequent rejection of each and every claim of the '126 patent under a prior-filed Ellipso patent application, is clearly illustrative that a genuine material fact exists in the present case as to whether the Defendant misappropriated material that should be considered as trade secrets, namely the content of Ellipso's confidential patent applications, in the form of both technical subject matter (disclosure) and claimed subject matter (the claims). The decision(s) by Commissioner for Patents are illustrative that Ellipso clearly had a reason to have a good faith belief that its trade secrets had been misappropriated by the Defendant, fraudulently **claimed** for himself as sole inventor under US Patent law (Exhibit 2), and subsequently **assigned** to a third party.

b. The '289 and '215 patent applications include material that includes trade secrets as defined by the Act.

The Defendant mistakenly asserts that the FCC Application of January 8, 1999 included all of the material that was included in the '289 provisional (and subsequent '215 non-provisional) applications, namely, that the files themselves and content of those applications were valuable trade secrets. The Act defines a trade secret as "information that derived actual or potential independent economic value from not being generally known to another and the information is the subject of reasonable efforts to maintain secrecy." Clearly, the '289 provisional and subsequent '215 non-provisional qualify as trade secrets independently of the material in the FCC application.

The Declaration of John Anderson, filed May 15, 2007, states that "Plaintiffs took no efforts to maintain the secrecy of their inventions once a patent application had been filed and their allegation of "trade secret" protection for those inventions is baseless."   The Defendant improperly asserts that Ellipso made the patent applications themselves public and that Ellipso lost their entire trade secret value in the confidential patent application, by applying for an FCC application and attracting investment and academic interest, Thus, the Defendant clear has failed to recognize that the disclosure and claimed subject matter of Ellipso's confidential patent application(s), clearly meets the definition of a trade secret as defined by the Act.

The Defendant states that "in fact, plaintiffs undertook concerted, public efforts to disclose and market the invention claims [sic] in those applications (P. 16, ¶2).  And further "plaintiff's disclosed that system in the FCC filing in January, 1999." (P.16, ¶3). Ellipso does not deny its efforts to procure FCC licenses and investment prior to September 10, 1999 (the day of the filing of '289 provisional application) for related technologies and inventions.  However, that does not mean: a) that Ellipso intended for the technical and claimed subject matter of the '289 provisional application and the '215 non-provisional application, to lose their status as a trade secret; and that: 2) all technical subject matter in the form of a trade secret in those applications was lost by the FCC application.

The Defendant appears to ignore the definition of a trade secret as defined in the Act, to argue that material related to the inventions that may be claimed in a patent application, of the fact that an unpublished patent application is clearly a trade secret.  The "trade secret value" of the technical and claimed subject matter of a confidential patent application can only be ferociously apparent to the owner of a patent application who discovers that a former employee has subsequently **claimed** (not merely disclosed) and patented those inventions all for himself.  In the present case, the trade secret value, as defined by the Act, is made more apparent by considering the astronomical odds that each and every element of all 27 claims of the Defendant's '280 application would be fully anticipated by a single Ellipso patent application that happened to be filed 7-1/2 months before the Defendant's departure.  Thus, Ellipso clearly has a good faith reason to believe that its confidential patent applications, in the form of the '289 provisional and the '215 non-provisional, included trade secrets that had not been made public.

-6-

c. The Defendant's actions before the patent office are inconsistent with the assertions that the FCC application of January 8, 1999 was "public material." (i.e. not a trade secret.)

Defendant cannot both simultaneously avail himself of a "public disclosure" defense to a trade secret, claiming that the subject matter of the FCC Application of January 8, 1999 was "public material," *id est,* that the FCC application of January 8, 1999, was not a trade secret, thereby removing the trade secret status of the '289 provisional application, while the Defendant's failed to reveal the FCC application "public material" to the Patent Office during the prosecution of the '280 application.

Exhibit 3, shows that the Defendant did not submit the FCC application of January 8, 1999 as a reference in the procurement of the '126 patent.  Thus, the logic in Ellipso's assertion that the Defendant cannot is clear:

a) the Defendant asserts that Ellipso's '289 and '215 applications did not include trade secrets, because the FCC application of January 8, 1999 publicly disclosed the subject matter of the those application;

b) The Defendant did not submit the FCC application of January 8, 1999, as prior art in the '126 patent (Exhibit 3), during the prosecution of the '280 application.

c) the Commissioner for Patents has initially determined that all the claims of the '126 application were anticipated by the '289 and 215 applications.

The fact that the patent office (at least initially) opined that each and every claim of the '126 patent was anticipated by what the Defendant *now* alleges as so-called "publicly available material" presents the Defendant with a serious dilemma: either it appears as if the Defendant simply forgot about the so-called "publicly available material" insofar as it related to the "280" application, or the Defendant hid the material in the FCC application of January 8, 1999 ,from the Patent Office in violation of his obligations, *inter alia*, under 37 CFR §1.56 (see Exhibit 2).  Either way, Ellipso's intellectual property has been severely compromised. [2]

_____

[2] Ellipso concedes that any failure of the Defendant to disclosure Ellipso's FCC Application of January 8, 1999 in the prosecution of the '280 application does not constitute trade secret misappropriation under the Act, but rather is a violation of 37 CFR 1.56 with regard to the '126 patent and may constitute fraud (or at least misrepresentation) on the Patent Office as defined by, *inter alia*, 37 CFR 10.1 et seq..

1
2
3
4
5
6

Further, now that the Commissioner for Patents has stated that each and every claim of the '126 patent was anticipated by the '613 patent, the Defendant may be admitting that the claims of the '126 patent clearly belonged to Ellipso as early as January 8, 1999, at the time of filing the '280 application, and not to the defendant.  Thus, Ellipso has further proof that it had a good faith belief for filing a trade secret misappropriation action against the Defendant.

7
8

d. The Plaintiff's Cause of Action under DC Code §36-404 is not barred by the three-year statute of limitations.

9
10

    i. Ellipso is not barred from bringing the present action by the three-year statute of limitations as it was unaware of the particulars and extent of the Defendant's alleged misappropriation until at least March 2, 2004.

11
12
13
14
15
16
17
18
19
20

Defendant is correct that it provided documents to Plaintiff's Counsel in a previous case between the parties on April 24, 2003 (see Defendant's Exhibits 3-9) and Ellipso has not made any "blatantly false allegations" regarding such disclosure.  In contrast, Ellipso asserts that: a) the Defendant is clearly incorrect as to the implications of providing "attorney's eyes only" documents to the Plaintiff's counsel in a previous case; and 2) that the extent and particularity of the Defendant's trade secret misappropriation could not have been discovered prior to the issuance of the '126 patent, as the Defendant had until the issuance of the '126 patent to remedy the mistake that Ellipso has now had to undertake to recover its intellectual property and pursue compensation from the Defendant for such an undertaking.

21
22
23
24
25
26

First, Ellipso would not have been able to "copy" or otherwise use the claims of the Defendant's '280 application, from the documents provided to Ellipso attorneys in the previous case, as "attorneys eyes only" would clearly have not allowed Ellipso to see the files, nor pursue any administrative remedy (e.g. interference, protest, etc.) to recover its own intellectual property that had been misappropriated, *inter alia*, in the Defendant's '280 application.

27
28

Further, the Defendant mistakenly states that Ellipso knew of **the** alleged misappropriation as early as 2001.  Ellipso may have known of **a misappropriation by the Defendant,** but not the particular misappropriation(s) set forth in the complaint of July

20, 2006.  A cause of action does not accrue until a party knows, or should have known, of a particular injury.  Here, Ellipso did not become aware of any injury because the '126 patent had not issued (and the Defendant could have still corrected the situation), and could not have been aware of any such injury, prior to July 20, 2003.

ii) Defendant misstates that "the patent applications filed by Mr. Draim in 2000 and 2002 were *all* publicly available in 2002.

The Defendant mistakenly asserts that Ellipso knew of the nature and extent of the Defendant's trade secret misappropriation due to the publication of the PCT applications in May, 2002.   A PCT application *may* be based on, but need not be, the same as, an (United States) application to which it claims priority.  Further, the claims of a PCT application may be completely different than those of a corresponding or priority US Application.  As the Defendant may well be aware, the PCT publications of May 2002, clearly may not have been informative as to the extent of the Defendant's misappropriation.

Further, a PCT application does not confer patent ownership and/or rights, as it is not a patent application in any particular country but rather a method for preparation for filing in many countries.  A Published PCT application is therefore only *disclosure and does not confer ownership rights on the Applicant until* a "national stage entry" application has been filed in a specific country (see footnote 1).

iii)   The Defendant's Exhibits 10 and 12-14 illustrate that the Plaintiff was not aware of the particular misappropriation and extent of the Defendant's trade secret misappropriation as late as April 24, 2003.

The Defendant's own Exhibits numbered 10 and 12-14 clearly undercut his argument that Ellipso knew exactly which trade secrets, in both the form of disclosed and claimed technical subject matter, had been misappropriated the Defendant.  Defendant's Exhibit 10 (letters from David Castiel to John Draim, December 2002) illustrates that Ellipso had thought that the Defendant had misappropriated technical subject matter from *US Patent 5,957,409 (*issued September 28, 1999*)*, an allegation that has clearly not been asserted in the present action.   Defendant's Exhibits 12, 13 and 14 also support that conclusion that Ellipso thought that the Defendant had misappropriated technical subject matter from US Patent 5,957,409.  US Patent 5,957,409 issued on September 28, 1999, and was

1  filed based on a priority dating back to March, 1995.  Whether or not the Defendant was

2  entitled to appropriate material from the '409 patent in his own patent application(s) is not

3  the subject of the present action, was not set forth in the Complaint, and therefore must

4  be considered irrelevant to the determination of whether Ellipso filed this action within the

5  required three-year statute of limitations of discovery or discovery with reasonable

   diligence.

6  Therefore, clearly Ellipso had a good faith belief that the: 1) Defendant misappropriated

7  trade secrets in the form of confidential patent applications that: 2) Ellipso had taken

8  steps to keep confidential in the form of the '289 and '215 patent applications, and that 3)

9  Ellipso filed the Complaint within three years of the discovery (or discovery with diligence)

10  of the Defendant's alleged misappropriation and that documents provided by counsel in a

11  previous case did not impart the particular knowledge to Ellipso to know the particular

12  trade secrets that had been misappropriated.

13  **II. The defendant was not released by the Settlement Agreement of July 20, 2005
14  because he refused to execute the agreement or perform the condition required to
   asset to the agreement.**

15

16  The Defendant was not released by the Ellipso parties in the settlement agreement of

   July 20, 2005 (Defendant's Exhibit 16).  The Defendant states that he was released by

17  Ellispo's agreement to settle with the Sahagen parties, yet he conspicuously is not a

18  signatory to this agreement.   Ellipso could not release Draim, if Draim did not release

19  Ellipso.  Article I, Section 1.1. of the agreement clearly states that:

20

21          each and every party to this Settlement Agreement who is a party in
          one or more of the Actions, shall, through their counsel of record in
22          said Action, execute Stipulations of Dismissal with Prejudice in the
          form deemed appropriate by their counsel.

23

24  It is undisputed that the Defendant did not execute the July 20, 2005, agreement either

25  by signing the agreement or by dismissing the prior action against Ellipso. Therefore,

26  because Draim was not a party to the Settlement Agreement, Ellipso did not and could

27  not have released Draim in the Settlement Agreement of July 20, 2005.   In essence,

   Draim provided no consideration for Ellipso's purported release of its claims against

28  Draim.  Thus, any purported release is unenforceable.  Any other conclusion would result

-10-

in the absurd reasoning that the Defendant would have the right to sue Ellipso at any time for any reason because he refused to execute the July 20, 2005 settlement agreement but that the Defendant was protected from any actions brought by Ellipso.

**III. The defendant has not been released by any prior adjudication**

The Defendant states that the plaintiff has filed the present action in bad faith because they agreed to "dismiss their claims" in a previous case.  Ellipso believes that the Defendant's position that all of the claims in the Complaint had been dismissed with prejudice is erroneous.  A review of Defendant's exhibit No. 15 illustrates that the Defendant is simply mistaken about an agreement to "dismiss" any and all claims of trade secret misappropriation against the Defendant.

In 2005, the parties agreed to limit the claims to be presented to the Court for determination of the patent bonus issue.  However, it does not appear anywhere in the record that any and all claims were dismissed with prejudice or that any of the trade secret misappropriations specifically set forth in the Complaint had been either dismissed or adjudicated.[3]

Furthermore, as shown in Judge Facciola's Conclusion of Facts and Law of May 15, 2006 in a previous case between the parties, (**Exhibit 4**) there simply was no conclusion of any kind related to any allegations of Trade Secret misappropriation.   Judge Facciola only reached conclusions of fact and law with regard to the patent bonus issue and the civil conspiracy defense.

**Conclusion**

Ellipso asserts that the above arguments, the Plaintiff's Exhibits, and even most of the Defendant's Exhibits are supportive of the Ellipso's position that the present action was brought in good faith against the Defendant.

---

[3] Cleverly, Defendant does not contend, because he cannot, that the parties' mutual dismissals were done with prejudice.  It is absurd even to consider, as Defendant would have this Court believe, that the parties, absent a settlement agreement, each would dismiss hotly contested claims with prejudice simply to expedite litigation of a single issue.

BY: counsel

/s/ David Bogart Dort

David Bogart Dort, DC. Bar No. 465,728

**Dort IP PLLC**
**(Rubinstein Law Group, P.C.)**
2020 14th Street N, Suite 700
Arlington, VA 22201
Telephone:    (202)-423-1085
Facsimile:    (202)-318-7729
Email: ddort@dort.com; ddort@rublaw.com
Attorneys for Plaintiff,
Ellipso, Inc.,Virtual Geosatellite LLC

EXHIBIT 1

United States Patent and Trademark Office "Office Action" dated March 12, 2007 in support for OPPOSITION TO DEFENDANT'S MOTION FOR ATTORNEY'S FEES AND COSTS



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,974 | 03/18/2006 | 6701126 | MISC.R001 | 2512 |

7590        03/12/2007

RABIN & BERDO PC
1101 14TH STREET NW, SUITE 500
WASHINGTON, DC 20005

| EXAMINER |
|---|
| Joseph R. Pokrzywa |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | IFW |

DATE MAILED: 03/12/2007

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

DAVID BOGART DORT
RUBINSTEIN LAW GROUP PC
1700 DIAGONAL ROAD, SUITE 300
ALEXANDRIA, VA  22314

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/007,974*.

PATENT NO. *6701126*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| *Ex Parte R  xamination Communication* | Contr. l No.<br>90/007,974 | Patent Und   Reexamination<br>6701126 | |
|---|---|---|---|
| | Examiner<br><br>Joseph R. Pokrzywa | Art Unit<br><br>3992 | |

**A SHORTENED STATUTORY PERIOD FOR RESPONSE TO THIS ACTION IS SET TO EXPIRE <u>2</u> MONTH(S)
FROM THE MAILING DATE OF THIS LETTER. EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).** If
the specified period for response is less than thirty (30) days, a response within the statutory minimum of thirty (30) days
will be considered timely.

Joseph R. Pokrzywa
Primary Examiner
Art Unit: 3992

cc: Requester (if third party requester)

| *Office Action in Ex Parte R   xamination* | C  ntrol No.<br>90/007,974 | Patent Under Re  xamination<br>6701126 | |
| | Examiner<br>Joseph R. Pokrzywa | Art Unit<br>3992 | |

*-- The MAILING DATE of this communication appears on th  cover sheet with the correspondenc  address --*

a ☐ Responsive to the communication(s) filed on _____ .        b ☐ This action is made FINAL.

c ☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐  Notice of References Cited by Examiner, PTO-892.        3. ☐  Interview Summary, PTO-474.

2. ☐  Information Disclosure Statement, PTO/SB/08.        4. ☐  _____ .

Part II    SUMMARY OF ACTION

1a. ☒  Claims *1-27* are subject to reexamination.

1b. ☐  Claims _____ are not subject to reexamination.

2. ☐  Claims _____ have been canceled in the present reexamination proceeding.

3. ☐  Claims _____ are patentable and/or confirmed.

4. ☒  Claims *1-27* are rejected.

5. ☐  Claims _____ are objected to.

6. ☐  The drawings, filed on _____ are acceptable.

7. ☐  The proposed drawing correction, filed on _____ has been  (7a) ☐  approved  (7b) ☐  disapproved.

8. ☐  Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

  a) ☐ All  b) ☐ Some*  c) ☐ None      of the certified copies have

    1 ☐  been received.

    2 ☐  not been received.

    3 ☐  been filed in Application No. _____ .

    4 ☐  been filed in reexamination Control No. _____ .

    5 ☐  been received by the International Bureau in PCT application No. _____ .

    * See the attached detailed Office action for a list of the certified copies not received.

9. ☐  Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

10. ☐  Other: _____

*Joseph R Phyw*

**JOSEPH R. POKRZYWA**
**PRIMARY EXAMINER**

cc: Requester (if third party requester)

U.S. Patent and Trademark Office
PTOL-466 (Rev. 08-06)            Office Acti  n in Ex Parte Reexamination            Part of Paper No. 20070302

Application/Control Number: 90/007,974                                    Page 2

Art Unit: 3992

# DETAILED ACTION

## *Reexamination*

1.    Currently, **claims 1-27** of U.S. Patent Number 6,701,126 are subject to reexamination.

## *Claim Rejections - 35 USC § 102*

2.    The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

3.    **Claims 1-27** are rejected under 35 U.S.C. 102(e) as being anticipated by Castiel *et al*.

(U.S. Patent Number 6,954,613, hereafter "Castiel")

The applied reference has a common inventor with the instant application that became the

'126 Patent.  Based upon the earlier effective U.S. filing date of the reference "Castiel", it

constitutes prior art under 35 U.S.C. 102(e).  This rejection under 35 U.S.C. 102(e) might be

overcome either by a showing under 37 CFR 1.132 that any invention disclosed but not claimed

in the reference was derived from the inventor of this application that became the '126 Patent,

and is thus not the invention "by another," or by an appropriate showing under 37 CFR 1.131.

Regarding *claim 1*, Castiel discloses a satellite communications system, comprising:

a ground station, including communications equipment and an antenna, located at a position on the earth [see col. 1, lines 34-47; also see 3, line 53-col. 4, line 16];

a plurality of satellites in orbits around the earth having apogees and perigees [see Figs. 1 and 3, see col. 2, lines 20-51],

each of the satellites having communications equipment thereon configured to communicate with the ground station only during a predetermined portion of the satellite's orbit proximate to apogee [col. 2, lines 48-51, and col. 17, lines 34-42],

the orbits of the plurality of satellites being configured to form at least two ground tracks on the earth displaced from each other longitudinally [see col. 17, lines 11-52; also see Table 1 in col. 18, lines 1-32; also see Fig. 9],

each of the ground tracks repeating daily and having a number of active arcs [see col. 5, lines 3-8; also see Table 2 in col. 18, lines 30-48, being the "Locations of the VIRGO Active Arcs"],

each active arc corresponding to the portion of the orbit of each satellite during which the communications equipment on the satellite is enabled to communicate with the ground station [col. 17, lines 11-57],

the orbits of the plurality of satellites being further configured such that at all times there are at least two of the satellites in each of the active arcs [col. 17, lines 34-42, wherein *"This requires three satellites out of a total of five to be active at any time."*] and such that at all times each of the satellites in any one of the active arcs is separated by at least a predetermined angle, as observed from the ground station, from each other satellite in the same active arc and from

Application/Control Number: 90/007,974                                      Page 4

Art Unit: 3992

any satellite in any other active arc [col. 17, lines 34-42; also see Table 3 in col. 18, line 48-col.

19, line 13, whereby the satellites are shown to be separated by the angles in the Mean Anomaly

"MA"].

Regarding *claim 2*, Castiel discloses the system discussed above in claim 1, and further

teaches that the orbit of each of the plurality of satellites has a mean motion that is one of 2, 3

and 4 [see col. 5, lines 19-23; also see col. 6, lines 5-10, whereby "12-hour satellites" have a

mean motion of 2; also see col. 12, lines 25-30].

Regarding *claim 3*, Castiel discloses the system discussed above in claim 1, and further

teaches that the orbits of each of the plurality of satellites is inclined at critical inclination [see

Table 3 on col. 18, line 48-col. 19, line 13].

Regarding *claim 4*, Castiel discloses the system discussed above in claim 1, and further

teaches that the argument of perigee of the orbits of each of the plurality of satellites is in the

range of 195 degrees to 345 degrees for apogees in the northern hemisphere and in the range of

15 degrees to 165 degrees for apogees in the southern hemisphere [see Table 1 in col. 18, lines 1-

25, whereby the Aurora I and II, which are in the northern hemisphere, have an "Argument of

Perigee" of 270 degrees, while the Australis, being in the southern hemisphere, has an

"Argument of Perigee" of 90 degrees, each of which are within the claimed range].

Application/Control Number: 90/007,974                                          Page 5

Art Unit: 3992

Regarding *claim 5*, Castiel discloses the system discussed above in claim 1, and further

teaches that each of the plurality of satellites has throughout its orbit an orbital height lower than

a height necessary for geostationary orbits [see col. 3, lines 26-33, wherein "these satellites

according to the disclosed system orbit at about half the altitude of the geo systems."].

Regarding *claim 6*, Castiel discloses the system discussed above in claim 1, and further

teaches that the plurality of satellites are equally spaced in mean anomaly within their respective

ground tracks [see Table 3 on col. 18, line 48-col. 19, line 13, whereby the mean anomaly "MA"

of the satellites are seen to be equally spaced].

Regarding *claim 7*, Castiel discloses the system discussed above in claim 1, and further

teaches that the orbits of the plurality of satellites are further configured such that the portion of

the orbits during which the communications equipment on the satellites is enabled to

communicate, is separated from the equatorial plane of the earth by at least a predetermined

amount [see col. 1, lines 34-48; also see col. 5, lines 24-59].

Regarding *claim 8*, Castiel discloses the system discussed above in claim 1, and further

teaches that the communications equipment on the plurality of satellites is further configured to

communicate at frequencies allocated to geostationary satellites [col. 3, line 53-col. 4, line 16].

Regarding *claim 9*, Castiel discloses the system discussed above in claim 1, and further

teaches that each of the plurality of satellites has a power system configured to generate a first

Application/Control Number: 90/007,974                                    Page 6
Art Unit: 3992

amount of power when the communications equipment on the satellite is enabled and a second

amount of power more than the first amount of power when the communications equipment is

not enabled [col. 2, lines 39-64; also see col. 4, lines 23-43], to store excess power generated

when the communications equipment is not enabled [col. 2, lines 39-64], and to enable the

communications equipment with both the stored excess power and the generated first amount of

power [col. 2, lines 52-64].


     Regarding *claim 10*, Castiel discloses a constellation of satellites, comprising:

     a plurality of satellites in orbits around the earth having apogees and perigees [see Figs. 1

and 3, see col. 2, lines 20-51],

     each of the satellites having communications equipment thereon configured to

communicate only during a predetermined portion of the satellite's orbit proximate to apogee

[col. 2, lines 48-51, and col. 17, lines 34-42],

     the orbits of the plurality of satellites being configured to form at least two ground tracks

on the earth displaced from each other longitudinally [see col. 17, lines 11-52; also see Table 1 in

col. 18, lines 1-32; also see Fig. 9],

     each of the ground tracks repeating daily and having a number of active arcs [see col. 5,

lines 3-8; also see Table 2 in col. 18, lines 30-48, being the "Locations of the VIRGO Active

Arcs"],

     each active arc corresponding to the portion of the orbit of each satellite during which the

communications equipment on the satellite is enabled to communicate [col. 17, lines 11-57],

Application/Control Number: 90/007,974                                      Page 7

Art Unit: 3992

the orbits of the plurality of satellites being further configured such that at all times there

are at least two of the satellites in each of the active arcs [col. 17, lines 34-42, wherein *"This*

*requires three satellites out of a total of five to be active at any time."*] and such that at all times

each of the satellites in any one of the active arcs is separated by at least a predetermined angle,

as observed from the earth, from each other satellite in the same active arc and from any satellite

in any other active arc [col. 17, lines 34-42; also see Table 3 in col. 18, line 48-col. 19, line 13,

whereby the satellites are shown to be separated by the angles in the Mean Anomaly "MA"].

Regarding *claim 11*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the orbit of each of the plurality of satellites has a mean motion that is one of

2, 3 and 4 [see col. 5, lines 19-23; also see col. 6, lines 5-10, whereby "12-hour satellites" have a

mean motion of 2; also see col. 12, lines 25-30].

Regarding *claim 12*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the orbit of each of the plurality of satellites is inclined at critical inclination

[see Table 3 on col. 18, line 48-col. 19, line 13].

Regarding *claim 13*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the argument of perigee of the orbits of each of the plurality of satellites is in

the range of 195 degrees to 345 degrees for apogees in the northern hemisphere and in the range

of 15 degrees to 165 degrees for apogees in the southern hemisphere [see Table 1 in col. 18, lines

1-25, whereby the Aurora I and II, which are in the northern hemisphere, have an "Argument of

Perigee" of 270 degrees, while the Australis, being in the southern hemisphere, has an

"Argument of Perigee" of 90 degrees, each of which are within the claimed range].

Regarding *claim 14*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that each of the plurality of satellites has throughout its orbit a orbital height

lower than a height necessary for geostationary orbits [see col. 3, lines 26-33, wherein "these

satellites according to the disclosed system orbit at about half the altitude of the geo systems."].

Regarding *claim 15*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the satellites in each of the two or more ground tracks are equally spaced in

mean anomaly [see Table 3 on col. 18, line 48-col. 19, line 13, whereby the mean anomaly

"MA" of the satellites are seen to be equally spaced].

Regarding *claim 16*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the orbit of each of the plurality of satellites is further configured such that

the portion of the orbits during which the communications equipment on the satellites is enabled

to communicate, is separated from the equatorial plane of the earth by a least a predetermined

amount [see col. 1, lines 34-48; also see col. 5, lines 24-59].

Regarding *claim 17*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the communications equipment on each of the plurality of satellites is further

Application/Control Number: 90/007,974                                    Page 9

Art Unit: 3992

configured to communicate at frequencies allocated to geostationary satellites [col. 3, line 53-col. 4, line 16].

Regarding *claim 18*, Castiel discloses the constellation discussed above in claim 10, and further teaches that each of the plurality of satellites has a power system configured to generate a first amount of power when the communications equipment on the satellite is enabled and a second amount of power more than the first amount of power when the communications equipment is not enabled [col. 2, lines 39-64; also see col. 4, lines 23-43], to store excess power generated when the communications equipment is not enabled [col. 2, lines 39-64], and to enable the communications equipment with both the stored excess power and the generated first amount of power [col. 2, lines 52-64].

Regarding *claim 19*, Castiel discloses a method for satellite communications, comprising:

orbiting a plurality of communications satellites about the earth, the orbits having apogees and perigees [see Figs. 1 and 3, see col. 2, lines 20-51]; and

enabling each of the plurality of communications satellites to communicate only during a predetermined portion of the orbits proximate to apogee [col. 2, lines 48-51, and col. 17, lines 34-42];

wherein the orbits of the plurality satellites form at least two ground tracks on the earth displaced from each other longitudinally [see col. 17, lines 11-52; also see Table 1 in col. 18, lines 1-32; also see Fig. 9],

each of the ground tracks repeating daily and having a number of active arcs [see col. 5, lines 3-8; also see Table 2 in col. 18, lines 30-48, being the "Locations of the VIRGO Active Arcs"],

each active arc corresponding to the portion of the orbit of each satellite during which the communications equipment on the satellite is enabled to communicate [col. 17, lines 11-57]; and

wherein the satellites are orbited such that at all times at least two of the satellites are in each of the active arcs [col. 17, lines 34-42, wherein *"This requires three satellites out of a total of five to be active at any time."*] and such that at all times each of the satellites in any one of the active arcs is separated by at least a predetermined angle, as observed from the earth, from each other satellite in the same active arc and from any satellite in any other active arc [col. 17, lines 34-42; also see Table 3 in col. 18, line 48-col. 19, line 13, whereby the satellites are shown to be separated by the angles in the Mean Anomaly "MA"].

Regarding *claim 20*, Castiel discloses the method discussed above in claim 19, and further teaches of configuring the orbits of each of the plurality of satellites to have a mean motion that is one of 2, 3 and 4 [see col. 5, lines 19-23; also see col. 6, lines 5-10, whereby "12-hour satellites" have a mean motion of 2; also see col. 12, lines 25-30].

Regarding *claim 21*, Castiel discloses the method discussed above in claim 19, and further teaches of configuring the orbits of each of the plurality of satellites to be inclined at critical inclination [see Table 3 on col. 18, line 48-col. 19, line 13].

Regarding *claim 22*, Castiel discloses the method discussed above in claim 19, and further teaches of configuring the argument of perigee of the orbits of each of the plurality of satellites to be in the range of 195 degrees to 345 degrees for apogees in the northern hemisphere and in the range of 15 degrees to 165 degrees for apogees in the southern hemisphere [see Table 1 in col. 18, lines 1-25, whereby the Aurora I and II, which are in the northern hemisphere, have an "Argument of Perigee" of 270 degrees, while the Australis, being in the southern hemisphere, has an "Argument of Perigee" of 90 degrees, each of which are within the claimed range].

Regarding *claim 23*, Castiel discloses the method discussed above in claim 19, and further teaches of configuring the orbits of each of the plurality of satellites to have throughout its orbit an orbital height lower than a height necessary for geostationary orbits [see col. 3, lines 26-33, wherein "these satellites according to the disclosed system orbit at about half the altitude of the geo systems."].

Regarding *claim 24*, Castiel discloses the method discussed above in claim 19, and further teaches of configuring the orbits of the plurality of satellites such that the satellites are equally spaced in mean anomaly within their respective ground tracks [see Table 3 on col. 18, line 48-col. 19, line 13, whereby the mean anomaly "MA" of the satellites are seen to be equally spaced].

Regarding *claim 25*, Castiel discloses the method discussed above in claim 19, and further teaches of configuring the orbits of the plurality of satellites such that the portion of the

orbits during which the satellites are enabled for communication, is separated from the equatorial

plane of the earth by at least a predetermined amount [see col. 1, lines 34-48; also see col. 5,

lines 24-59].


Regarding *claim 26*, Castiel discloses the method discussed above in claim 19, and

further teaches of communicating with the plurality of satellites at frequencies allocated to

geostationary satellites [col. 3, line 53-col. 4, line 16].


Regarding *claim 27*, Castiel discloses the method discussed above in claim 19, and

further teaches that each of the plurality of satellites has a power system generating a first

amount of power when the communications equipment on the satellite is enabled and a second

amount of power more than the first amount of power when the communications equipment is

not enabled [col. 2, lines 39-64; also see col. 4, lines 23-43], and further comprising:

storing excess power generated when the communications equipment is not enabled [col.

2, lines 39-64]; and

enabling the communications equipment with both the stored excess power and the

generated first amount of power [col. 2, lines 52-64].

Application/Control Number: 90/007,974                                           Page 13

Art Unit: 3992

### Conclusion

4.    Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination

proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)).  Extensions of time in

*ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).


5.    The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

Patent No. 6,701,126 throughout the course of this reexamination proceeding.


6.    ALL correspondence relating to this ex parte reexamination proceeding should be

directed as follows:


**Please mail any communications to:**

Attn: Mail Stop "Ex Parte Reexam"
Central Reexamination Unit
Commissioner for Patents
P. O. Box 1450
Alexandria VA 22313-1450


**Please FAX any communications to:**

(571) 273-9900
Central Reexamination Unit

Application/Control Number: 90/007,974                                              Page 14

Art Unit: 3992

**Please hand-deliver any communications to:**

Customer Service Window
Attn: Central Reexamination Unit
Randolph Building, Lobby Level
401 Dulany Street
Alexandria, VA 22314

Any inquiry concerning this communication or earlier communications from the Reexamination
Legal Advisor or Examiner, or as to the status of this proceeding, should be directed to the
Central Reexamination Unit at telephone number (571) 272-7705.

Signed:

JOSEPH R. POKRZYWA
PRIMARY EXAMINER

Joseph R. Pokrzywa
Central Reexamination Unit 3992
(571) 272-7410

Conferees :

ROLAND G. FOSTER
CRU EXAMINER-AU 3992

Sue Lao

| Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|
| 90/007,974 | 6701126 |
| **Examiner** | **Art Unit** |
| Joseph R. Pokrzywa | 3992 |

| √ | Rejected | – | (Through numeral) Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| Claim | | Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 3/5/07 | | | | | | | |
| | (1) | √ | | | | | | | |
| | 2 | √ | | | | | | | |
| | 3 | √ | | | | | | | |
| | 4 | √ | | | | | | | |
| | 5 | √ | | | | | | | |
| | 6 | √ | | | | | | | |
| | 7 | √ | | | | | | | |
| | 8 | √ | | | | | | | |
| | 9 | √ | | | | | | | |
| | (10) | √ | | | | | | | |
| | 11 | √ | | | | | | | |
| | 12 | √ | | | | | | | |
| | 13 | √ | | | | | | | |
| | 14 | √ | | | | | | | |
| | 15 | √ | | | | | | | |
| | 16 | √ | | | | | | | |
| | 17 | √ | | | | | | | |
| | 18 | √ | | | | | | | |
| | 19 | √ | | | | | | | |
| | 20 | √ | | | | | | | |
| | 21 | √ | | | | | | | |
| | 22 | √ | | | | | | | |
| | 23 | √ | | | | | | | |
| | 24 | √ | | | | | | | |
| | 25 | √ | | | | | | | |
| | 26 | √ | | | | | | | |
| | 27 | √ | | | | | | | |
| | 28 | | | | | | | | | |
| | 29 | | | | | | | | | |
| | 30 | | | | | | | | | |
| | 31 | | | | | | | | | |
| | 32 | | | | | | | | | |
| | 33 | | | | | | | | | |
| | 34 | | | | | | | | | |
| | 35 | | | | | | | | | |
| | 36 | | | | | | | | | |
| | 37 | | | | | | | | | |
| | 38 | | | | | | | | | |
| | 39 | | | | | | | | | |
| | 40 | | | | | | | | | |
| | 41 | | | | | | | | | |
| | 42 | | | | | | | | | |
| | 43 | | | | | | | | | |
| | 44 | | | | | | | | | |
| | 45 | | | | | | | | | |
| | 46 | | | | | | | | | |
| | 47 | | | | | | | | | |
| | 48 | | | | | | | | | |
| | 49 | | | | | | | | | |
| | 50 | | | | | | | | | |

| Claim | | Date |
|---|---|---|
| Final | Original | |
| | 51 | |
| | 52 | |
| | 53 | |
| | 54 | |
| | 55 | |
| | 56 | |
| | 57 | |
| | 58 | |
| | 59 | |
| | 60 | |
| | 61 | |
| | 62 | |
| | 63 | |
| | 64 | |
| | 65 | |
| | 66 | |
| | 67 | |
| | 68 | |
| | 69 | |
| | 70 | |
| | 71 | |
| | 72 | |
| | 73 | |
| | 74 | |
| | 75 | |
| | 76 | |
| | 77 | |
| | 78 | |
| | 79 | |
| | 80 | |
| | 81 | |
| | 82 | |
| | 83 | |
| | 84 | |
| | 85 | |
| | 86 | |
| | 87 | |
| | 88 | |
| | 89 | |
| | 90 | |
| | 91 | |
| | 92 | |
| | 93 | |
| | 94 | |
| | 95 | |
| | 96 | |
| | 97 | |
| | 98 | |
| | 99 | |
| | 100 | |

| Claim | | Date |
|---|---|---|
| Final | Original | |
| | 101 | |
| | 102 | |
| | 103 | |
| | 104 | |
| | 105 | |
| | 106 | |
| | 107 | |
| | 108 | |
| | 109 | |
| | 110 | |
| | 111 | |
| | 112 | |
| | 113 | |
| | 114 | |
| | 115 | |
| | 116 | |
| | 117 | |
| | 118 | |
| | 119 | |
| | 120 | |
| | 121 | |
| | 122 | |
| | 123 | |
| | 124 | |
| | 125 | |
| | 126 | |
| | 127 | |
| | 128 | |
| | 129 | |
| | 130 | |
| | 131 | |
| | 132 | |
| | 133 | |
| | 134 | |
| | 135 | |
| | 136 | |
| | 137 | |
| | 138 | |
| | 139 | |
| | 140 | |
| | 141 | |
| | 142 | |
| | 143 | |
| | 144 | |
| | 145 | |
| | 146 | |
| | 147 | |
| | 148 | |
| | 149 | |
| | 150 | |

Part of Paper No.  20070302

EXHIBIT 2

Declaration of John E. Draim (in US Patent 6,701,126), dated November 13, 2000 in
support for OPPOSITION TO DEFENDANT'S MOTION FOR ATTORNEY'S FEES
AND COSTS



Docket No.: 3700-02

# DECLARATION AND POWER OF ATTORNEY

As a below named inventor, I hereby declare that:

My residence, post office and citizenship are as stated below next to my name.

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter claimed and for which a patent is sought on the invention entitled "An Improved System and Method for Implementing a Constellation of Non-Geostationary Satellites That Does Not Interfere With the Geostationary Satellite Ring", the specification of which

[X] is attached hereto.    [ ] was filed on _____ as Application Serial No. _____ and was amended on _____ (if applicable).

I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is known to me to be material to patentability in accordance with Title 37, Code of Federal Regulations, Section 1.56(a).

I hereby claim foreign priority benefits under Title 35, United States Code, Section 119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

Prior Foreign Application(s):

| | | | Priority Claimed | |
|---|---|---|---|---|
| | | | Yes | No |
| Number | Country | Day/Month/Year filed | | |

I hereby claim the benefit under Title 35, United States Code, Section 120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, Section 112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, Section 1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

Prior U. S. Application(s):

| Serial No. | Filing Date | Status: Patented, Pending, Abandoned |
|---|---|---|

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true, and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

I hereby appoint the following attorney(s) and/or agent(s): Alfred A. Stadnicki, Reg. No. 30,226; Peter N. Lalos, Reg. No. 19,789; Francis A. Keegan, Reg. No. 19,245; Phillip G. Avruch, Reg. No. 46,076; Michael N. Lau, Reg. No.39,479; Ron Snider, Reg. No. 24,962 all of:

LALOS & KEEGAN
1146 Nineteenth Street, N.W.
Fifth floor
Washington, D.C. 20036-3703

with full power of substitution and revocation, to prosecute this application and to transact all business in the Patent and Trademark Office connected therewith, and all future correspondence should be addressed to Alfred A. Stadnicki @ LALOS & KEEGAN, 1146 Nineteenth Street, N.W., Washington, D.C. 20036-3703

Docket No.. 3700-02

Full name of sole or first inventor: John E. Drain                (JOHN EMERY DRAIM)

Inventor's signature: _John E. Drain_                    Date: 13 Nov. 2000

Residence: 9310 Telfer Court, Vienna, Virginia 22182

Citizenship: USA

Post Office Address: Same as Residence

RCE/2684

PTO/SB/30 (01-03)
Approved for use through 4/30/2003. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| REQUEST FOR CONTINUED EXAMINATION (RCE) TRANSMITTAL Address to: **Mail Stop RCE** **Commissioner for Patents** **P.O. Box 1450** **Alexandria, VA 22313-1450** | Application Number: 09/709,280 |
| | Filing Date: November 13, 2000 |
| | First Named Inventor: John E. Draim |
| | Group Art Unit: 2684 |
| | Examiner Name: Edan Orgad |
| | Attorney Docket Number: SRI 102 |

This is a Request for Continued Examination (RCE) under 37 C.F.R. § 1.114 of the above-identified application.
Request for Continued Examination (RCE) practice under 37 C.F.R. § 1.114 does not apply to any utility or plant application filed prior to June 8, 1995, or to any design application. See Instruction Sheet for RCEs (not to be submitted to the USPTO) on page 2.

**RECEIVED**
AUG 1 1 2003
Technology Center 2600

1. **Submission Required Under 37 C.F.R. § 1.114**

    a. ☐ Previously Submitted
    i. ☐ Consider the amendment(s)reply under 37 C.F.R. §1.116 previously filed on _____
        (Any unentered amendment(s) referred to above will be entered).
    ii. ☐ Consider the arguments in the Appeal Brief or Reply Brief previously filed on_____
    iii.☐ Other _____

    b. **X Enclosed**
    i. ☐ Amendment/Reply
    ii. ☐ Affidavit(s)/Declaration(s)
    iii.X Information Disclosure Statement (IDS)
    iv.☐ Other                    08/07/2003 ANABI1   00000081 09709280

2. **Miscellaneous**                              01 FC:2801                    375.00 OP

    a. ☐ Suspension of action on the above-identified application is requested under 37 C.F.R. §1.103(c) for
        a period of ___ months. (Period of suspension shall not exceed 3 months; Fee under 37 C.F.R. § 1.17 (i) **required**)
    b. ☐ Other _____

3. **FEES** The RCE fee under 37 C.F.R. §1.17(e) is required by 37 C.F.R. §1.114 when the RCE is filed.
    a. **X** The Director is hereby authorized to charge the following fees, or credit any overpayments, to Deposit Account No. 18-0002.
    i. **X** RCE fee (small entity) required under 37 C.F.R. § 1.17(e) **$375.00**
    ii. ☐ Extension of time fee (37 C.F.R. §§ 1.136 and 1.17)
    iii.☐ Other _____
    b. **X** Check in the amount of **$375.00** enclosed.
    c. ☐ Payment by credit card (Form PTO-2038 enclosed)

*(margin, left side, rotated)* FEE ENCLOSED:$ 375 Pleas charge any further fee to ur D p sit A c unt No. 18-0002

## SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT REQUIRED

| Name (Print or Type) | Phillip G. Avruch | Registration Number | 46,076 |
| Signature | *(signature)* | Date | August 6, 2003 |



# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Group Art Unit: 2684
Examiner: Edan Orgad

In Re PATENT APPLICATION Of:

| | | |
|---|---|---|
| Applicants | : John E. Draim | ) |
| | | ) |
| Serial No. | : 09/709,280 | ) |
| | | ) **INFORMATION DISCLOSURE** |
| Filed | : November 13, 2000 | ) **STATEMENT** |
| | | ) |
| For: | SYSTEM AND METHOD FOR IMPLEMENTING | ) |
| | A CONSTELLATION OF NON-GEOSTATIONARY | ) |
| | SATELLITES THAT DOES NOT INTERFERE | ) |
| | WITH THE GEOSTATIONARY SATELLITE RING | ) |
| | | ) |
| Attorney Ref. : SRI 102 | | )_____ |

Mail Stop: <u>RCE</u>
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

RECEIVED

AUG 1 1 2003

Technology Center 2600

Sir:

This is an information disclosure statement submitted in compliance with the timing requirements of 37 C.F.R. §1.97 (b)(3), i.e., prior to a First Office Action on the Merits.

Attached are copies of a PCT International Search Report, 1 U.S. patent document, and 1 English-language publication. The documents and publication are listed on the attached Form PTO-1449.

Since this Information Disclosure Statement is being filed before the First Office Action, no certification or fee is required, and the requirements of 37 C.F.R. §§1.97 and 1.98 are deemed to be fully met as to all documents submitted. Consideration of the submitted documents is respectfully requested.

Respectfully submitted,

Phillip G. Avruch (Registration No. 46,076)
Customer No. 23995

PGA:tlc

| FORM PTO-1449 | Atty. Docket | | Application No. |
|---|---|---|---|
| INFORMATION DISCLOSURE STATEMENT | SRI 102 | | 09/709,280 |
| | Applicant<br>John E. Draim | | |
| | Filing Date<br>November 13, 2000 | | Group<br>2684 |

**U.S. PATENT DOCUMENTS**

| Examiner Initial | | Document Number | Date | Name | Class | Sub-Class | Filing Date |
|---|---|---|---|---|---|---|---|
| | AA | 5,845,206 | 12/1/98 | CASTIEL et al | | | 3/24/95 |
| | AB | | | | | | |
| | AC | | | RECEIVED | | | |
| | AD | | | AUG 1 1 2003 | | | |
| | AE | | | Technology Center 2600 | | | |
| | AF | | | | | | |
| | AG | | | | | | |
| | AH | | | | | | |

**FOREIGN PATENT DOCUMENTS**

| | | Document Number | Date | Country | Class | Sub-Class | Trans-lation |
|---|---|---|---|---|---|---|---|
| | AI | | | | | | |
| | AJ | | | | | | |
| | AK | | | | | | |
| | AL | | | | | | |
| | AM | | | | | | |
| | AN | | | | | | |

**OTHER (Including Author, Title, Date, Pertinent Pages, etc.)**

| | AO | Internet Article from "Online!", <URL:http://www.virgualgeo.com/orbits_plain_print.htm>: "VIRTUAL GEOSATELLITE LLC: Virtual Geosatellite Orbits Better for New Satellite Systems Using the 'K' Frequency Band", March 4, 1999. |
|---|---|---|

| Examiner | | Date Considered | |
|---|---|---|---|

EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; draw line through citation if not in conformance and not considered. Include copy of this form with next communication to Applicant.

EXHIBIT 4

Finding of Fact, Conclusion of Law and Order, May 15, 2006 (J. Facciola), in *Draim v. Virtual Geosatellite Holdings, Inc. et al.* (1:01 cv 2690) in support of OPPOSITION TO DEFENDANT'S MOTION FOR ATTORNEY'S FEES AND COSTS

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOHN E. DRAIM,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 01-2690 (JMF)** |
| **VIRTUAL GEOSATELLITE HOLDINGS, INC.,** *et al.,* | |
| **Defendants.** | |
| **MOBILE COMMUNICATIONS HOLDINGS, INC.,** *et al.,* | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 02-0775 (JMF)** |
| **JOHN E. DRAIM,** | |
| **Defendant.** | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ORDER**

These consolidated cases were referred to me, upon consent of the parties, for all purposes including trial.  Prior to the trial, the parties agreed to the dismissal of all claims except plaintiff John Draim's claim that he is entitled to the payment of bonuses for patents issued after he resigned from the corporate defendants' employ and in which he was a named inventor.  A bench trial was held on April 18, 2006 and, after considering the testimony of the witnesses, the exhibits, and the arguments of the parties, I reach the following findings of fact and conclusions

of law.

## FINDINGS OF FACT

1.      In 1992, plaintiff John Draim ("Draim") began working for defendant Mobile

Communications Holdings, Inc. ("MCHI") as a consultant.  Draim and the

president of MCHI, David Castiel ("Castiel") signed a Consulting Agreement

under which Draim agreed to assign to MCHI all rights in his inventions

conceived during the term of the Consulting Agreement and MCHI agreed to pay

Draim a $2,000 bonus upon the filing of a patent application, and a $10,000 bonus

upon the successful issuance of any one patent.  According to the Consulting

Agreement, the actual amount of the bonus would be determined in inverse

proportion to the number of co-inventors listed on the patent application.  Draim

worked for MCHI as a consultant through June 1997.

2.      In July 1997, Draim became an employee of MCHI, but a written employment

agreement was never drafted or signed.  During Draim's employment, the parties

continued to operate under the understanding that Draim's inventions would be

assigned to MCHI, or to other Castiel affiliated entities, and that he would be paid

$2,000 for each patent application and $10,000 for each successful issuance of a

patent.

3.      While employed at MCHI, Draim also performed work for affiliated Castiel

companies (*e.g.*, Defendant Virtual Geosatellite Holdings, Inc. and Ellipso, Inc.)

(collectively the "Castiel entities").

4.      At some point during Draim's employment, the bonus for filing a patent

2

application increased from $2,000 to $2,500, and the bonus for the issuance of a patent increased from $10,000 to $12,500.

5. In May 2000, Draim terminated his employment and began working for a company named VGS, Inc. ("VGS"), which later became known as Space Resource America Corporation ("SRA").

6. At the time Draim terminated his employment with the Castiel entities, there were numerous outstanding patent applications in which he was a named inventor. These applications have since resulted in the issuance of eleven patents. The patents name various Castiel entities as the assignees. In some of these patents Draim is listed as the sole inventor, and in some he is listed as one of three or four inventors.

7. Draim has not been paid a bonus for the issuance of any of these eleven patents.

8. When the patent office decides that a patent application should be divided into multiple patents, the resulting patents are called "divisional patents." Two of these eleven patents were divisional patents.

9. In February 2000, three months before Draim resigned, Draim and Castiel filed a provisional patent application for an invention that the parties referred to as the "168 slot" invention. In this provisional application, Castiel and Draim were listed as co-inventors. Provisional applications function as "place holders" and are generally not reviewed by the patent board. The applicant has one year from filing the provisional application to file the actual patent application.

10. In November 2000, SRA filed an "interfering" patent application for the "168

3

slot" invention, naming Draim as the sole inventor.  Subsequently, in February 2001, Castiel filed an application for the "168 slot" invention, but did not name Draim as an inventor.  Ultimately, the patent was issued to Virtual Geosatellite, LLC, a Castiel company, as assignee and Draim was not listed as an inventor.

11.     Draim was never paid a bonus for the issuance of the "168 slot" patent.

12.     Around the time of Draim's resignation, several other Castiel employees also left the Castiel entities to work for VGS.  At trial, defendants presented testimony about VGS having tried to take over the Castiel entities, steal the Castiel entities' property, and use the Castiel entities' marketing materials as its own.

## CONCLUSIONS OF LAW

13.     The parties do not dispute that there was a contract between the Castiel entities and Draim under which Draim was to be paid bonuses for the filing of patent applications and for the issuance of patents.  Defendants did not argue that, under the contract, Draim was not entitled the payment of bonuses for patents issued after the termination of his employment in which he was a named inventor and the application was filed while he was still employed with the Castiel entities. Accordingly, I find that there was an enforceable contract and, under that contract, Draim was entitled to bonuses for the issuance of patents, in which he was a named inventor, that were based on applications filed during his employment, regardless of whether the patents were issued after his employment ended.

14.     In defense of the enforcement of this contract, defendants raised three arguments. First, defendants argued that Draim has already been paid more then he was

4

entitled to receive under the contract.  However, defendants presented no evidence at trial that Draim was paid more than he was entitled to under the employment contract and, therefore, I will not deny enforcement of the contract on that ground.

15.    Second, defendants argued that Draim is not entitled to the payment of bonuses for the issuance of divisional patents.  Two of the twelve patents at issue are divisional patents.  The only written guidance on this issue is the Consulting Agreement, which states that Draim will be paid a bonus "upon successful issuance of any one patent." Plaintiff's Exhibit # 1.  That language indicates that Draim was to paid a bonus upon the issuance of any one patent, regardless of whether or not it was a divisional patent.  In contradiction of this language, defendants argued that it was not Castiel's practice to pay bonuses for divisional patents.  According to Castiel's testimony, he remembers only two prior divisional patents.  No evidence was presented at trial as to whether or not bonuses were paid on these two divisional patents.  Accordingly, I do not find sufficient evidence of a past practice of not paying bonuses for divisional patents and I will not deny enforcement of the contract, in whole or in part, on the ground that two of the patents were divisional patents.

16.    Third, defendants argued that Draim breached a fiduciary duty to the Castiel entities by going to work for VGS and by participating in a conspiracy to take over the Castiel entities and steal their property and that, therefore, Draim is not entitled to the patent bonuses.  I do not find that it is more likely than not that Draim participated in a conspiracy to destroy or steal from the Castile entities.

5

Defendants presented little to no evidence linking Draim to the alleged VGS conduct, let alone evidence that Draim agreed to take part in an unlawful action. See, e.g., Hall v. Clinton, 285 F.3d 73, 83 (D.C. Cir. 2002) (the two essential elements of civil conspiracy [under District of Columbia law] are (1) an agreement to take part in an unlawful action or a lawful action in an unlawful manner and (2) an overt tortious act in furtherance of the agreement that causes injury).  To the contrary, I find that Castiel's anger at the behavior of his former employees, like Draim, who went to work for VGS, led him not to pay Draim for the bonuses.  Therefore, even if Draim owed a fiduciary duty to the Castiel entities, I find that enforcement of the contract cannot be denied on the ground that Draim breached any such fiduciary duty by participating in a conspiracy.

17.    Accordingly, I find that Draim is entitled to the payment of bonuses based on the $12,500 rate and in an amount in inverse proportion to the number of co-inventors listed on the patent for each of the eleven patents in which he is a named inventor. Specifically, Draim is entitled to the following bonuses:

a.    United States Patent # 6102335; four inventors; bonus = $3,125

b.    United States Patent # 6227497; one inventor; bonus = $12,500

c.    United States Patent # 6263188; three inventors; bonus = $4,166.67

d.    United States Patent # 6457678; one inventor; bonus = $12,500

e.    United States Patent # 6487476; one inventor; bonus = $12,500

f.    United States Patent # 6577864; three inventors; bonus = $4,166.67

g.    United States Patent # 6611683; three inventors; bonus = $4,166.67

    h.      United States Patent # 6678519; three inventors; bonus = $4,166.67

    i.      United States Patent # 6766166; one inventor; bonus = $12,500

    j.      United States Patent # 6795687; three inventors; bonus = $4,166.67

    k.      United States Patent # 6954613; three inventors; bonus = $4,166.67

18.    With regard to the "168 slot" patent, Draim was not named as an inventor in either the patent application or in the resulting patent; Draim was only named as an inventor in the *provisional* application.  Under the Consulting Agreement, Draim was entitled to a bonus upon "the completion of successful filing for any one patent." Plaintiff's Exhibit # 1.  Based on the testimony at trial, I find that it was the parties' understanding that, with regard to the assignment of patent rights and the payment of bonuses, the terms of the Consulting Agreement carried over into Draim's oral employment agreement.  No evidence or argument was presented at trial regarding the expansion of that language to include provisional applications, nor did plaintiff present any evidence that he had been paid bonuses for the filing of provisional applications in the past.  Therefore, I find that Draim is not entitled to a bonus for the issuance of patent number 6695260 (*i.e.*, the "168 slot" patent).

19.    Draim is also entitled to pre-judgment interest on the patent bonuses, to be calculated from the date each patent was issued and at the statutory rate of six-percent per annum. See D.C. Code § 15-108[1]; Bragdon v. Twenty-Five Twelve

---

[1] All citations to the District of Columbia Code are to the electronic versions available through Westlaw and Lexis.

Assocs. Ltd. P'ship, 856 A.2d 1165 (D.C. 2004) (awarding pre-judgment interest

under D.C. Code § 15-508 because it was customary to pay interest on funds that

are withheld and not paid when due and that prejudgment interest is an element of

complete compensation); D.C. Code § 28-3302; District of Columbia v. Pierce

Assocs., Inc., 527 A.2d 306, 311 (D.C. 1987) ("the trial court cannot award

interest at a rate greater than 6% under § 15-508 . . . unless an express contractual

provision is to the contrary.")

## CONCLUSION

Based on the proceeding findings of fact and conclusions of law, plaintiff shall be

awarded $78,125.02 plus prejudgment interest, calculated from the date of the issuance of each

patent through the date of judgment at the rate of six-percent per annum, and costs.  To that end,

the parties are, hereby, **ORDERED** to submit, within ten days of this order, a joint praecipe

detailing the prejudgment interest calculation through the date of the filing of the praecipe.  By

agreeing to the joint praecipe, the parties do not concede any arguments or waive any rights on

appeal.

    **SO ORDERED.**


    _____
    JOHN M. FACCIOLA
Dated:        UNITED STATES MAGISTRATE JUDGE