EXHIBIT 1: Order of January 17, 2008

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ELLIPSO, INC., *et al.*,          :
                                  :
          Plaintiffs,             :
                                  :
     v.                           :  Civil Action No. 06-1373 (JR)
                                  :
JOHN E. DRAIM,                    :
                                  :
          Defendant.              :

**MEMORANDUM ORDER**

        After entry of summary judgment in favor of the
defendant, the remaining issue in this case is whether the
imposition of sanctions is appropriate.  Three legal bases for
sanctions might apply: (1) Federal Rule of Civil Procedure
11(b)(2), governing frivolous legal argument; (2) 28 U.S.C.
§ 1927, governing vexatious litigation; and (3) D.C. Code § 36-
404(1), which applies specifically to actions such as this one
for misappropriation of trade secrets and makes sanctionable the
filing of a suit in bad faith.  Two factors convince me that
sanctions are appropriate under any and all of the above.

        First, as discussed in my memorandum concerning summary
judgment, it was clear when this action was filed that it was
untimely.  See [28] at 2-6.  More than three years before this
action commenced, see D.C. Code § 36-406 (creating 3-year filing
window), the plaintiff sent threatening letters to the defendant
indicating its awareness of precisely the misappropriation
alleged.  Ellipso's argument that it did not know the <u>exact</u>

nature or full extent of the misappropriation until Draim's
patent using the misappropriated information actually issued does
not circumvent the plain text of the statute, as I noted in my
memorandum.  Even at this date, and under the threat of
sanctions, plaintiff has offered no case law or even legal
argument to support its dubious theory of timeliness.  See SEC v.
Loving Spirit Foundation Inc., 392 F.3d 486, 494 (D.C. Cir. 2004)
(prosecution of a matter is sanctionable when blatantly out of
time).

     More clearly sanctionable is Ellipso's attempt to
prosecute a claim that it released as part of a settlement
agreement.  Ellipso complained in a previous action before me
that Draim had "filed several patent applications based upon
purported inventions that are actually based upon the proprietary
technology of the Ellipso System," and charged a count of
misappropriation under the D.C. Code – exactly as it did in this
case.  Verified Complaint [10, Exhibit 11] at ¶¶ 31-32, 45-50;
see also Verified Amended Complaint [10, Exhibit 12] at ¶¶ 31-32,
49-54.  This dispute and others between Ellipso (and related
parties) and Draim (and related parties) precipitated a
settlement agreement that required the parties to dismiss all
claims with prejudice.  See Settlement Agreement [10, Exhibit 16]
at ¶ 1.1.  The agreement stipulated, however, that Ellipso and
its related parties would satisfy any claims that Draim had

against them in his individual capacity.  See id. at ¶ 1.2.
David Castiel signed the agreement as President and CEO of
Ellipso, id. at 15, and executed a General Release for all claims
against John Draim.  Id. at App. B.  Thus, pursuant to the
agreement of the parties, see Joint Pretrial Statement [10,
Exhibit 15], Judge Facciola (to whom I had referred the case)
decided only the issue of Draim's entitlement to certain patent
bonuses from Ellipso, and considered all other claims dismissed.
See Findings of Fact and Conclusions of Law [29, Exhibit 4].

        It thus appears clear that Ellipso released Draim from
any misappropriation claim prior to the commencement of this
action.  Ellipso halfheartedly submits that its General Release
is unenforceable because Draim did not sign a release for Ellipso
and so was without consideration.  But Ellipso presents no legal
support for the proposition that a signed release requires
consideration to be enforceable.  In any case, Ellipso did
receive consideration for its General Release.  As part of the
settlement, Draim's subsequent employer Peter Sahagen signed a
General Release of claims against Ellipso and its related parties
on behalf of the corporate entities under his control.  [10,
Exhibit 16].  Finally, the settlement agreement itself required
Ellipso to satisfy claims made by Draim as an individual, see
Settlement Agreement [10, Exhibit 16] at ¶ 1.2, making it
unremarkable that Draim did not sign a release for his individual

claims against Ellipso and that the parties allowed Judge Facciola to consider and decide them.

Attempting to prosecute a claim that has been released is quintessentially vexatious and clearly sanctionable. Accordingly, it is

**ORDERED** that Draim's motion for attorney's fees [10] is **granted**. The Clerk is directed to re-enter judgment for defendant (<u>see</u> Minute Order of 10/30/2007), including reasonable attorney's fees and costs. If the parties cannot agree on the amount of such fees and costs, Draim may submit an appropriate motion. Any calculation should exclude any fees and costs associated with Draim's most recent reply brief [30], which was unilluminating.

JAMES ROBERTSON
United States District Judge

EXHIBIT 2: Complaint

CLIENT COPY

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

0005563-06

RECEIVED    Case No. _____
Civil Clerk's Office

ELLIPSO, INC.,
A Delaware Corporation,

and

JUL   2 0   2006 **COMPLAINT FOR THEFT OF TRADE SECRETS**

Superior Court of Columbia

VIRTUAL GEOSATELLITE LLC, District of Columbia
Delaware Limited Liability Company, Washington, D.C. **DC Code §36-401 et seq.**

**DEMAND FOR JURY TRIAL**

Plaintiffs

v.

John E. DRAIM, an individual,

Defendant.

Plaintiff, Virtual Geosatellite LLC ("Virtual Geo") and its parent company Ellipso, Inc.

("Ellipso"), for its complaint against Defendant John E. Draim states as follows:

## PARTIES

1.    Plaintiff Ellipso, Inc., is a Delaware Corporation, and its subsidiary, Virtual Geosatellite

is a Delaware Limited Liability Company, both with their principal place of business in

Washington, DC at 4400 Massachusetts Avenue NW, Suite 385, Washington, DC.

2.    John E. Draim is a resident of the State of Virginia residing at: 9310 Telfer Court

Vienna, VA.

## JURISDICTION AND VENUE

3.    Venue is proper pursuant to District of Columbia Code, §36, Chapter 4, et. seq..

4.    Personal Jurisdiction is proper in this Court under DC Code §13-421 through 424, as,

*inter alia*, the events that gave rise to this cause of action occurred within the District of Columbia

## STATEMENT OF FACTS

-1-

5.   Ellipso, Inc predecessor (MCHI) was formed in August 1991 to develop new satellite technologies. Ellipso formed several subsidiaries since 1991, including Virtual Geosatellite LLC and Mobile Communications Holdings, Inc. became a subsidiary of Ellipso in 1998 (all these are herein referred to collectively "Ellipso" or "Ellipso companies").

6.   John E. Draim was engaged as a consultant the Ellipso companies from 1992 to 1997, and 1997 he became an employee of the Ellipso companies from May, 1997 to at least May 24, 2000.

7.   John E. Draim agreed to assign all his inventions to the Ellipso companies in the course of both his consulting and employment terms with Ellipso.

8.   On September 10, 1999, Virtual Geosatellite filed a Provisional Patent Application with the United States Patent and Trademark Office ("USPTO"), entitled FIXED SATELLITE CONSTELLATION SYSTEM EMPLOYING NON-GEOSTATIONARY SATELLITES IN SUB-GEOSYNCHRONOUS ELLIPTICAL ORBITS WITH COMMON GROUND TRACKS naming David Castiel, Jack Anderson, and John Draim all as co-inventors. The Provisional Application was given serial No. 60/153,289. The provisional application was assigned to Virtual Geo LLC either explicitly or under employment agreement (herein the '289 provisional).

9.   On February 3, 2000, a provisional application entitled "Creating and array virtual geostanional [sic] satellites that provide 2 degree separations at apogee (and thourghout [sic] the active arcs), and non-interference with the geo ring", naming David Castiel and John Draim as co-inventors, was filed and subsequently given application serial no. 60/180,025 (herein the '025 provisional).

10.   John E. Draim left the employ of the Ellipso companies on approximately May 25, 2000 to join an illegally reverse merged company VGS, which later became Space Resources of America (herein "SRA").

-2-

11. John Draim became an employee of VGS immediately after leaving the Ellipso companies.

12. In May, 2000, a lawsuit was filed by the Ellipso companies in Delaware Court of Chancery to have the illegal VGS merger reversed.

13. In September, 2000, the Delaware Court of Chancery ruled that the merger of the Ellipso companies into VGS was illegal and that all property, including trade secrets and intellectual property, must be returned to the Ellipso companies and issued an injunction prohibiting VGS and its agents from using or claiming any rights to Ellipso's property. The appeal was subsequently denied.

14. Personnel at VGS were aware of the ruling from the Delaware Court of Chancery that Ellipso's property was to be returned.

15. VGS subsequently became Space Resources of America (herein "SRA"). SRA and its related entities are believed to have been incorporated under the Laws of Bermuda and had their main place of business in the District of Columbia.

16. John Draim became an employee of SRA. It is believed that Draim was employed by SRA under the same terms as he had with VGS, including an indemnification he sought from SRA for legal issues with Ellipso arising out of his employment with SRA.

17. On September 8, 2000, Ellipso filed a Non-provisional patent application entitled FIXED SATELLITE CONSTELLATION SYSTEM EMPLOYING NON-GEOSTATIONARY SATELLITES IN SUB-GEOSYNCHRONOUS ELLIPTICAL ORBITS WITH COMMON GROUND TRACKS, claiming priority to the September 10, 1999 provisional patent application, and naming Castiel, Anderson, and Draim as co-inventors. The application was subsequently given serial no. 09/658,215 (herein the '215 application).

-3-

18. According to testimony given by John Draim in a DC Federal District Court (DC 01-2690), Draim filed a patent application on November 3, 2000, which was designed to "interfere" with subject matter in a patent application (herein "Satellite Slot Application") that he had already been assigned to the Ellipso companies by Draim, and filed by Ellipso. The specifics of this patent application remain unknown. It is unknown if Draim named himself sole inventor of the Satellite Slot Application.

19. It is believed that Draim has assigned or agreed to assign the Satellite Slot Application to SRA in exchange for compensation and/or property.

20. John E. Draim filed a patent application through his attorneys, Arnold and Porter, on November 13, 2000, entitled SYSTEM AND METHOD FOR IMPLEMENTING A CONSTELLATION OF NON-GEOSTATIONARY SATELLITES THAT DOES NOT INTERFERE WITH THE GEOSTATIONARY SATELLITE RING which was assigned Serial No. 09/709,820, (herein the "'820 application") and subsequently assigned it to SRA. It is not known whether the agreement to assign was executed prior to or before the filing of patent application or the amount of compensation and/or property that Draim received for the assignment of the patent application.

21. According to 35 USC §122, The Patent Laws for patent applications filed before November 29, 2000 were such that the application was not published prior to issuance or voluntary publication, and therefore patent Applications filed prior to November 29, 2000 in the USPTO, were to remain confidential under they issued or were voluntarily published or disclosed

22. John E. Draim filed a patent application through his attorneys on December 29, 2000, entitled SYSTEM AND METHOD FOR IMPLEMENTING A CONSTELLATION OF NON-GEOSTATIONARY SATELLITES THAT PROVIDES SIMPLIFIED SATELLITE TRACKING which was assigned Serial No. 09/750,047, (herein the "'047 application") and subsequently

-4-

assigned or known by the agreement was required prior to or before the filing of patent application, or the amount of compensation and/or property that Draim received for the assignment of the patent application.

23.     On February 5, 2001, Ellipso filed a non-provisional patent application with the USPTO entitled "VIRTUALLY GEOSTATIONARY SATELLITE ARRAY" claiming priority to the '025 Application, and naming David Castiel and Jay Brosius as inventors.Several lawsuits were filed between the Ellipso companies and SRA and related entities, between January 1, 2001 and January 1, 2003 in various jurisdictions, including the DC Superior Court, Federal Southern District of New York, Federal Eastern District of Virginia, and Federal District of the District of Columbia.

24. On February 22, 2002, Draim filed a Patent Application entitled "System and method for satellite communications" in the USPTO, it was subsequently given serial No. 10/079,411 (herein the '411 application).  It is believed that Draim assigned this application to SRA for compensation and/or property.

25. On September 19, 2002, the '047 application was published, pursuant to the revised 35 USC §122.

26. On September 26, 2002, Draim's '411 application was published, pursuant to the revised 35 USC §122.  The Application was subsequently amended to include claims that are believed to have been assigned by Draim to Ellipso.  The Application recently went abandoned.

27. Draim's '820 Patent Application remained confidential and not published in March 2, 2004 when it issued as US Patent 6,701,126.

28.  Draim's '126 Patent Issued (and therefore published) on March 2, 2004, so that this action is brought within the three year statute of limitations as required by DC Law §36-406.

Patent 6,714,521

30. In July, 2005, all issues pending in the Southern District of New York case were resolved between the SRA companies and most of the associated parties and the Ellipso companies in a settlement agreement.

31. The settlement agreement of July, 2005 did not resolve the remaining disputes between Draim and the Ellipso companies.

32. On October 11, 2005, Ellipso's '215 application issued as US Patent No. 6,954,613.

33. A request for reexamination was filed with the United States Patent and Trademark Office on March 18, 2006, pursuant to 35 USC 302, against Draim's '126 patent. The request stated that all elements of all claims of Draim's '126 patent, were anticipated or disclosed by Ellipso's '613 patent.

34. A general principle of patent law is that an applicant has the right to claim material disclosed in a patent application during its pendency before the USPTO. Therefore, Virtual Geo was assigned Draim's rights that had been claimed by Draim in his '126 patent.

35. Between March 30, 2005 and the present, Ellipso has untaken substantial effort and cost to file patent applications claiming subject matter that it believes itself entitled to and claimed by Draim in one his patents or patent applications that are believed to be assigned to SRA.

36. A bench trial between Ellipso and John Draim was held on April 18, 2006, and resulted in a monetary judgment for Draim for patent bonuses after Draim left the employ of the Ellipso companies

37. During the bench trial between Draim and Ellipso on April 18, 2006, Draim testified under oath to acts that give rise to this complaint for theft of trade secrets, namely, that Draim filed

at least one patent application covering and/or claiming subject matter which he had already assigned to Ellipso.

38. On May 16, 2006, the Commissioner for Patents ordered the reexamination of Draim's '126 patent, stating that Ellipso's '613 patent appeared to anticipated each and every element of the '126 patent.

## COUNT

### Theft of Trade Secrets

39. Plaintiff incorporates and re-alleges paragraphs 1 through the immediately preceding paragraph as though fully set forth herein.

40. It is a general principle of trade secret law that a patent application that is held in confidence by the United States Patent and Trademark Office is a trade secret until it is made public. Thus, an unpublished patent application is a trade secret.

41. After John Draim had left Ellipso, John Draim misappropriated, *inter alia*, the content of at least two confidential patent applications belonging to Ellipso, derived patent applications from Ellipso's confidential patent applications, naming himself as sole inventor, and assigned the rights to subject matter contained in the copied Ellipso's confidential patent application to a third party for monetary compensation and/or property.

42. Ellipso is filing this complaint for theft of trade secrets within the three year time limit of actual discovery or discovery with diligence, namely, the '126 patent issued and published on March 2, 2004. Other discovery of Draim's misappropriation of trade secrets was discovered after March 2, 2004 and afterward, and, in particular, during Draim's testimony before the US District Court in the bench trial of April 18, 2006 (see Exhibit A).

43. The USPTO determination of reexamination of May 16, 2006, may show by a preponderance of the evidence that Draim's '126 patent claimed material that Draim had already

1   assigned to Ellipso and Ellipso owned in a confidential patent application. Thus, Draim may have

2   taken confidential patent application information from Ellipso in violation of DC Code §36,

3   Chapter 4.

4

5      44. Ellipso has been financially damaged by Draim's theft of trade secrets in violation of DC

6   Code §36, Chapter 4, namely, that Ellipso has been forced to spend a substantial sum of money in

7   recovering its intellectual property, including, but not limited to, the disclosure contained in

8   Draim's Satellite Slot Application and disclosed and claimed Draim's '126 patent. The disclosure

9   and claims these patent applications are believed to have been assigned to Ellipso by Draim before

10

11   Draim's department from Ellipso.

12      45. Ellipso has been damaged by the theft of trade secrets by John Draim in violation of DC

13   Code §36, Chapter 4, namely, that intellectual property of at least, but not limited to the content of

14   the '820 application was misappropriated by Draim, and then represented as belonging to a

15   competitor of Ellipso.

16

17      46. Draim has been unjustly enriched in violation of DC Code §36, Chapter 4, by the sale,

18   license or transfer of rights of at least the '820 application to a third party, which he did not own.

19                        **RELIEF REQUESTED**

20   WHEREFORE, Plaintiff Ellipso prays for the following relief:

21      (a) For compensation for the costs associated with regaining the trade secret (intellectual

22   property) that was misappropriated by Draim, namely, legal costs associated with the

23

24   misappropriation for an amount that will be proven at trial, but in any event is an amount no less

25   than $25,000;

26      (b) For compensation for the loss of economic opportunity associated with Draim's

27   misappropriation of Ellipso's intellectual property which Draim represented as belonging to a

28   third party, the amount of loss of economic opportunity for an amount that will be proven at trial,

-8-

1    but in any event is an amount to be believed that is no less than $75,000, and no greater than

2    $7,500,000;

3        (c) For the return of all of Draim's profits and property gained by the sale, license or

4    transfer of trade secrets or intellectual property that Draim had previously assigned to Ellipso

5    and/or currently belonging to Ellipso, for an amount that will be proven at trial, but is believ

6    be no less than $5,000;

7

8        (d)    For attorney's fees;

9        (e)    For costs of the suit herein;

10        (f)    For any punitive damages that the court deems appropriate; and

11        (g)    For such other and further relief as the Court may deem just and proper.

12

13                        **DEMAND FOR JURY TRIAL**

14    Plaintiff Ellipso, Inc, hereby demands trial by jury of all issues so triable.

15    Dated:  July 20, 2006

16

17

18                            By

19                            David Bogart Dort
20                            DC Bar No. 465,478
21                            Rubinstein Law Group
                            A Professional Law Corporation
22                            Attorneys for Plaintiff
                            Ellipso, Inc.
23                            Virtual Geosatellite LLC

24

25

26

27

28

-9-

EXHIBIT 3: Patent '126 award of March 2, 2004

**United States Patent**                                                        **6,701,126**

*Draim*                                                                    **March 2, 2004**

System and method for implementing a constellation of non-geostationary satellites that does not interfere with the geostationary satellite ring

### Abstract

Provided is an improved system and method for implementing a constellation of satellites in inclined elliptical orbits. The satellites are operated during the portion of their orbits near apogee to emulate the characteristics of geostationary satellites. The orbits are configured to form a number of closely spaced repeating ground tracks around the earth. In each ground track the satellites operate only in arcs well above or below the equator to provide a large number of non-geostationary orbital slots that substantially increase global satellite capacity without interfering with the existing geostationary satellite ring. Minimum spacing is maintained between satellites in each active arc and between satellites in the active arcs of adjacent ground tracks to ensure that the satellites in the non-geostationary constellation do not interfere with each other.

Inventors: *Draim*; **John E.** (Vienna, VA)

Assignee: **Space Resource International Ltd.** (Washington, DC)

Appl. No.: **09/709,280**

Filed:    **November 13, 2000**

| | |
|---|---|
| **Current U.S. Class:** | **455/13.1** ; 455/12.1; 455/13.2; 455/427 |
| **Current International Class:** | B64G 1/00 (20060101); B64G 1/24 (20060101); G05D 1/08 (20060101); H04B 7/185 (20060101); B64G 1/10 (20060101); H04B 7/19 (20060101); H04B 007/185 (); H04B 007/19 (); H04Q 007/20 () |
| **Field of Search:** | 455/12.1,13.1,7,13.2,13.3,427,428,429,430,403 342/350,352,355 |

### References Cited [Referenced By]

#### U.S. Patent Documents

| | | |
|---|---|---|
| 5845206 | December 1998 | Castiel et al. |
| 6333924 | December 2001 | Porcelli et al. |
| 2001/0045494 | November 2001 | Higgins |
| 2002/0017593 | February 2002 | Castiel et al. |
| 2002/0160710 | October 2002 | Castiel et al. |

2002/0177403                November 2002                LaPrade et al.

## Other References

Giovanni et al, "Development of the INTELSAT-IX Satellite System", Space Systems/Loral, Palo Alto, CA, Sep. 1997.* .
Internet Article from "Online!",
<URL:http://www.virgualgeo.com/orbits_plain_print.htm>: "Virtual Geosattelite LLC: Virtual Geosatellite Orbits Better for New Satellite Systems Using the `K` Frequency Band", Mar. 4, 1999..

*Primary Examiner:* Maung; Nay
*Assistant Examiner:* Orgad; Edan
*Attorney, Agent or Firm:* Rabin & Berdo, P.C. Avruch; Philip G.

---

### *Claims*

---

What is claimed is:

1. A satellite communications system, comprising: a ground station, including communications equipment and an antenna, located at a position on the earth; a plurality of satellites in orbits around the earth having apogees and perigees, each of the satellites having communications equipment thereon configured to communicate with the ground station only during a predetermined portion of the satellite's orbit proximate to apogee, the orbits of the plurality of satellites being configured to form at least two ground tracks on the earth displaced from each other longitudinally, each of the ground tracks repeating daily and having a number of active arcs, each active arc corresponding to the portion of the orbit of each satellite during which the communications equipment on the satellite is enabled to communicate with the ground station, the orbits of the plurality of satellites being further configured such that at all times there are at least two of the satellites in each of the active arcs and such that at all times each of the satellites in any one of the active arcs is separated by at least a predetermined angle, as observed from the ground station, from each other satellite in the same active arc and from any satellite in any other active arc.

2. A system according to claim 1, wherein the orbit of each of the plurality of satellites has a mean motion that is one of 2, 3 and 4.

3. A system according to claim 1, wherein the orbits of each of the plurality of satellites is inclined at critical inclination.

4. A system according to claim 1, wherein the argument of perigee of the orbits of each of the plurality of satellites is in the range of 195 degrees to 345 degrees for apogees in

the northern hemisphere and in the range of 15 degrees to 165 degrees for apogees in the southern hemisphere.

5. A system according to claim 1, wherein each of the plurality of satellites has throughout its orbit an orbital height lower than a height necessary for geostationary orbits.

6. A system according to claim 1, wherein the plurality of satellites are equally spaced in mean anomaly within their respective ground tracks.

7. A system according to claim 1, wherein the orbits of the plurality of satellites are further configured such that the portion of the orbits during which the communications equipment on the satellites is enabled to communicate, is separated from the equatorial plane of the earth by at least a predetermined amount.

8. A system according to claim 1, wherein the communications equipment on the plurality of satellites is further configured to communicate at frequencies allocated to geostationary satellites.

9. A system according to claim 1, wherein each of the plurality of satellites has a power system configured to generate a first amount of power when the communications equipment on the satellite is enabled and a second amount of power more than the first amount of power when the communications equipment is not enabled, to store excess power generated when the communications equipment is not enabled, and to enable the communications equipment with both the stored excess power and the generated first amount of power.

10. A constellation of satellites, comprising: a plurality of satellites in orbits around the earth having apogees and perigees, each of the satellites having communications equipment thereon configured to communicate only during a predetermined portion of the satellite's orbit proximate to apogee, the orbits of the plurality of satellites being configured to form at least two ground tracks on the earth displaced from each other longitudinally, each of the ground tracks repeating daily and having a number of active arcs, each active arc corresponding to the portion of the orbit of each satellite during which the communications equipment on the satellite is enabled to communicate, the orbits of the plurality of satellites being further configured such that at all times there are at least two of the satellites in each of the active arcs and such that at all times each of the satellites in any one of the active arcs is separated by at least a predetermined angle, as observed from the earth, from each other satellite in the same active arc and from any satellite in any other active arc.

11. A constellation according to claim 10, wherein the orbit of each of the plurality of satellites has a mean motion that is one of 2, 3 and 4.

12. A constellation according to claim 10, wherein the orbit of each of the plurality of satellites is inclined at critical inclination.

13. A constellation according to claim 10, wherein the argument of perigee of the orbits of each of the plurality of satellites is in the range of 195 degrees to 345 degrees for apogees in the northern hemisphere and in the range of 15 degrees to 165 degrees for apogees in the southern hemisphere.

14. A constellation according to claim 10, wherein each of the plurality of satellites has throughout its orbit a orbital height lower than a height necessary for geostationary orbits.

15. A constellation according to claim 10, wherein the satellites in each of the two or more ground tracks are equally spaced in mean anomaly.

16. A constellation according to claim 10, wherein the orbit of each of the plurality of satellites is further configured such that the portion of the orbits during which the communications equipment on the satellites is enabled to communicate, is separated from the equatorial plane of the earth by a least a predetermined amount.

17. A constellation according to claim 10, wherein the communications equipment on each of the plurality of satellites is further configured to communicate at frequencies allocated to geostationary satellites.

18. A constellation according to claim 10, wherein each of the plurality of satellites has a power system configured to generate a first amount of power when the communications equipment on the satellite is enabled and a second amount of power more than the first amount of power when the communications equipment is not enabled, to store excess power generated when the communications equipment is not enabled, and to enable the communications equipment with both the stored excess power and the generated first amount of power.

19. A method for satellite communications, comprising: orbiting a plurality of communications satellites about the earth, the orbits having apogees and perigees; and enabling each of the plurality of communications satellites to communicate only during a predetermined portion of the orbits proximate to apogee; wherein the orbits of the plurality satellites form at least two ground tracks on the earth displaced from each other longitudinally, each of the ground tracks repeating daily and having a number of active arcs, each active arc corresponding to the portion of the orbit of each satellite during which the communications equipment on the satellite is enabled to communicate; and wherein the satellites are orbited such that at all times at least two of the satellites are in each of the active arcs and such that at all times each of the satellites in any one of the active arcs is separated by at least a predetermined angle, as observed from the earth, from each other satellite in the same active arc and from any satellite in any other active arc.

20. A method according to claim 19, further comprising: configuring the orbits of each of the plurality of satellites to have a mean motion that is one of 2, 3 and 4.

21. A method according to claim 19, further comprising: configuring the orbits of each of the plurality of satellites to be inclined at critical inclination.

22. A method according to claim 19, further comprising: configuring the argument of perigee of the orbits of each of the plurality of satellites to be in the range of 195 degrees to 345 degrees for apogees in the northern hemisphere and in the range of 15 degrees to 165 degrees for apogees in the southern hemisphere.

23. A method according to claim 19, further comprising: configuring the orbits of each of the plurality of satellites to have throughout its orbit an orbital height lower than a height necessary for geostationary orbits.

24. A method according to claim 19, further comprising: configuring the orbits of the plurality of satellites such that the satellites are equally spaced in mean anomaly within their respective ground tracks.

25. A method according to claim 19, further comprising: configuring the orbits of the plurality of satellites such that the portion of the orbits during which the satellites are enabled for communication, is separated from the equatorial plane of the earth by at least a predetermined amount.

26. A method according to claim 19, further comprising: communicating with the plurality of satellites at frequencies allocated to geostationary satellites.

27. A method according to claim 19, wherein each of the plurality of satellites has a power system generating a first amount of power when the communications equipment on the satellite is enabled and a second amount of power more than the first amount of power when the communications equipment is not enabled, and further comprising: storing excess power generated when the communications equipment is not enabled; and enabling the communications equipment with both the stored excess power and the generated first amount of power.

---

## *Description*

---

FIELD OF THE INVENTION

The present invention is generally related to satellite communications systems and, more particularly, to a constellation of non-geostationary satellites that may be deployed and utilized in a manner that substantially increases global communications satellite capacity and does not interfere with the existing geostationary satellite ring.

BACKGROUND OF THE INVENTION

Geostationary ("geo") satellites for telecommunications applications were first proposed

many years ago by the author Arthur C. Clark. Today, there are numerous communications systems employing geo satellites for such diverse applications as telephone and data trunking, television distribution, direct-to-home broadcasting, and mobile communications. Geo satellites operate on the physical principle that a satellite, in circular orbit at the proper altitude above the equator, will orbit the earth at the same angular velocity as the earth's rotation. These satellites therefore, appear to be fixed relative to a point on the earth. This characteristic of geo satellites facilitates their use for communications applications by allowing communications terminals on the earth to simply point their antennas at one position in the sky.

There are however, a number of distinct drawbacks associated with geostationary satellite systems. One major drawback is the high cost of raising a satellite into geo orbit. Geostationary orbits have a radius from the earth center of approximately 36,000 kilometers. Typically, a geo satellite is launched first into an elliptical transfer orbit having an apogee at geostationary altitude, and then its orbit is circularized by using a kick motor to impart the necessary addition momentum to the satellite at apogee. The apogee kick motor, before it is fired, typically weighs as much as the satellite itself, meaning that the launch vehicle must initially launch a payload twice as heavy as the satellite in final orbit. Accordingly, the cost of putting a satellite into the high circular orbit required for geostationary operation is significantly greater than for non-geostationary satellites. The cost associated with deployment of satellites must generally be amortized over the lifetime of the satellite, making use of geo satellites more expensive.

Another problem associated with the altitude at which geo satellites orbit is the delay in the round trip transmission to and from the satellite. For a pair of diverse communications terminals located within the coverage area of a geo satellite, the path length from terminal-to-satellite-to terminal is at least 70,000 kilometers. For the average satellite "hop" the associated transmission delay is approximately one-quarter of a second. For voice communications by satellite, the delay may not be noticeable to most users, but does make it necessary to use special circuitry for echo control. For data communications, the delay complicates the use of protocols that are predicated on the characteristics of terrestrial circuits.

Other problems arise from the geometry of coverage of geo satellite systems. A geostationary satellite system intended to provide "global" services would include three geo satellites spaced equal along the equatorial arc at 120-degree intervals. The coverage of each of these satellites describes a circle on the surface of the earth with its center on the equator. At the equator, the coverage areas of two adjacent geo satellites overlap approximately 40 degrees in longitude. However, the overlap decreases as latitude increases, and there are points on the earth, north and south of the coverage areas, from which none of the geo satellites is visible. The lack of coverage is most pronounced at points where the coverage areas intersect, mid-way between satellite orbital locations.

For a geo system, in which the satellites are in orbit above the equator, earth stations in the equatorial regions generally "see" the satellites at high elevation angles above the

horizon. However, as the latitude of an earth station location increases, the elevation angle to geo satellites from the earth station decreases. For example, elevation angles from ground stations in the United States to geostationary satellites range from 20 to 50 degrees. Low elevation angles can degrade the satellite communications link in several ways. The significant increase in path length through the atmosphere at low elevation angles exacerbates such effects as rain fading, atmospheric absorption and scintillation. For mobile communications systems in particular, low elevation angles increase link degradation due to blockage and multi-path effects.

Because each of the geo satellites only covers one part of the world, some communications links may require more than one satellites hop, or some combined use of satellite and terrestrial transmission facilities to reach their destination. The problem with multiple satellite hops is that for satellites in geostationary orbit, there is a corresponding significant increase in total circuit delay. Of course, multiple satellite hops require an earth station located in view of both satellites that can relay the transmission from one satellite to another.

Direct, inter-satellite links have been proposed as a means for extending the coverage of Geo satellites without the need for such an intermediate earth station. Although the inter-satellite link eliminates the earth station and one round-trip path to the satellite, the benefit is largely offset by the delay incurred in the path between the two orbit satellites. For geo satellites spaced at 120 degrees, the path between satellites is approximately 50,000 kilometers. Moreover, the equipment needed on-board the satellites to implement the inter-satellite link, whether microwave or optical, is complex and expensive. As a result, inter-satellite links have not found extensive application in geo stationary satellites.

Another, and perhaps more significant, problem resulting from the specific geometry of the geo orbit, is the limited availability of orbital positions (or "slots") along the geostationary orbital arc. The ring of geostationary satellites that has grown up over time generally occupies multiple slots spaced two degrees apart and identified by their longitudinal positions. This arrangement has been adopted internationally to allow for satellite communications with a minimum of interference between adjacent satellites operating in the same frequency bands. The two-degree spacing is achieved by using high gain, directional antennas at the ground stations accessing the satellites. The geo ring around the equator thus provides a total of 180 slots (360 degrees/two degrees per slot). Most of the Geo slots are now occupied, making it difficult to find positions for more geo satellites. Frequency, polarization and beam diversity have been used to multiply capacity, but capacity in the geostationary arc remains limited. Moreover, not all geo orbital positions are equally useful or attractive for various applications.

Various non-geostationary satellite systems have been implemented in the past to overcome some of the drawbacks of geo satellites. An example is the Russian Molniya system, which employed satellites in elliptical 12-hour orbits to provide coverage to the northern latitudes in the Soviet Union. The Iridium and Globalstar systems use satellites in low circular orbits to significantly reduce transmission delay. Generally, non-

geostationary systems operate in inclined orbits, and pose a potential for interference with satellites operating at the same frequencies as they cross the geo ring.

In January 1999, an application was filed before the Federal Communications Commission (FCC) by Virtual Geosatellite LLC for the construction of a global broadband satellite communications system based on the teachings of U.S. Pat. Nos. 5,845,206 and 5,957,409, issued to the inventor of the present invention and two other individuals on Dec. 21, 1998 and Sep. 28, 1999, respectively. The system proposed in the FCC application employs three arrays of satellites in elliptical orbits, two arrays covering the northern hemisphere and one covering the southern hemisphere, each array having five 8-hour satellites emulating many of the characteristics of geo satellites. The satellites appear to "hang" in the sky because their angular velocity at or near apogee approximates the rotation rate of the earth. Nine so-called "active arcs" are created with centers located at the apogee points of the satellite orbits. The satellites in each of the three arrays move in a repeating ground track from one active arc to the next, so that there is always one active satellite available in each active arc. Satellites are deactivated between arcs. The active arcs occupy a different portion of the sky than any of the geo satellites located near the equator. As a result, the virtual geo satellites are visible from most parts of the northern and southern hemispheres, but do not interfere with satellites in the geo arc. Even with the prior art virtual geo satellite constellation described above, the present inventor recognizes that capacity issues will continue to become more pressing as communication traffic needs, both in terms of bandwidth and capacity, grow. There will be a need for non-geostationary satellite constellations that provide greater capacity than has already been contemplated in the prior art.

OBJECTIVES

Therefore, it is an object of the present invention to provide a system of satellites that substantially increases global communications satellite capacity without interfering with the existing geostationary satellite ring.

It is another objective of the present invention to provide a global system of communications satellites with higher average elevation angles and lower transmission delay than existing geostationary satellites.

It is a further objective of the present invention to provide a global system of communications satellites with lower construction and launch costs than existing geostationary satellites.

It is yet a further objective of the present invention to provide a global system of communications satellites capable of effectively reusing existing geostationary satellite spectrum allocations.

The above-stated objectives, as well as other objectives, features and advantages, of the present invention will become readily apparent from the following detailed description, which is to be read in conjunction with the appended drawings.

SUMMARY OF THE INVENTION

The present invention is directed to a constellation of non-geostationary satellites that may be deployed and utilized in a matter the substantially increases global communications capacity and does not interfere with satellites in the existing geostationary ring around the earth's equator. A system embodiment includes a ground station, including communications equipment and a steerable antenna, located at a point on the earth, a plurality of satellites in inclined elliptical orbits that forms at least two repeating ground tracks that are displaced from each other in longitude, but all have the same shape. The repeating ground tracks bring the satellites the over the same points on the earth everyday. In the preferred embodiment the satellites have a mean motion of 3, meaning they orbit the earth three times per day, but other integer values of mean motion, such as 2 and 4 have potential applicability.

Each orbiting satellite has communications equipment on board for communicating with ground stations. The communications equipment on each satellite in the constellation is enabled only during a portion of the orbit when the satellite is near apogee, the point in the orbit where the satellite altitude is greatest and the satellite is moving most slowly from the viewpoint of the earth station. In the preferred embodiment, with mean motion 3, each of the satellites is enabled near its apogee for duration of 4 hours, which is 50 percent of total orbit period.

Each of the satellite ground tracks has a number of active arcs corresponding to the portion of the satellite orbits during which the communications equipment on the satellites is enabled to communicate. The orbits of the plurality of satellites are configured such that there are at all times at least two satellites in each active arc enabled to communicate. At the same time, the orbits of the satellites forming each ground track are configured such that the separation between enabled satellites in the same ground track is not less than a predetermined amount considered necessary to prevent interference. Preferably, the satellites in each ground track are equally spaced in mean anomaly to achieve the greatest number of satellites enabled at the same time. In the preferred embodiment, continuous communication at a 50 percent duty cycle requires a minimum of six satellites spaced evenly in mean anomaly. As one satellite of the array leaves an active arc, another satellite enters the active arc to take its place. Adding more arrays of six equally spaced satellites to each ground track in the preferred embodiment creates additional orbital slots. Actually, each group of six satellites, in the preferred embodiment, also provides orbital slots to other positions in the ground track spaced at 120-degree intervals around earth. In the preferred embodiment, the orbital parameters allow up 20 satellites to be placed in each active arc of the ground track while maintaining a minimum angular spacing between satellites of at least 2 degrees.

To avoid potential interference between satellites in different ground tracks, the orbits of the satellites in the two or more ground tracks are also configured such that each satellite enabled to communicate in one of the active arcs is separated by at least a predetermined angle from each of the satellites enabled to communicate in the other ground tracks. In

the preferred embodiment, the argument of perigee is adjusted to make the elliptical orbits lean over, allowing the active portions of adjacent ground tracts to be brought close together without interference. The argument of perigee in the present invention preferably ranges from 195 degrees to 345 degrees for apogee is in the northern hemisphere and from 15 degrees to 165 degrees for apogee is in the southern hemisphere.

In another aspect of the invention, each of the satellites in the constellation has an orbital height lower than the height necessary for geostationary orbits. This aspect of the invention has the benefit of reducing satellite size and weight for a given communications capacity, reducing launch requirements, and reducing satellite transmission delay. Also launching into elliptical orbits requires less energy than circular orbits, further reducing launch vehicle costs.

In a further aspect of the present invention, the orbits of satellites are configured such that the portion of the orbits during which communications equipment is enabled, is separated from the earth's equatorial plane by at least a predetermined amount. This feature avoids potential interference with existing satellites in the geostationary ring and allows the communications frequencies allocated to geostationary satellites to be reused for the non-geostationary constellation of the present invention.

In yet a further aspect of the present invention, each satellite has a power system configured to generate an amount of power less than that required when the communications equipment on the satellite is enabled, and more than that required when the communications equipment is not enabled. The power system can store the excess power generated when the communications equipment is not enabled, and use the stored power to supplement the generated power to meet the requirements of the communications equipment when it is enabled. For the preferred embodiment with a duty cycle of 50 percent, satellite weight saving resulting from this power conservation scheme can be significant.

To minimize perturbation effects caused by the earth's shape and achieve a stable orbit, the present invention preferably also uses the critical orbital inclination of 63.4 degrees.

The preferred embodiment can accommodate 24 ground tracks having 72 non-interfering active arcs in each hemisphere, or a total of 144 active arcs worldwide. If each arc is filled with a maximum of 20 active satellites, the total number of equivalent non-geostationary satellites slots that the present invention can support is 2880, or 16 times as many as the existing Geo stationary ring, assuming minimum two-degree satellite spacing.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates the spatial relationship between the non-geostationary satellite arrays of the present invention and the geostationary ring.

FIG. 2 shows the basic characteristics of an elliptical satellite orbit including the

bunching together of satellites near apogee.

FIG. 3 is a flowchart showing a power consumption methodology of a satellite according to the present invention.

FIG. 4 shows a perspective view of five elliptical orbits having on satellite in each orbit according to the prior art.

FIG. 5 is a Cartesian plot showing a ground track for the elliptical orbits of FIG. 1 according to the prior art.

FIGS. 6A-6B show equatorial and polar perspective views of six elliptical orbits having on satellite in each orbit according to the present invention.

FIG. 7 is a Cartesian plot showing a ground track for the elliptical orbits of FIG. 6 according to the present invention.

FIG. 8 is a Cartesian plot showing in detail 20 satellites in an active arc according to the present invention.

FIG. 9 is a Cartesian plot showing 40 active and inactive satellites in each of three adjacent ground tracks according to the present invention.

FIG. 10 is a Cartesian plot showing in detail the active arcs of three adjacent ground tracks according to the present invention.

FIG. 11 is a Cartesian plot showing 144 in the northern and southern hemispheres according to the present invention.

FIG. 12 is a Cartesian plot showing the active arcs of two adjacent ground tracks with staggered satellites according to the present invention.

FIG. 13 is a Cartesian plot showing an array of four satellites with a 75% duty cycle according to the present invention.

FIGS. 14A-14B is are block diagrams showing a layout of typical satellite and ground station communications equipment used according to the present invention.

DETAILED DESCRIPTION OF THE INVENTION

The present invention is directed to a communications system including ground stations and a constellation of satellites in elliptical orbits that emulate many of the characteristics of geostationary satellites from the viewpoint of the ground stations on the earth. In the present invention, the parameters of the orbits in which the satellites travel, and their motive operation, allow a potentially large number of satellites to be available simultaneously to users without interfering with each other or with satellites in the

equatorial geostationary ring. As illustrated in FIG. 1, and explained in greater detail below, the satellites of the present invention 2 operate in multiple arcs 4 well above the equator 6. These active arcs, and a complementary set below the equator (not shown), occupy a total of about 60 percent of the spherical space around the earth, as compared to only five percent for the geostationary ring. Within a region close to the equator, the satellites of the present invention are inactive, and hence do not interfere with geostationary satellites. FIG. 1 shows the angular separation 9 of the active arcs from the nearest geo satellite for a low latitude ground station, and the angular separation 7 for a high latitude ground station. The minimum separation (15 degrees) occurs for a high latitude ground site viewing a satellite that has just entered the southern end of an active arc.

The present invention takes advantage of the fact that satellites in elliptical orbits spend more time near the apogees of their orbits, when they are farther from the earth, than near their perigees. FIG. 2 shows a typical elliptical orbit 80 having a focus 82. The satellite orbits along the path of the ellipse 80, with the center of the earth be at the focus position 82 (the "occupied focus").

The apogee 84 and perigee 86 of the orbit are defined by the points on the ellipse farthest from and closest to the focus, respectively. The major axis of the ellipse 88 runs through the two foci of the ellipse, from apogee 84 to perigee 86. The two lengths along the semi-major axis, from the apogee 84 and perigee 86 to the occupied focus 82 are called the "radius of apogee" and the "radius of perigee", respectively. The amount of difference between these distances defines the eccentricity of the ellipse. The semi-major axis is defined as half of the major axis of the ellipse. In terms of the semi-major axis, a, and eccentricity, e, the radius of apogee and the radius of perigee are:

and

The greater the eccentricity, the less the ellipse resembles a circle.

The position of a satellite in an elliptical orbit follows Kepler's second law of motion, which states that the orbiting satellite will sweep out equal areas of the orbit in equal times. This results in the satellite moving rapidly when it is at or near perigee and moving slowly when it is near or near apogee. For a 12-hour orbit, for example, a satellite will spend eight hours near apogee. The circles on the ellipse of FIG. 2 represent even time intervals in the motion of a satellite about the orbit, and show clearly how the satellite slows down and dwells for an extended period of time near apogee.

The present invention defines a system using a constellation of satellites chosen to operate such that the desired point on the earth always tracks and communicates with a satellite at or near apogee. By using prograde orbits, those in which the satellite is rotating in the same directional sense as the earth, the satellites at apogee can be made to appear to move very slowly in the sky.

Although the satellites in the present invention resemble geostationary satellites in that

they appear virtually stationary when at or near apogee, typically moving at a rate of less than eight degrees per hour, each does eventually leave its active arc, and, as explained in further detail below, is replaced by another satellite that enters its active arc at the same time, within view of the same ground stations. This characteristic means that unlike geo satellites, each satellite of the present invention does not operate 100 percent of the time. Outside of their active arcs, the satellites are typically not using their transmit and receive capability, and hence do not use a large portion of their power capacity.

Since each satellite is fully powered only part of the time, the satellite can be generating and storing power during the period when it is not active and use it while in its active arc. Hence the satellite power source, typically an array of solar cells, can be sized to provide only a fraction of the power needed during operation with the balance coming from the energy stored, typically in rechargeable batteries, during the inactive parts of its orbit. For example, if a satellite in the present invention is operating only 50 percent of the time, its power system can, in principle, be designed to generate 50 percent of the full load power (plus whatever power is required to maintain housekeeping functions). This mode of operation can result in a significant saving in the weight and size of the satellites.

FIG. 3 depicts this power consumption methodology of a satellite of the present invention in a flowchart format that is generally designated 50. Step 52 represents controlling a ground station antenna tracking the satellites. This requires that a processor keep track of the positions of the satellites in orbit. The pointing angle between the non-geo satellite and position of the geo ring is determined in step 54. Step 56 determines if there is a possibility of interference. If there is any possibility of interference, satellite communications is disabled in step 58. If interference is not possible at step 56, then the satellite is enabled at step 60. An enabled satellite can be, but is not necessarily, turned on. Therefore, step 62 determines if the satellite is powered. This may be determined from the satellite's position in the repeating ground track, or other information. If the satellite is not powered at step 62, the battery is charged at step 64. If the satellite is powered, then power is drawn from both the supply and the battery at step 66.

Operating the satellites only in the region of apogee also prevents interference with satellites in the geostationary ring. In the present invention, the active orbital arcs are well away from the equator because coverage has been optimized to place satellite apogee, where the satellites spend most of their time, over high traffic density areas in the northern and southern hemispheres. The present invention will allow the existing satellite frequency allocations to be reused many more times and help to reduce the intense worldwide pressure on scarce spectrum resources.

In addition to avoiding possible interference with the geostationary ring, the present invention provides high elevation angles to the satellites while in their active arcs. As noted earlier, maximizing elevation angle materially reduces the atmospheric effects, blockage and multi-path that often adversely affect communication with geo satellites.

The system of the present invention has a number of other distinct advantages. Importantly, integral values of mean motion are preferably employed for the satellites in

the constellation to ensure, as explained in detail below, that the ground tracks of the satellites repeat on a daily basis. The ground track of a satellite is the path traced out on the surface of the earth by a line extending from the center of the earth to the satellite. If the ground tracks are made to repeat each day, the orbit apogee passes repeatedly over the same location relative to a desired geographic area. The ground stations in the target area will always have one active satellite at or near apogee to communicate with, although as noted above, not the same satellite throughout the day.

Although the satellite system according to the present invention performs in many of its aspects like a geostationary satellite system, the satellites in the system orbit at a significantly lower altitude. A geostationary satellite orbits at 36,000-kilometer altitude, while the 8-hour satellites of the present invention, for example operate at an altitude between approximately 21,000 and 26,000 kilometers in their active arcs. The size of a satellite tends to be directly proportional to the square of the distance between the satellite and the earth. Because the path loss of the communications link to satellites in these elliptical orbits is significantly less than the path loss to geostationary orbit, both the power and antenna size of the communications package on the satellites can be reduced accordingly.

Lower orbital altitude also yields benefits in terms of the cost of launching the satellites. Unlike Geo satellites, satellites elliptical orbits do not require apogee motors to boost them into final orbit. This factor alone reduces by approximately half the launch vehicle lift requirement per satellite. In addition, the reductions in size and weight of the satellite power and communications systems, mentioned above, all add to the benefits of present invention from viewpoint of launch costs.

Before describing in detail the preferred satellite arrangement according to the present invention, the nomenclature utilized herein to describe the characteristics of satellite orbits will be first defined. The term "mean motion" is a value indicating the number of complete revolutions per day a satellite makes. As earlier noted, if this number is an integer, the ground tracks of the satellites repeat each day and each ground track for that day overrides the tracks of the preceding day.

Mean motion (n) is conventionally defined as the hours in a day (24) divided by the number of hours that it takes a satellite to complete a single orbit. For example, a satellite that completes an orbit every eight hours (an "8hour satellite") has a mean motion of three. Integral mean motions of two, three and four are of particular applicability, but the present invention does not exclude higher values. The "elevation angles", .delta., is the angle from the observers horizon up to the satellite. As satellite on the horizon would have zero degrees elevation while satellites directly overhead would have 90 degrees elevation. Geo satellites orbit near the equator, and usually have a 20-30 degree elevation from points in the United States.

The "inclination", I, is the angle between the orbital plane of the satellite and equatorial plane. Prograde orbit satellites orbit in the same orbital sense (clockwise or counter clockwise) as the earth. For prograde orbits, inclination lies between zero degrees and 90

degrees. Satellite retrograde orbits rotate in the opposite orbital sense relative to the earth, so for retrograde orbits the inclination lies between 90 degrees and 180 degrees.

The "critical inclination" for an elliptical orbit is the planar inclination that results in zero apsidal rotation rate. This results in a stable elliptical orbit whose apogee always stays at the same latitude in the same hemisphere. Two inclination values satisfy this condition: 63.435 degrees for prograde orbits or its supplement 116.565 degrees for retrograde orbits.

The "ascending node" is the point on the equator where the satellite passes from the southern hemisphere to the northern hemisphere. The right ascension of the ascending node ("RAAN") is the angle measured eastward in the plane of the equator from a fixed inertial axis in space (the vernal equinox) to the ascending node.

For the present invention, the longitudinal spacing between the ascending nodes of different satellites in the constellation is called "S", and is uniform in the preferred embodiment.

The "argument of perigee" is a value that indicates the angular position in the plane of the orbit where perigee occurs. Arguments of perigee between zero degrees and 180 degrees locate the position of perigee in the northern hemisphere, and hence concentrate satellite coverage in the southern hemisphere. Conversely arguments of perigee between 180 degrees and 360 degrees locate the perigee in the southern hemisphere and hence concentrate coverage on the northern hemisphere.

"Mean anomaly", M, represents the fraction of an orbit period that has elapsed since the satellite passed through perigee, as expressed in degrees. For example, the mean anomaly of a satellite two hours into an 8-hour orbit is 90 degrees (one quarter of a period). The total mean anomaly over the period of a day for a satellite with mean motion n is simply n times 360 degrees.

In January 1999, an application was filed before the Federal Communications Commission (FCC) by Virtual Geosatellite LLC for the construction of a global broadband satellite communications system based on the teachings of U.S. Pat. No. 5,845,206, issued Dec. 21, 1998, and U.S. Pat. No. 5,957,409, issued Sep. 28, 1999. The system proposed in the application employs three arrays of satellites in elliptical orbits, two arrays covering the northern hemisphere and one covering the southern hemisphere, each array having five 8-hour satellites emulating many of the characteristics of geo satellites.

FIG. 4 depicts one of the five-satellite arrays, generally designated 10, of the prior art system. Virtual geo satellite 12 is shown in elliptical orbit 14 around the earth. The communications equipment on satellite 12 communicates with earth ground stations 16 and 18. Virtual geo satellite 20, shown in a separate elliptical orbit 22, is also is in communication with ground stations 16 and 18.

Like geo-based systems, the virtual geo satellites implemented in accordance with the prior art system are virtually continuously in the same general location or region in the sky. Unlike geo-based systems, however, the ground communications equipment of the prior does not always communicate with the same satellite. For example in the illustrated embodiment, ground stations 16 is initially in communication with satellite 12, but is later in communication with satellite 20 that is in elliptical orbit 22. The virtual geo satellites move slightly relative to the earth when they are at or near apogee. However, the one virtual geo satellite at apogee later moves to perigee, and still later to other locations over other areas of the earth including, for example, ground stations 24 and 26. The prior art system allows for operation over specific geographic locations that are preferentially covered. For example, continental landmasses can be covered by the constellation to the exclusion of other areas, such as the oceans between the continents. In the illustrated prior art embodiment, for example, the United States, Europe and portions of Asia and Russia are preferentially covered.

The five satellites depicted in FIG. 4 are in orbits that have the same values for radius of apogee, radius of perigee, inclination and mean motion, but are spaced in RAAN and in mean anomaly such that they all follow a common ground track. FIG. 5 shows a plot of the ground track 38 in Cartesian coordinates, superimposed on a Mercator projection of the earth, for the prior art five-satellite array of FIG. 4. Note that the plot of the single ground track 38 actually "folds over" from the left edge of the world map to the right edge, giving it the appearance of multiple traces. In the prior art system, the satellites have a mean emotion of three, thus making three orbits of the earth each day. The orbits are equally spaced around the axis of the earth, and are equally spaced in mean anomaly. For the five satellites the orbital spacing in longitude, S, is set equal to 72 degrees. In order to have the five satellites in the five different orbits all follow the same ground track, their spacing in mean anomaly must be n times S, or 216 degrees. As can be seen from FIG. 5, the satellites, having mean motion three, make three loops around the world. In general, the number of loops in the ground track will be the same as the mean motion. The positions of the loops can be shifted east or west in longitude to target different coverage areas by adjusting the RAANs of all of the orbits of the array while maintaining their relative spacing. In the prior art system depicted, the argument of perigee is 270 degrees, which makes the loops symmetrical about the apogee of the orbits. As the apogee is in the northern hemisphere, the prior art system shown favors coverage of the northern hemisphere. As can be seen, there is one satellite 40, 44, 46 in each of the active arcs at the top of the loops near apogee, and two inactive satellites 42, 48 in positions between the active arcs. In this particular case the ends of the active arcs are each at 45.1 degrees north latitude and the middle at 63.4 degrees north latitude, which is the same as the angle of inclination. This provides a very large separation (approximately 40 degrees) between the active arcs and the geostationary ring. The duty cycle of each satellite shown in FIG. 4 is 60 percent, meaning that each satellite is active for 60 percent of time, centered around its apogee. When an active satellite is about to leave one end point of an active arc, one of the inactive satellites appears at the other end point to take its place and is switched from an inactive state to an active state. The prior art system offers the opportunity to add more satellites to each active arc and to insert a second ground track with an equal number of satellites, between the loops of the original ground track in each

hemisphere. Each orbital position in each of the active arcs constitutes, in effect, an orbital slot, which in the prior art system has been dubbed a "V-slot". However, the possible number of such virtual slots for any orbital configuration is ultimately limited by the spacing between satellites at apogee within each active arc, and the spacing between satellites in the vicinity of the points where the active arcs of adjacent ground tracks intersect. It has been determined that the prior art virtual geo system can accommodate a maximum of 14 satellites in each active arc while still maintaining minimal 2 degree satellite spacing. If in addition, a second ground track is added to the southern as well as the northern hemisphere, raising the total number of active arcs to 12, then the maximum potential number of virtual sots is 14.times.12 or 168 virtual slots.

The present invention takes advantage of a selected set of orbital parameters to allow the number of virtual orbital slots per active arc and the total number of active arcs disposed around the earth, to be increased dramatically over the prior art system.

FIG. 6A depicts the basic six-satellite array, generally designated 70 of the present invention. The six satellites are in elliptical orbits around the earth all have the same radius of apogee, radius of perigee, inclination and mean emotion, and are spaced in RAAN and in mean anomaly such that they all follow a common ground track. The communications system on satellite 72, which is in orbit 96, communicates with earth ground stations 74 and 76. Satellite 78 shown in separate elliptical orbit 98, is also in communication with ground stations 74 and 76, but at later time will be in communication with ground stations 90 and 92. Satellites 72 and 78 may also be connected with an inter-satellite link 94.

FIG. 6B shows the same basic six-satellite array of the present invention looking down from the North Pole. This perspective shows very clearly that the all of the elliptical orbits have the same shape and are spaced evenly around the earth.

Unlike the prior art system, the elliptical orbits of the present invention have arguments of perigee that are not the usual 90 or 270 degrees, but a value in between 180 degrees and 270 degrees, such that the orbital ellipse is in effect "leaning over" towards the equator. The apogee occurs in the vicinity of 40 degrees latitude, which has the benefit of being closer to populations at the middle latitudes that such a system might be likely to serve. Another difference from the prior art system is that the basic array of present invention contains six satellites operating with a duty factor of 50 percent, that is, the satellites are in their active arcs and operating only 50 percent of the time. The essential parameters of the elliptical orbits for the preferred embodiment are:

Mean Motion: 3

Semi-major axis: 20,261 km

Eccentricity: 0.6458

Inclination: 63.41 degs.

Argument of perigee: 226.445 degs.

Latitude of apogee: 39.5 degs.

Altitude at Apogee: 26,975 km

Latitudes at ends of active arc: 15.4 degs., 60 degs .

Altitude at ends of active arc: 20,735 kilometers

FIG. 7 shows a Mercator projection of the ground track for the basic array depicted in the FIGS. 6A-6B. As in the prior art system, there are three loops in the ground track, each over a population center in the United States Europe and Asia. However, because the argument of perigee now makes the orbits lean, the loops of the ground track are no longer symmetrical about a meridian of longitude. The active arcs 102, 104, 106 of the ground track are on one side of each loop and are oriented in a predominantly north-south direction. On the Mercator projection the active arcs are said to resemble a coiled cobra, with its head lying at the higher latitudes and the body portion lying at the lower latitudes. Although the active arcs begin at lower latitudes than in the prior art system, there is sufficient angular separation to avoid interference with any of the geo satellites. With even spacing in mean anomaly between satellites, half the six satellites are, at any time, in the active arcs of the ground track, while the other half are traveling between the active arcs.

FIG. 8 illustrates the method in accordance with the present invention, for increasing the number of available satellite slots in each ground track by adding additional satellites to fill each of the active arcs. It has been determined that up to 20 satellites 110 may be fit into each active arc while still maintaining a minimum separation between satellites at perigee apogee of at least two degrees, which is the spacing criterion for satellites in geostationary slots. Each satellite has the parameters specified above, with a difference between each satellite in RAAN of three degrees and a difference in mean anomaly of nine degrees to ensure that each satellite follows the same ground track, and that there is a minimum of two degrees spacing between satellites along the ground track at apogee. Since there are three loops for each ground track, a completely filled ground track, in accordance with the present invention, provides a total of 60 nongeostationary slots around the world. Because half of the satellites in each ground track are inactive at any point in time, the total number of satellites required to completely fill out each ground track is 120.

FIG. 9 illustrates the method, according to the present invention, for increasing the number of available satellite slots by adding additional ground tracks displaced from each other by a small longitudinal increment, which in the preferred embodiment shown is five degrees. The nearly north-south orientation of the active arcs in the present invention makes it possible to pack ground tracks closer together without having the active arcs overlap, and, therefore, without incurring potential interference between satellites in the

adjacent ground tracks. For the sake of clarity, FIG. 9 shows only one of the loops of three adjacent ground tracks 120, 122, 124 in detail with the 40 satellites, both active and inactive, in the loop. In the active arc between 15.4 and 60 degrees north latitude the satellites are bunched together and moving in formation along the tracks.

FIG. 10 provides a more detailed view of the same three adjacent ground tracks 120, 122, 124, each with 20 active satellites 125, traversing North America. The positions of the inactive satellites 126 are shown as well, by a different symbol. In this case, the spacing between tracks is minimum at the northern end of the active arc. By deactivating the satellites at 60 degrees north latitude, the possibility of interference at the point where the ground tracks cross, at 63.4 degrees north latitude, is avoided.

FIG. 11 shows all of the active arcs 128, 130 possible with the preferred embodiment by the stacking the ground tracks five degrees apart in longitude in both the northern and southern hemispheres. By spacing of the active loops in each hemisphere five degrees apart the total number of active loops per hemisphere is 360 degrees/5 degrees (72), or a total of 144 active arcs in both hemispheres. If each active loop is filled with the maximum of 20 satellites discussed above, then the total effective number of orbital slots that can be achieved with in the preferred embodiment is 2,880. With a duty cycle of 50 percent, the 2,880 effective slots require an additional 2,880 inactive satellites in orbits between the active arcs. The total number of satellites therefore required to provide the maximum number of slots in accordance with the preferred embodiment is 5,760. Although it may not be economically feasible to totally fill "cobra space" with satellites in accordance with the preferred embodiment, the preceding discussion illustrates the significant increase in worldwide satellite capacity that can be achieved by employing the invention described herein. Compared to the 180 slots available in the geostationary ring, the number of effective slots according to the present invention represents a sixteen-fold increase. As suggested by FIG. 10, the satellites in adjacent ground tracks "fly in formation", maintaining the spacing between them. In effect, the satellites in the active arc former a rectangular grid that moves slowly across the sky. In an alternative embodiment, illustrated in FIG. 12, the mean anomalies of satellites 132 and 134 in adjacent ground tracks are adjusted to staggered the positions of the satellites in the formation, and hence achieve either greater spacing between satellites in the adjacent ground tracks or allow the ground tracks to be positioned even closer together than the five degree longitudinal separation used in the preferred embodiment.

It should be noted that, unlike satellites in the geostationary ring, satellites according to the preferred embodiment must be added in increments of six, filling three slots equally spaced around the world. However, for the reasons earlier discussed, the cost of constructing and launching the six satellites in a basic array should compare favorably with that of three geo satellites providing equivalent global services.

The system of the present invention with leaning elliptical orbits has been optimized in the preferred embodiment to maximize the number of effective orbital slots. It should be apparent to one skilled in the art that the orbital parameters of the inventive system can be varied to emphasize other performance factors that may be desirable, such as duty cycle.

By way of example, FIG. 13 illustrates another embodiment having a basic array of only four satellites 150, 152, 154, 156 in a common ground track, spaced evenly in mean anomaly, and having a 75 percent duty cycle. To achieve this result, the argument of perigee has been adjusted to be closer to 270 degrees than in the preferred embodiment, such that the active arc in this case includes the highest point in latitude.

FIG. 13 shows that an additional ground track could be inserted between the loops of ground track shown without having the active arcs cross each other. Even if the active arcs do cross, it may be possible to phase the passage of the satellites through the crossing points to maintain the desired inter-satellite spacing.

All elliptical orbits, including those described herein are subject to effects of long-term perturbations, which if not compensated, cause the desired satellite coverage to drift off with the passage of time. These perturbation effects result from the earth's J2 rotation harmonic, which reflects the fact that the earth is not a perfect sphere, but actually bulges at the equator. The two principal effects are regression of the line of nodes for posigrade orbits (I>90 degrees), and rotation of the line of apsides. For inclinations greater than critical (I between 63.4 degrees and 116.6 degrees) the line between the perigee and the apogee for each satellite (the line of apsides) will regress; for other inclinations (I<63.4 degrees or >116.6 degrees) the line of apsides will progress. At exactly the critical angles of 63.4 degrees or 116.6 degrees, the line of apsides will remain stable, a very desirable effect which is used to advantage in the preferred embodiment for maintaining apogee at a selected latitude. For inclined elliptical orbits there will be a regression of the line of nodes that must be compensated by a small adjustment in orbital period. All the satellites in a given array design are affected similarly. The effect is to cause the plane of the orbit to rotate clockwise as seen looking down on the North Pole. If that happens, the satellite would pass over a selected meridian at a slightly earlier time each day. Fortunately this effect can be compensated by slightly decreasing the period of each satellite in the array to effectively stretch out the trajectory ground track and cause the ground track to repeat exactly over the life of the satellite.

As will be apparent to a person of skill in the art, the system of the present invention has applicability to a broad variety of satellite communications services, including telephone, broadband data, television distribution, direct broadcasting and mobile communications, and to non-communications services as well, such as meteorology and earth resources monitoring. FIGS. 14A-14B provide, by way of example, block diagrams of the satellite and ground stations that can be used for television distribution and data transmission services in accordance with the present invention. The block diagrams show elements that can be used, for example, to carry out communication between the ground station 74, satellite 72, and ground station 76 of FIG. 6. In addition, the elements shown can support the inter-satellite link 94 as shown from satellite 72 to satellite 78.

Referring to FIG. 14B, the video input to be distributed is received as video input 200, and input to a video coder 202 which processes digital coded video information. This digital coded video is multiplexed with a number of other channels of video information by video multiplexer 204. The resultant multiplexed video 206 is modulated and

appropriately coded by element 208 and then up converted by transmitter element 210. The up-converted signal is transmitted in the Ku band, at around 14 GHz, by antenna 212. Antenna 212 is pointed at satellite bb and is controlled by pointing servos 213.

Referring now to FIG. 14A, the transmission from antenna 212 is received by phased array antenna 214 of satellite 72. The received signal is detected by receiver 216, from which it is input to multiplexer 218. Multiplexer 218 also receives information for the into satellite transponders 238. The output of multiplexer 218 feeds the direct transponders 250, which through power amplifier 252 and multiplexer 254 feeds beam former 256. Beam former 256 drives a transmit, steerable phased array antenna 260 which transmits a signal in a current geo frequency band to steerable antenna 262 in the remote user terminal 76, of FIG. 14B. This signal preferably uses the same frequency that utilized by current geo satellites for such services. The phased array antenna 260 is steered by an on-board computer that follows a preset and repeating path, or from the ground. At user terminal 76 in FIG. 14B, the signal is received by receiver 264 through steerable antenna 262, demodulated at 266, and decoded at 268 to produce the video output 270. In the alternative, user terminal 76 may include transmitter and receiver 212 capable of two-way transmission of voice and data.

Referring again to FIG. 14A, satellite 72 includes another input to multiplexer 218 from the inter-satellite link 26 via receiver 240. Transmit information for inter-satellite link 94 is multiplexed at 242 and amplified at 246 prior to being multiplexed.

Still referring to FIG. 14A, output 222 of input multiplexer 218 represents a storage output. The satellite electronics include the capacity for one-hour of TV program information. The TV channels typically produced information that the rate of 6 megabytes per second. The channels are typically digitally multiplexed to produce information on four to six channels at time. Therefore the present invention preferably uses 22 gigabytes of storage for over one hour of information at about 4.7 megabytes per second. The information stored can then be broadcast over another active arc. The storage unit 224, accordingly, is a wide SCSI-2 devise capable of receiving 4.7 megabytes per second and storing 22 gigabytes. Upon appropriate satellite command, the output of storage unit 224 is modulated and up-converted at 226.

In addition, FIG. 14A depicts an on-board processor 280, which determines the position in the orbit and steering of the satellite antennas from various parameters. Power supply 290 supplies and regulates electrical power for all the various satellite subsystems and components that require such power. Power supply 290 includes a source of power, here shown as solar array 292, and an energy storage element, here showed as a battery array 294. Importantly, according to the present invention, the solar array 292 is sized to provide an amount of power that is less than that required to fully power the satellite communications functions of the satellite, the fraction being referred to herein as the power ratio of the satellite. The power ratio depends on the kind of orbit that satellites will have, and how long the satellites will be transmitting during the elliptical orbit. The preferred embodiment of the present invention has a power ratio of 0.5, to power satellite that is communicating half of the time. The other half of the time, the transmitters and

receivers on-board the satellite are disabled, allowing solar array 292 to provide power to charge battery 294. Employment of the inventive system provides a new standard with greatly increasing the number of the world's communications satellites, with no interference to any geo satellites, and also no interference to each other. A total of 5,760 virtual Geo satellites will provide 2880 active slots. This will increase by sixteen-fold the 180 2-degree slots that are currently available in the geo ring. As such, the method and system of the present invention can be utilized to improve the elliptical satellite orbits described in the prior art to dramatically increase available communication capacity.

While this invention has been described in reference to illustrative embodiments, the description is not intended to be construed in a limiting sense. Various modifications and combinations of the illustrative embodiments, as well as other embodiments of the invention, will be apparent to persons skilled in the art upon reference to the description. It is therefore intended that the appended claims encompass any of such modifications or embodiments.

* * * * *

EXHIBIT 4: Request by Ellipso to Sahagen to pay Draim

# TIGHE PATTON ARMSTRONG TEASDALE, PLLC

ATTORNEYS AT LAW

1747 PENNSYLVANIA AVENUE, N.W.
SUITE 300
WASHINGTON, DC 20006-4604
————

TELEPHONE (202) 454-2800
FACSIMILE (202) 454-2805
www.tighepatton.com

DAVID J. TAYLOR
WRITER'S DIRECT DIAL: (202) 454-2855
Email: dtaylor@tighepatton.com

May 18, 2006

Wayne Williams, Esq.
c/o Ardustry Entertainment                    Via First Class Postage and e-mail
9255 Sunset Boulevard
Suite 1000
West Hollywood, CA 90069

Re: Draim v. Virtual Geosatellite et al.

Dear Wayne:

As you know, we went to trial over the disputed patent bonuses in April. Unfortunately, Judge Facciola ruled against our position, and has ordered that our clients pay Draim the amount of $78,125.02 for patents issued after Draim left our clients' employ. Draim's attorney has also calculated interest through May 23, 2006, as being in the additional amount of $15,393.87. I am attaching copies of both the Court's Findings of Fact, Conclusions of Law and Order, and John Anderson's calculations.

Pursuant to the terms of the Global Settlement between the Sahagen Parties and the Castiel Parties, we therefore MAKE DEMAND upon Sahagen and Space Resources International for immediate payment of the $93,518.89 which the Court has ORDERED is due to Draim.

You will recall that Sahagne's satisfaction of the Draim case is a condition precedent to the entire settlement; we are certain that neither you nor Peter Sahagen would wish to see the global settlement fall apart over this relatively minor amount.

We therefore insist that the full amount be paid to this firm immediately so that arrangements can be made to satisfy the judgment before the appeals period expires. Failure to comply with this demand will result in our having to take additional action in this matter against Sahagen and SRZ. Any costs, including attorney's fees, expended in that effort will be chargeable to your client.

I trust that you will prevail on your client to make good on his contractual obligations.

# TIGHE PATTON ARMSTRONG TEASDALE, PLLC

May 18, 2006
Page 2


      Failure to respond to this demand within five (5) days will be deemed by us to be an indication of your unwillingness to meet this obligation, and action will have to be started to protect our clients' interests.

                                  Sincerely yours,



                                  David J. Taylor

Enclosures: Court Order
                Interest Calculation

cc: David Castiel
    Jim Bailer, Esq.
    Thomas Earl Patton, Esq.

**David Castiel**

| | |
|---|---|
| **From:** | David J. Taylor [DTaylor@tighepatton.com] |
| **Sent:** | Thursday, August 10, 2006 11:40 AM |
| **To:** | Waynesworld119@aol.com |
| **Subject:** | RE: DEAR DAVID...CONFIDENTIAL... |
| **Attachments:** | Findings, Conlcusions and ORDER 5-15-06.pdf |

Wayne: Here it is. Please let me know what you intend to do about payment. If we have to appeal, those costs will be added to your overall final bill. David

---

**From:** Waynesworld119@aol.com [mailto:Waynesworld119@aol.com]
**Sent:** Thursday, August 03, 2006 5:12 AM
**To:** David J. Taylor
**Subject:** DEAR DAVID...CONFIDENTIAL...

Could you please e-mail me a copy of the recent D.C. judgment...Thanks!

Regards,

Wayne S. Williams
310-623-1866 [w]
310-360-0915 [h]
310-467-7428 [c]

EXHIBIT 5: PTO Revocation Order of '126



UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,974 | 03/18/2006 | 6701126 | MISC.R001 | 2512 |

7590    03/12/2007

RABIN & BERDO PC
1101 14TH STREET NW, SUITE 500
WASHINGTON, DC  20005

| EXAMINER |
|---|
| Joseph R. Pokrzywa |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | IFW |

DATE MAILED: 03/12/2007

Please find below and/or attached an Office communication concerning this application or proceeding.

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

DAVID BOGART DORT
RUBINSTEIN LAW GROUP PC
1700 DIAGONAL ROAD, SUITE 300
ALEXANDRIA, VA  22314

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/007,974*.

PATENT NO. *6701126*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| *Ex Parte R__ xamination Communication* | Contr. l No. 90/007,974 | | Patent Und _ Reexamination 6701126 |
| | Examiner | Art Unit | |
| | Joseph R. Pokrzywa | 3992 | |

**A SHORTENED STATUTORY PERIOD FOR RESPONSE TO THIS ACTION IS SET TO EXPIRE <u>2</u> MONTH(S) FROM THE MAILING DATE OF THIS LETTER. EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).** If the specified period for response is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Joseph R. Pokrzywa
Primary Examiner
Art Unit: 3992

cc: Requester (if third party requester)

| *Office Action in Ex Parte Reexamination* | Control No.<br>90/007,974 | Patent Under Reexamination<br>6701126 |
|---|---|---|
| | Examiner<br>Joseph R. Pokrzywa | Art Unit<br>3992 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a ☐ Responsive to the communication(s) filed on _____ .        b ☐ This action is made FINAL.

c ☐ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892.    3. ☐ Interview Summary, PTO-474.

2. ☐ Information Disclosure Statement, PTO/SB/08.    4. ☐ _____ .

Part II    SUMMARY OF ACTION

1a. ☒ Claims *1-27* are subject to reexamination.

1b. ☐ Claims _____ are not subject to reexamination.

2. ☐ Claims _____ have been canceled in the present reexamination proceeding.

3. ☐ Claims _____ are patentable and/or confirmed.

4. ☒ Claims *1-27* are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ The drawings, filed on _____ are acceptable.

7. ☐ The proposed drawing correction, filed on _____ has been (7a)☐ approved (7b)☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

　　a)☐ All  b)☐ Some*  c)☐ None    of the certified copies have

　　1☐ been received.

　　2☐ not been received.

　　3☐ been filed in Application No. _____ .

　　4☐ been filed in reexamination Control No. _____ .

　　5☐ been received by the International Bureau in PCT application No. _____ .

　　* See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: _____

*Joseph R Pkyw*

**JOSEPH R. POKRZYWA**
**PRIMARY EXAMINER**

cc: Requester (if third party requester)

Application/Control Number: 90/007,974                                Page 2

Art Unit: 3992

## DETAILED ACTION

### *Reexamination*

1.    Currently, **claims 1-27** of U.S. Patent Number 6,701,126 are subject to reexamination.

### *Claim Rejections - 35 USC § 102*

2.    The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (e) the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

3.    **Claims 1-27** are rejected under 35 U.S.C. 102(e) as being anticipated by Castiel *et al*.

(U.S. Patent Number 6,954,613, hereafter "Castiel")

The applied reference has a common inventor with the instant application that became the

'126 Patent.  Based upon the earlier effective U.S. filing date of the reference "Castiel", it

constitutes prior art under 35 U.S.C. 102(e).  This rejection under 35 U.S.C. 102(e) might be

overcome either by a showing under 37 CFR 1.132 that any invention disclosed but not claimed

in the reference was derived from the inventor of this application that became the '126 Patent,

and is thus not the invention "by another," or by an appropriate showing under 37 CFR 1.131.

Application/Control Number: 90/007,974                                      Page 3
Art Unit: 3992

Regarding *claim 1*, Castiel discloses a satellite communications system, comprising:

a ground station, including communications equipment and an antenna, located at a position on the earth [see col. 1, lines 34-47; also see 3, line 53-col. 4, line 16];

a plurality of satellites in orbits around the earth having apogees and perigees [see Figs. 1 and 3, see col. 2, lines 20-51],

each of the satellites having communications equipment thereon configured to communicate with the ground station only during a predetermined portion of the satellite's orbit proximate to apogee [col. 2, lines 48-51, and col. 17, lines 34-42],

the orbits of the plurality of satellites being configured to form at least two ground tracks on the earth displaced from each other longitudinally [see col. 17, lines 11-52; also see Table 1 in col. 18, lines 1-32; also see Fig. 9],

each of the ground tracks repeating daily and having a number of active arcs [see col. 5, lines 3-8; also see Table 2 in col. 18, lines 30-48, being the "Locations of the VIRGO Active Arcs"],

each active arc corresponding to the portion of the orbit of each satellite during which the communications equipment on the satellite is enabled to communicate with the ground station [col. 17, lines 11-57],

the orbits of the plurality of satellites being further configured such that at all times there are at least two of the satellites in each of the active arcs [col. 17, lines 34-42, wherein *"This requires three satellites out of a total of five to be active at any time."*] and such that at all times each of the satellites in any one of the active arcs is separated by at least a predetermined angle, as observed from the ground station, from each other satellite in the same active arc and from

any satellite in any other active arc [col. 17, lines 34-42; also see Table 3 in col. 18, line 48-col. 19, line 13, whereby the satellites are shown to be separated by the angles in the Mean Anomaly "MA"].

Regarding *claim 2*, Castiel discloses the system discussed above in claim 1, and further teaches that the orbit of each of the plurality of satellites has a mean motion that is one of 2, 3 and 4 [see col. 5, lines 19-23; also see col. 6, lines 5-10, whereby "12-hour satellites" have a mean motion of 2; also see col. 12, lines 25-30].

Regarding *claim 3*, Castiel discloses the system discussed above in claim 1, and further teaches that the orbits of each of the plurality of satellites is inclined at critical inclination [see Table 3 on col. 18, line 48-col. 19, line 13].

Regarding *claim 4*, Castiel discloses the system discussed above in claim 1, and further teaches that the argument of perigee of the orbits of each of the plurality of satellites is in the range of 195 degrees to 345 degrees for apogees in the northern hemisphere and in the range of 15 degrees to 165 degrees for apogees in the southern hemisphere [see Table 1 in col. 18, lines 1-25, whereby the Aurora I and II, which are in the northern hemisphere, have an "Argument of Perigee" of 270 degrees, while the Australis, being in the southern hemisphere, has an "Argument of Perigee" of 90 degrees, each of which are within the claimed range].

Application/Control Number: 90/007,974                                             Page 5

Art Unit: 3992

Regarding *claim 5*, Castiel discloses the system discussed above in claim 1, and further

teaches that each of the plurality of satellites has throughout its orbit an orbital height lower than

a height necessary for geostationary orbits [see col. 3, lines 26-33, wherein "these satellites

according to the disclosed system orbit at about half the altitude of the geo systems."].

Regarding *claim 6*, Castiel discloses the system discussed above in claim 1, and further

teaches that the plurality of satellites are equally spaced in mean anomaly within their respective

ground tracks [see Table 3 on col. 18, line 48-col. 19, line 13, whereby the mean anomaly "MA"

of the satellites are seen to be equally spaced].

Regarding *claim 7*, Castiel discloses the system discussed above in claim 1, and further

teaches that the orbits of the plurality of satellites are further configured such that the portion of

the orbits during which the communications equipment on the satellites is enabled to

communicate, is separated from the equatorial plane of the earth by at least a predetermined

amount [see col. 1, lines 34-48; also see col. 5, lines 24-59].

Regarding *claim 8*, Castiel discloses the system discussed above in claim 1, and further

teaches that the communications equipment on the plurality of satellites is further configured to

communicate at frequencies allocated to geostationary satellites [col. 3, line 53-col. 4, line 16].

Regarding *claim 9*, Castiel discloses the system discussed above in claim 1, and further

teaches that each of the plurality of satellites has a power system configured to generate a first

Application/Control Number: 90/007,974                                            Page 6

Art Unit: 3992

amount of power when the communications equipment on the satellite is enabled and a second

amount of power more than the first amount of power when the communications equipment is

not enabled [col. 2, lines 39-64; also see col. 4, lines 23-43], to store excess power generated

when the communications equipment is not enabled [col. 2, lines 39-64], and to enable the

communications equipment with both the stored excess power and the generated first amount of

power [col. 2, lines 52-64].


Regarding *claim 10*, Castiel discloses a constellation of satellites, comprising:

a plurality of satellites in orbits around the earth having apogees and perigees [see Figs. 1

and 3, see col. 2, lines 20-51],

each of the satellites having communications equipment thereon configured to

communicate only during a predetermined portion of the satellite's orbit proximate to apogee

[col. 2, lines 48-51, and col. 17, lines 34-42],

the orbits of the plurality of satellites being configured to form at least two ground tracks

on the earth displaced from each other longitudinally [see col. 17, lines 11-52; also see Table 1 in

col. 18, lines 1-32; also see Fig. 9],

each of the ground tracks repeating daily and having a number of active arcs [see col. 5,

lines 3-8; also see Table 2 in col. 18, lines 30-48, being the "Locations of the VIRGO Active

Arcs"],

each active arc corresponding to the portion of the orbit of each satellite during which the

communications equipment on the satellite is enabled to communicate [col. 17, lines 11-57],

Application/Control Number: 90/007,974                                    Page 7

Art Unit: 3992

the orbits of the plurality of satellites being further configured such that at all times there

are at least two of the satellites in each of the active arcs [col. 17, lines 34-42, wherein *"This*

*requires three satellites out of a total of five to be active at any time."*] and such that at all times

each of the satellites in any one of the active arcs is separated by at least a predetermined angle,

as observed from the earth, from each other satellite in the same active arc and from any satellite

in any other active arc [col. 17, lines 34-42; also see Table 3 in col. 18, line 48-col. 19, line 13,

whereby the satellites are shown to be separated by the angles in the Mean Anomaly "MA"].

Regarding *claim 11*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the orbit of each of the plurality of satellites has a mean motion that is one of

2, 3 and 4 [see col. 5, lines 19-23; also see col. 6, lines 5-10, whereby "12-hour satellites" have a

mean motion of 2; also see col. 12, lines 25-30].

Regarding *claim 12*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the orbit of each of the plurality of satellites is inclined at critical inclination

[see Table 3 on col. 18, line 48-col. 19, line 13].

Regarding *claim 13*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the argument of perigee of the orbits of each of the plurality of satellites is in

the range of 195 degrees to 345 degrees for apogees in the northern hemisphere and in the range

of 15 degrees to 165 degrees for apogees in the southern hemisphere [see Table 1 in col. 18, lines

1-25, whereby the Aurora I and II, which are in the northern hemisphere, have an "Argument of

Perigee" of 270 degrees, while the Australis, being in the southern hemisphere, has an

"Argument of Perigee" of 90 degrees, each of which are within the claimed range].

Regarding *claim 14*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that each of the plurality of satellites has throughout its orbit a orbital height

lower than a height necessary for geostationary orbits [see col. 3, lines 26-33, wherein "these

satellites according to the disclosed system orbit at about half the altitude of the geo systems."].

Regarding *claim 15*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the satellites in each of the two or more ground tracks are equally spaced in

mean anomaly [see Table 3 on col. 18, line 48-col. 19, line 13, whereby the mean anomaly

"MA" of the satellites are seen to be equally spaced].

Regarding *claim 16*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the orbit of each of the plurality of satellites is further configured such that

the portion of the orbits during which the communications equipment on the satellites is enabled

to communicate, is separated from the equatorial plane of the earth by a least a predetermined

amount [see col. 1, lines 34-48; also see col. 5, lines 24-59].

Regarding *claim 17*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that the communications equipment on each of the plurality of satellites is further

Application/Control Number: 90/007,974                                    Page 9

Art Unit: 3992

configured to communicate at frequencies allocated to geostationary satellites [col. 3, line 53-col.

4, line 16].


Regarding *claim 18*, Castiel discloses the constellation discussed above in claim 10, and

further teaches that each of the plurality of satellites has a power system configured to generate a

first amount of power when the communications equipment on the satellite is enabled and a

second amount of power more than the first amount of power when the communications

equipment is not enabled [col. 2, lines 39-64; also see col. 4, lines 23-43], to store excess power

generated when the communications equipment is not enabled [col. 2, lines 39-64], and to enable

the communications equipment with both the stored excess power and the generated first amount

of power [col. 2, lines 52-64].


Regarding *claim 19*, Castiel discloses a method for satellite communications, comprising:

orbiting a plurality of communications satellites about the earth, the orbits having

apogees and perigees [see Figs. 1 and 3, see col. 2, lines 20-51]; and

enabling each of the plurality of communications satellites to communicate only during a

predetermined portion of the orbits proximate to apogee [col. 2, lines 48-51, and col. 17, lines

34-42];

wherein the orbits of the plurality satellites form at least two ground tracks on the earth

displaced from each other longitudinally [see col. 17, lines 11-52; also see Table 1 in col. 18,

lines 1-32; also see Fig. 9],

Application/Control Number: 90/007,974                                    Page 10

Art Unit: 3992

each of the ground tracks repeating daily and having a number of active arcs [see col. 5, lines 3-8; also see Table 2 in col. 18, lines 30-48, being the "Locations of the VIRGO Active Arcs"],

each active arc corresponding to the portion of the orbit of each satellite during which the communications equipment on the satellite is enabled to communicate [col. 17, lines 11-57]; and

wherein the satellites are orbited such that at all times at least two of the satellites are in each of the active arcs [col. 17, lines 34-42, wherein *"This requires three satellites out of a total of five to be active at any time."*] and such that at all times each of the satellites in any one of the active arcs is separated by at least a predetermined angle, as observed from the earth, from each other satellite in the same active arc and from any satellite in any other active arc [col. 17, lines 34-42; also see Table 3 in col. 18, line 48-col. 19, line 13, whereby the satellites are shown to be separated by the angles in the Mean Anomaly "MA"].


Regarding *claim 20*, Castiel discloses the method discussed above in claim 19, and further teaches of configuring the orbits of each of the plurality of satellites to have a mean motion that is one of 2, 3 and 4 [see col. 5, lines 19-23; also see col. 6, lines 5-10, whereby "12-hour satellites" have a mean motion of 2; also see col. 12, lines 25-30].


Regarding *claim 21*, Castiel discloses the method discussed above in claim 19, and further teaches of configuring the orbits of each of the plurality of satellites to be inclined at critical inclination [see Table 3 on col. 18, line 48-col. 19, line 13].

Regarding *claim 22*, Castiel discloses the method discussed above in claim 19, and further teaches of configuring the argument of perigee of the orbits of each of the plurality of satellites to be in the range of 195 degrees to 345 degrees for apogees in the northern hemisphere and in the range of 15 degrees to 165 degrees for apogees in the southern hemisphere [see Table 1 in col. 18, lines 1-25, whereby the Aurora I and II, which are in the northern hemisphere, have an "Argument of Perigee" of 270 degrees, while the Australis, being in the southern hemisphere, has an "Argument of Perigee" of 90 degrees, each of which are within the claimed range].

Regarding *claim 23*, Castiel discloses the method discussed above in claim 19, and further teaches of configuring the orbits of each of the plurality of satellites to have throughout its orbit an orbital height lower than a height necessary for geostationary orbits [see col. 3, lines 26-33, wherein "these satellites according to the disclosed system orbit at about half the altitude of the geo systems."].

Regarding *claim 24*, Castiel discloses the method discussed above in claim 19, and further teaches of configuring the orbits of the plurality of satellites such that the satellites are equally spaced in mean anomaly within their respective ground tracks [see Table 3 on col. 18, line 48-col. 19, line 13, whereby the mean anomaly "MA" of the satellites are seen to be equally spaced].

Regarding *claim 25*, Castiel discloses the method discussed above in claim 19, and further teaches of configuring the orbits of the plurality of satellites such that the portion of the

Application/Control Number: 90/007,974                                              Page 12
Art Unit: 3992

orbits during which the satellites are enabled for communication, is separated from the equatorial

plane of the earth by at least a predetermined amount [see col. 1, lines 34-48; also see col. 5,

lines 24-59].


     Regarding *claim 26*, Castiel discloses the method discussed above in claim 19, and

further teaches of communicating with the plurality of satellites at frequencies allocated to

geostationary satellites [col. 3, line 53-col. 4, line 16].


     Regarding *claim 27*, Castiel discloses the method discussed above in claim 19, and

further teaches that each of the plurality of satellites has a power system generating a first

amount of power when the communications equipment on the satellite is enabled and a second

amount of power more than the first amount of power when the communications equipment is

not enabled [col. 2, lines 39-64; also see col. 4, lines 23-43], and further comprising:

    storing excess power generated when the communications equipment is not enabled [col.

2, lines 39-64]; and

    enabling the communications equipment with both the stored excess power and the

generated first amount of power [col. 2, lines 52-64].

Application/Control Number: 90/007,974                                    Page 13

Art Unit: 3992

## *Conclusion*

4.      Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination

proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)).  Extensions of time in

*ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).

5.      The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

Patent No. 6,701,126 throughout the course of this reexamination proceeding.

6.      ALL correspondence relating to this ex parte reexamination proceeding should be

directed as follows:

**Please mail any communications to:**

Attn: Mail Stop "Ex Parte Reexam"
Central Reexamination Unit
Commissioner for Patents
P. O. Box 1450
Alexandria VA 22313-1450

**Please FAX any communications to:**

(571) 273-9900
Central Reexamination Unit

Application/Control Number: 90/007,974                                    Page 14
Art Unit: 3992

**Please hand-deliver any communications to:**

Customer Service Window
Attn: Central Reexamination Unit
Randolph Building, Lobby Level
401 Dulany Street
Alexandria, VA 22314

Any inquiry concerning this communication or earlier communications from the Reexamination
Legal Advisor or Examiner, or as to the status of this proceeding, should be directed to the
Central Reexamination Unit at telephone number (571) 272-7705.

Signed:

JOSEPH R. POKRZYWA
PRIMARY EXAMINER

Joseph R. Pokrzywa
Central Reexamination Unit 3992
(571) 272-7410

Conferees :

ROLAND G. FOSTER
CRU EXAMINER-AU 3992

Sue Lao

| Application/Control No. | Applicant(s)/Patent under |
|---|---|
| 90/007,974 | 6701126 |
| **Examiner** | **Art Unit** |
| Joseph R. Pokrzywa | 3992 |

**Index of Claims**

| √ | Rejected | — | (Through numeral) Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| Claim (Final) | Claim (Original) | Date 3/5/07 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | (1) | √ | | | | | | |
| | 2 | √ | | | | | | |
| | 3 | √ | | | | | | |
| | 4 | √ | | | | | | |
| | 5 | √ | | | | | | |
| | 6 | √ | | | | | | |
| | 7 | √ | | | | | | |
| | 8 | √ | | | | | | |
| | 9 | √ | | | | | | |
| | (10) | √ | | | | | | |
| | 11 | √ | | | | | | |
| | 12 | √ | | | | | | |
| | 13 | √ | | | | | | |
| | 14 | √ | | | | | | |
| | 15 | √ | | | | | | |
| | 16 | √ | | | | | | |
| | 17 | √ | | | | | | |
| | 18 | √ | | | | | | |
| | 19 | √ | | | | | | |
| | 20 | √ | | | | | | |
| | 21 | √ | | | | | | |
| | 22 | √ | | | | | | |
| | 23 | √ | | | | | | |
| | 24 | √ | | | | | | |
| | 25 | √ | | | | | | |
| | 26 | √ | | | | | | |
| | 27 | √ | | | | | | |
| | 28 | | | | | | | |
| | 29 | | | | | | | |
| | 30 | | | | | | | |
| | 31 | | | | | | | |
| | 32 | | | | | | | |
| | 33 | | | | | | | |
| | 34 | | | | | | | |
| | 35 | | | | | | | |
| | 36 | | | | | | | |
| | 37 | | | | | | | |
| | 38 | | | | | | | |
| | 39 | | | | | | | |
| | 40 | | | | | | | |
| | 41 | | | | | | | |
| | 42 | | | | | | | |
| | 43 | | | | | | | |
| | 44 | | | | | | | |
| | 45 | | | | | | | |
| | 46 | | | | | | | |
| | 47 | | | | | | | |
| | 48 | | | | | | | |
| | 49 | | | | | | | |
| | 50 | | | | | | | |

| Claim (Final) | Claim (Original) | Date | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 51 | | | | | | | |
| | 52 | | | | | | | |
| | 53 | | | | | | | |
| | 54 | | | | | | | |
| | 55 | | | | | | | |
| | 56 | | | | | | | |
| | 57 | | | | | | | |
| | 58 | | | | | | | |
| | 59 | | | | | | | |
| | 60 | | | | | | | |
| | 61 | | | | | | | |
| | 62 | | | | | | | |
| | 63 | | | | | | | |
| | 64 | | | | | | | |
| | 65 | | | | | | | |
| | 66 | | | | | | | |
| | 67 | | | | | | | |
| | 68 | | | | | | | |
| | 69 | | | | | | | |
| | 70 | | | | | | | |
| | 71 | | | | | | | |
| | 72 | | | | | | | |
| | 73 | | | | | | | |
| | 74 | | | | | | | |
| | 75 | | | | | | | |
| | 76 | | | | | | | |
| | 77 | | | | | | | |
| | 78 | | | | | | | |
| | 79 | | | | | | | |
| | 80 | | | | | | | |
| | 81 | | | | | | | |
| | 82 | | | | | | | |
| | 83 | | | | | | | |
| | 84 | | | | | | | |
| | 85 | | | | | | | |
| | 86 | | | | | | | |
| | 87 | | | | | | | |
| | 88 | | | | | | | |
| | 89 | | | | | | | |
| | 90 | | | | | | | |
| | 91 | | | | | | | |
| | 92 | | | | | | | |
| | 93 | | | | | | | |
| | 94 | | | | | | | |
| | 95 | | | | | | | |
| | 96 | | | | | | | |
| | 97 | | | | | | | |
| | 98 | | | | | | | |
| | 99 | | | | | | | |
| | 100 | | | | | | | |

| Claim (Final) | Claim (Original) | Date | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 101 | | | | | | | |
| | 102 | | | | | | | |
| | 103 | | | | | | | |
| | 104 | | | | | | | |
| | 105 | | | | | | | |
| | 106 | | | | | | | |
| | 107 | | | | | | | |
| | 108 | | | | | | | |
| | 109 | | | | | | | |
| | 110 | | | | | | | |
| | 111 | | | | | | | |
| | 112 | | | | | | | |
| | 113 | | | | | | | |
| | 114 | | | | | | | |
| | 115 | | | | | | | |
| | 116 | | | | | | | |
| | 117 | | | | | | | |
| | 118 | | | | | | | |
| | 119 | | | | | | | |
| | 120 | | | | | | | |
| | 121 | | | | | | | |
| | 122 | | | | | | | |
| | 123 | | | | | | | |
| | 124 | | | | | | | |
| | 125 | | | | | | | |
| | 126 | | | | | | | |
| | 127 | | | | | | | |
| | 128 | | | | | | | |
| | 129 | | | | | | | |
| | 130 | | | | | | | |
| | 131 | | | | | | | |
| | 132 | | | | | | | |
| | 133 | | | | | | | |
| | 134 | | | | | | | |
| | 135 | | | | | | | |
| | 136 | | | | | | | |
| | 137 | | | | | | | |
| | 138 | | | | | | | |
| | 139 | | | | | | | |
| | 140 | | | | | | | |
| | 141 | | | | | | | |
| | 142 | | | | | | | |
| | 143 | | | | | | | |
| | 144 | | | | | | | |
| | 145 | | | | | | | |
| | 146 | | | | | | | |
| | 147 | | | | | | | |
| | 148 | | | | | | | |
| | 149 | | | | | | | |
| | 150 | | | | | | | |

Part of Paper No.  20070302

EXHIBIT 6: EPO Rejection of Draim's Application



| ✉ EPA/EPO/OEB D-80298 München<br>☎ +49 89 2399 - 0<br>FAX +49 89 2399 - 4465 | **Europäisches Patentamt** | **European Patent Office** | **Office européen des brevets** |
|---|---|---|---|
| | Generaldirektion 2 | Directorate General 2 | Direction Générale 2 |

Betten & Resch
Patentanwälte,
Theatinerstrasse 8
80333 München
ALLEMAGNE



**Formalities Officer**

Name: Poquet Oliver

Tel.: 2911

| Date | 04.08.05 |
|---|---|

| Reference | Application No./Patent No. |
|---|---|
| RAB 011 WO/EP | 01986991.6 - 2411 |

| Applicant/Proprietor |
|---|
| Draim, John E. |

**Extension of time limit pursuant to Rule 84 EPC**

Examination procedure

With reference to your request, the time limit for replying to the communication dated 18.03.05  has been extended

by    2    months

to a total of    6    months

from the date of notification of the above-mentioned communication.

Please note: To the extent that your request exceeded the above extension, your request has been refused.

**Note:**
The granting of extensions to time limits is governed by the implementing Regulations to the EPC and the Guidelines for Examination in the EPO, part E-VIII, 1.6.

**If no reply to the communication is received in due time, the European patent application will be deemed to be withdrawn (Article 96(3) EPC).**

Examining Division



EPO Form 2944A  06.01    01.08.05

to EPO postal service: 01.08.05

# BETTEN & RESCH

EPO - Munich
51

18. Juli 2005

BETTEN & RESCH  Postfach 10 02 51  D-80076 München

European Patent Office

80298  Munich

Patentanwälte
European Patent Attorneys
European Trademark Attorneys
European Design Attorneys

Jürgen Betten
Dipl.-Ing.
Franz-Josef Schöniger
Dipl.-Phys.
Dr. Alexander Esslinger
Dipl.-Phys.
Dirk C. Sieckmann
Dipl.-Ing.
Dr. René Günther
Dipl.-Phys.

July 18, 2005

Dott. Isabella Peiker-Giannotti
European Trademark Attorney
European Design Attorney

European Patent Application No. 01986991.6
"An inproved system and method for implementing a ..."
Space Resource International Ltd.
Our File:   RAB 011 WO/EP  S/EG

To the communication of March 18, 2005.

It is kindly requested to extend the term for responding to the office
action by 2 months.

Franz-Josef Schöniger

Theatinerstrasse 8
(FÜNF HÖFE)
D-80333 München

Tel. +49 (0) 89-24 24 17-0
Fax +49 (0) 89-260 78 96

mail@bettenpat.com
www.bettenpat.com

Patents
Trademarks
Designs
Domain Name Protection
Computer Program Protection



| ⊠ EPA/EPO/OEB<br>D-80298 München | **Europäisches<br>Patentamt** | **European<br>Patent Office** | **Office européen<br>des brevets** |
|---|---|---|---|
| ☎ +49 89 2399-0<br>TX 523 656 epmu d<br>FAX +49 89 2399-4465 | Generaldirektion 2 | Directorate General 2 | Direction Générale 2 |

Betten & Resch
Patentanwälte,
Theatinerstrasse 8
80333 München
ALLEMAGNE

| **Telephone numbers:** | |
|---|---|
| **Primary Examiner**<br>(substantive examination) | +49 89 2399-8947 |
| **Formalities Officer / Assistant**<br>(Formalities and other matters) | +49 89 2399-2911 |



| Application No.<br>01 986 991.6 - 2411 | Ref.<br>RAB 011 WO/EP | Date<br>18.03.2005 |
|---|---|---|
| Applicant<br>Draim, John E. | | |

**Communication pursuant to Article 96(2) EPC**

The examination of the above-identified application has revealed that it does not meet the requirements of the European Patent Convention for the reasons enclosed herewith. If the deficiencies indicated are not rectified the application may be refused pursuant to Article 97(1) EPC.

You are invited to file your observations and insofar as the deficiencies are such as to be rectifiable, to correct the indicated deficiencies within a period

**of    4    months**

from the notification of this communication, this period being computed in accordance with Rules 78(2) and 83(2) and (4) EPC.

One set of amendments to the description, claims and drawings is to be filed within the said period on separate sheets (Rule 36(1) EPC).

**Failure to comply with this invitation in due time will result in the application being deemed to be withdrawn (Article 96(3) EPC).**



Draper, A
Primary Examiner
for the Examining Division

Enclosure(s):    3  page/s reasons (Form 2906)



| **Bescheid/Protokoll** (Anlage) | **Communication/Minutes** (Annex) | **Notification/Procès-verbal** (Annexe) |
|---|---|---|
| Datum<br>Date     18.03.2005<br>Date | Blatt<br>Sheet          1<br>Feuille | Anmelde-Nr.:<br>Application No.: 01 986 991.6<br>Demande n°: |

The examination is being carried out on the **following application documents**:


**Description, Pages**

1-33                              as originally filed


**Claims, Numbers**

1-27                              as originally filed


**Drawings, Sheets**

1/15-15/15                        as originally filed


1).     Citation: D1=US-A-5845206

2).     The subject-matter of all claims lacks inventive step (Article 52(1) EPC in combination with Article 56 EPC) in the light of D1.

3).     D1 (from the same inventors), discloses:

A satellite communications system, comprising: a ground station, including communications equipment and an antenna, located at a position on the earth; a plurality of satellites in orbits around the earth having apogees and perigees, each of the satellites having communications equipment thereon configured to communicate with the ground station only during a predetermined portion of the satellite's orbit proximate to apogee, the orbits of the plurality of satellites being configured to form at least two ground tracks on the earth displaced from each other longitudinally (see D1, Figs. 7A-7G), each of the ground tracks repeating daily and having a number of active arcs, each active arc corresponding to the portion of the orbit of each satellite

EPO Form 2906  01.91CSX



| Bescheid/Protokoll (Anlage) | Communication/Minutes (Annex) | Notification/Procès-verbal (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date  18.03.2005 | Blatt<br>Sheet    2<br>Feuille | Anmelde-Nr.:<br>Application No.:  01 986 991.6<br>Demande n°: |

during which the communications equipment on the satellite is enabled to communicate with the ground station (see e.g. D1, abstract),

4). D1 does not disclose:

i) the orbits of the plurality of satellites being further configured such that at all times there are at least two of the satellites in each of the active arcs
ii) that at all times each of the satellites in any one of the active arcs is separated by at least a predetermined angle, as observed from the ground station, from each other satellite in the same active arc and from any satellite in any other active arc.

5). However, with respect to point i), especially in the light of D1 it is considered to be obvious to increase the number of satellites so as to provide for greater capacity and/or redundancy by having at least two satellites in each active arc. D1 explicitly suggests (col. 7, lines 1-5) using "higher order arrays" whereby "successively larger numbers of satellites can be used to provide more coverage, **more overlapping coverage**, or smaller integral mean motion values". Furthermore, D1 explicitly states (col. 7, lines 54-57) "The rules for spacing and phasing the satellites will be given in the **general form for more complicated constellations or arrays**", and (at col. 7, lines 64-65) "we can also set the number of satellites in array N **to be any integer greater than n+1**". Clearly, at the time of D1 the inventor was already contemplating increasing the coverage density in a manner corresponding to that now claimed.

6). With respect to point ii), it is considered obvious that the satellites have to be so-phased as to allow reasonable angular discrimination by ground stations. The issue of angular discrimination is addressed in the context of avoiding self-interference in D1, col. 10, lines 1-4. It is noted that the regulatory spacing of satellites in the geostationary ring is comparably 2° for similar technical reasons (see e.g. D1, col. 2, lines 13-15).

7). Claim 1 therefore lacks inventive step over D1.

A similar analysis applies to independent claims 10 and 19 which similarly lack inventive step.



| Bescheid/Protokoll (Anlage) | Communication/Minutes (Annex) | Notification/Procès-verbal (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date  18.03.2005 | Blatt<br>Sheet     3<br>Feuille | Anmelde-Nr.:<br>Application No.:  01 986 991.6<br>Demande n°: |

8). As to the remaining, dependent claims, these relate to details of implementation which are already considered for the constellation disclosed in D1, or are at least obvious in the light thereof, as follows:
Claim 2: see D1, col. 12, lines 60-61.
Claim 3: see D1, col. 13, lines 53-55.
Claim 4: see D1, col. 6, lines 31-40.
Claim 5: see D1, abstract, second sentence.
Claim 6: see D1, col. 6, lines 45-54.
Claim 7: see D1, col. 12, lines 12-17, lines 34-41 and Fig. 4H.
Claim 8: see D1, col. 12, lines 34-41.
Claim 9: see D1, col. 12, lines 18-26.

Claims 11-18 and claims 20-27 correspond in subject-matter to claims 2-9.

9). The subject-matter of these dependent claims therefore also lacks inventive step (Article 52(1) EPC in combination with Article 56 EPC).

10). It is not at present apparent which part of the application could serve as a basis for a new, allowable claim. Should the applicant nevertheless regard some particular matter as patentable, an independent claim directed to this matter should be filed. The applicant should also indicate in the letter of reply the difference of the subject-matter of the new claim vis-à-vis the state of the art and the significance thereof.

11). If filing new application documents, the following should be attended to:
The description should be brought into conformity with any new claims. The two-part form of claims should preferably be used (Rule 29(1)(a) and (b) EPC). Reference signs should be inserted in the claims (Rule 29(7)). Relevant prior art documents should be acknowledged (Rule 27(1)(b)) - in the present case this is D1. Any amendments should not go beyond the scope of the originally-filed application (Article 123(2)).

12). Rule 29(2) EPC should be respected by ensuring that there is only one claim in each category (apparatus and method).

EXHIBIT 7: Delaware Injunction and Delaware Supreme Court Affirmance

# IN THE COURT OF CHANCERY OF THE STATE OF. DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| VGS, INC., | ) |
| | ) |
|        Plaintiff, | ) |
| | ) |
| V. | ) C.A. No. 17995 |
| | ) |
| DAVID CASTIEL, VIRTUAL | ) |
| GEOSATELLITE HOLDINGS, INC., | ) |
| and ELLIPSO, INC., | ) |
| | ) |
|        Defendants, | ) |
| | ) |
| VIRTUAL GEOSATELLITE HOLDINGS, | ) |
| INC., and ELLIPSO, INC., | ) |
| | ) |
|        Counterclaim Plaintiffs, | ) |
| | ) |
| and | ) |
| | ) |
| VIRTUAL GEOSATELLITE LLC, | ) |
| | ) |
|        Counterclaim Plaintiff-Intervenor, | ) |
| | ) |
| V. | ) |
| | ) |
| VGS, INC., PETER D. SAHAGEN, | ) |
| THOMAS QUINN, NEEL HOWARD and | ) |
| SAHAGEN SATELLITE TECHNOLOGY | ) |
| GROUP, LLC, | ) |
| | ) |
|        Counterclaim Defendants. | ) |

Submitted: July 5, 2000
Decided: August 3 1, 2000

## *MEMORANDUM OPINION*

Stuart M. Grant and Megan D. McIntyre of Grant & Eisenhofer, Wilmington, Delaware. Attorneys for VGS, Inc.

Brian A. Sullivan and Duane D. Werb of Werb & Sullivan, Wilmington, Delaware. OF COUNSEL: John W. Bickel II and James S. Renard of Bickel & Brewer, Dallas, Texas. Attorneys for Peter D. Sahagen and Sahagen Satellite Technology Group, LLC.

Thomas R. Hunt, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware. OF COUNSEL: William H. Jeffress, Jr., R. Stan Mortenson, Jody Manier Kris and Kelli C. McTaggart of Miller, Cassidy, Larroca & Lewin, LLP, Washington, D.C. Attorneys for Defendant-Counterclaim Plaintiffs Virtual Geosatellite Holdings. Inc. and Ellipso, Inc. and Counter-plaintiff-Intervenor Virtual Geosatellite LLC.


**STEELE, V.C.**

One entity controlled by a single individual forms a one "member" limited liability company. Shortly thereafter, two other entities, one of which is controlled by the owner of the original member, become members of the LLC. The LLC Agreement creates a three-mernber Board of Managers with sweeping authority to govern the LLC. The individual owning the original member has the authority to name and remove two of the three managers.  He also acts as CEO. The unaffiliated third member becomes disenchanted with the original member's leadership.  Ultimately the third member's owner, also the third manager, convinces the original member's owner's appointed manager to join him in a clandestine strategic move to merge the LLC into a Delaware corporation. The appointed manager and the disaffected third member do not give the original member's owner, still a member of the LLC's board of managers, notice of their strategic move. After the merger, the original member finds himself relegated to a minority position in the surviving corporation.  While a majority of the board acted by written consent, as all i-nvolved surely knew, had the original member's manager received notice beforehand that his appointed manager contemplated action against his interests he would have promptly attempted to remove him. Because the two managers acted without notice to the third manager under circumstances where they knew that with notice that he could have acted to protect his majority interest, they breached their duty of loyalty to the original member and

3

their fellow manager by failing to act in good faith. The purported merger must therefore be declared invalid.

The parties tried this case from June 15, 2000 through June 23, 2000. In further detail below, I describe the case's relevant facts and explain the rationale for my ruling.

## I.    Facts

David Castiel formed Virtual Geosatellite LLC (the "LLC") on January 6, 1999 in order to pursue a Federal Communications Commission ("FCC") license to build and operate a satellite system which its proponents claim could dramatically increase the "real estate" in outer space capable of transmitting high speed internet traffic and other communications.'   When originally formed, it had only one Member -- Virtual Geosatellite Holdings, Inc. ("Holdings"). On January 8, 1999, Ellipso, Inc. ("Ellipso") joined the LLC as its second Member. Several weeks later, on January 29, 1999, Sahagen Satellite Technology Group LLC ("Sahagen Satellite") became the third Member of the LLC.

David Castiel controls both Holdings and Ellipso. Peter Sahagen, an aggressive and apparently successful venture capitalist, controls Sahagen Satellite.

---

[1] In more technologically precise terms, the LLC's purpose was "to construct, launch and operate a global fixed-satellite service system employing nongeostationary satellites in subgeosynchronous elliptical orbits developing the related [ground] segment and offering the related communications services." LLC Agreement, at 15, § 4.01(a).

Pursuant to the LLC Agreement, Holdings received 660 units (representing 63.46% of the total equity in the LLC), Sahagen Satellite received 260 units (representing 25%), and Ellipso received 120 units (representing 11.54%). The founders vested management of the LLC in a Board of Managers. As the majority unitholder, Castiel had the power to appoint, remove, and replace two of the three members of the Board of Managers. Castiel, therefore, had the power to prevent any Board decision with which he disagreed. Castiel named himself and Tom Quinn to the Board of Managers. Sahagen named himself as the third member of the Board.

Not long after the formation of the LLC, Castiel and Sahagen were at odds. Castiel contends that Sahagen wanted to control the LLC ever since he became involved, and that Sahagen repeatedly offered, unsuccessfully, to buy control of the LLC. Sahagen maintains that Castiel ran the LLC so poorly that its mission had become untracked, additional necessary capital could not be raised, and competent managers could not be attracted to join the enterprise. Further, Sahagen claims that Castiel directed LLC assets to Ellipso in order to prop up a failing, cash-strapped Ellipso. At trial, these issues and other similar accusations from both sides were explored in great detail. For our purposes here, all that need be concluded is the unarguable fact that Castiel and Sahagen had very different ideas about how the LLC should be managed and operated.

Sahagen ultimately convinced Quinn that Castiel must be ousted from leadership in order for the LLC to prosper. As a result, Quinn (Castiel's nominee) covertly "defected" to Sahagen's camp, and he and Sahagen decided to wrest control of the LLC from Castiel. Many LLC employees and even some of Castiel's lieutenants testified that they believed it to be in the LLC's best interest to take control from Castiel.

On April 14, 2000, without notice to Castiel, Quinn and Sahagen acted by written consent to merge the LLC under Delaware law into VGS, Inc. ("VGS"), a Delaware corporation.  Accordingly, the LLC ceased to exist, its assets and liabilities passed to VGS, and VGS became the LLC's legal successor-in-interest. VGS's Board of Directors is comprised of Sahagen, Quinn, and Neel Howard. Of course, the incorporators did not name Castiel to VGS's Board.

On the day of the merger, Sahagen executed a promissory note to VGS in the amount of $10 million plus interest.  In return, he received two million shares of VGS Series A Preferred Stock. VGS also issued 1,269,200 shares of common stock to Holdings, 230,800 shares of common stock to Ellipso, and 500,000 shares of common stock to Sahagen Satellite. Once one does the math, it is apparent that Holdings and Ellipso went from having a 75% controlling combined ownership interest in the LLC to having only a 37.5% interest in VGS.  On the other hand,

Sahagen and Sahagen Satellite went from owning 25% of the LLC to owning 62.5% of VGS.

There can be no doubt why Sahagen and Quinn, acting as a majority of the LLC's board of managers did not notify Castiel of the merger plan. Notice to Castiel would have immediately resulted in Quinn's removal from the board and a newly constituted majority which would thwart the effort to strip Castiel of control. Had he known in advance, Castiel surely would have attempted to replace Quinn with someone loyal to Castiel who would agree with his views.  Clandestine machinations were, therefore: essential to the success of Quinn and Sahagen's plan.

## II.    Analysis

### A.    The Board of Managers did have authority to act by majority vote.

The LLC Agreement does not expressly state whether the Board of Managers must act unanimously or by majority vote.  Sahagen and Quinn contend that because a number of provisions would be rendered meaningless if a unanimous vote was required, a majority vote is implied. Castiel, however, maintains that a unanimous vote must be implied when the majority owner has blocking power.

Section 8.01(b)(i) of the LLC Agreement states that, "[t]he Board of Managers shall initially be composed of three (3) Managers." Sahagen Satellite

has the right to designate one member of the initial board, and if the Board of Managers increased in number, Sahagen Satellite could "designate a number of representatives on the Board of Managers that is less than Sahagen's then current Percentage Interest."[2] If unanimity were required, the number of managers would be irrelevant – Sahagen, and his minority interest, would have veto power in any event. The existence of language in the LLC Agreement discussing expansion of the Board is therefore quite telling.

Also persuasive is the fact that Section 8.01(c) of the LLC Agreement, entitled "Matters Requiring Consent of Sahagen," provides that Sahagen's approval is needed for a merger, consolidation, or reorganization of the LLC. If a unanimity requirement indeed existed, there would have been no need to expressly list matters on which Sahagen's minority interest had veto power.

Section 12.01(a)(i) of the LLC Agreement also supports Sahagen's argument. This section provides that the LLC may be dissolved by written consent by either the Board of Managers or by Members holding two-thirds of the Common Units. The effect of this Section is to allow any combination of Holdings and Sahagen Satellite, or Holdings and Ellipso, as Members, to dissolve the LLC. It seems unlikely that the Members designed the LLC Agreement to permit Members holding two-thirds of the Common Units to dissolve the LLC but denied

---

[2] LLC Agreement, at § 8.01 (b)(i).

their appointed Managers the power to reach the same result unless the minority manager agreed.

Castiel takes the position that while the Members can act by majority vote, the Board of Managers can act only by unanimous vote. He maintains that if the Board fails to agree unanimously on an issue the issue should be put to an LLC Members' vote with the majority controlling. The practical effect of Castiel's interpretation would be that whenever Castiel and Sahagen disagreed, Castiel would prevail because the issue would be submitted to the Members where Castiel's controlling interest would carry the vote. If that were the case, both Sahagen's Board position and Quinn's Board position would be superfluous. I am confident that the parties never intended that result, or if they had so intended, that they would have included plain and simple language in the agreement spelling it out clearly.

## B.  By failing to give notice of their proposed action, Sahagen and Quinn failed to discharge their duty of loyalty to Castiel in good faith

Section 18-404(d) of the LLC Act states in pertinent part:

Unless otherwise provided in a limited liability company agreement, on any matter that is to be voted on by managers, the managers may take such action without a meeting, *without prior notice* and without a vote if a consent or consents in writing, setting forth the action so taken, shall be signed by the managers, having not less than the minimum number of votes that would be necessary to authorize such action at a meeting (emphasis added).

Therefore, the LLC Act, read literally, does not require notice to Castiel before Sahagen and Quinn could act by written consent. The LLC Agreement does not purport to modify the statute in this regard.

Those observations can not complete the analysis of Sahagen and Quinn's actions, however. Sahagen and Quinn knew what would happen if they notified Castiel of their intention to act by written consent to merge the LLC into VGS, Inc. Castiel would have attempted to remove Quinn, and block the planned action. Regardless of his motivation m doing so, removal of Quinn in that circumstance would have been within Castiel's rights as the LLC's controlling owner under the Agreement.

Section 18-404(d) has yet to be interpreted by this Court or the Supreme Court. Nonetheless, it seems clear that the purpose of permitting action by written consent without notice is to enable LLC managers to take quick, efficient action in situations where a minority of managers could not block or adversely affect the course set by the majority even if they were notified of the proposed action and objected to it. The General Assembly never intended, I am quite confident, to enable two managers to deprive, clandestinely and surreptitiously, a third manager representing the majority interest in the LLC of an opportunity to protect that interest by taking an action that the third manager's member would surely have opposed if he had knowledge of it.  My reading of Section 18-404(d) is grounded

in a classic maxim of equity – "Equity looks to the intent rather than to the form."[3] In this hopefully unique situation, this application of the maxim requires construction of the statute to allow action without notice only by a *constant or fixed majority*. It can not apply to an illusory, will-of-the wisp majority which would implode should notice be given.  Nothing in the statute suggests that this court of equity should blind its eyes to a shallow, too clever by half, manipulative attempt to restructure an enterprise through an action taken by a "majority" that existed only so long as it could. act in secrecy.

Sahagen and Quinn each owed a duty of loyalty to the LLC, its investors and Castiel, their fellow manager. Castiel or his entities owned a majority interest in the LLC and he sat as a member of the board representing entities and interests empowered by the Agreement to control the majority membership of the board. The majority investor protected his equity interest in the LLC through the mechanism of appointment to the board rather than by the statutorily sanctioned

---

[3] DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY, at vii (1998) (listing the maxims of equity). *See also Westendorf v. Gateway 2000*, Del. Ch., CA. No. 16913, 2000 WL 307369, at *5, Steele, V.C. (March 16, 2000) ("A long-standing equitable maxim states that equity looks to the intent rather than to the form"); *Infinity Investors Limited v. Takefman*, Del. Ch., CA. No. 17347, 2000 WL 130622, at *5, Chandler, C. (Jan. 28, 2000) ("As equity looks to the intent rather than to the form, this Court should not permit parties to manipulate procedural rules for the purpose of avoiding resolution on the merits"); *The Estate of Helen Lattimore Speare*, Del. Ch., 2000 WL 130622, at *4, Brown, C. (Aug. 11, 1982) (quoting the maxim and citing 2 POMEROY, EQUITY JURISPRUDENCE, § 363 - § 384 (5th ed. (1941)))

mechanism of approval by members owning a majority of the LLC's equity interests. It may seem somewhat incongruous, but this Agreement allows the action to merge, dissolve or change to corporate status to be taken by a simple majority vote of the board of managers rather than rely upon the default position of the statute which requires a majority vote of the equity interest. Instead the drafters made the critical assumption, known to all the players here, that the holder of the majority equity interest has the right to appoint and remove two managers, ostensibly guaranteeing control over a three member board. When Sahagen and Quinn, fully recognizing that this was Castiel's protection against actions adverse to his majority interest, acted. in secret, without notice, they failed to discharge their duty of loyalty to him in good faith. They owed Castiel a duty to give him prior notice even if he would have interfered with a plan that they conscientiously believed to be in the best interest of the LLC.[4] Instead, they launched a preemptive strike that furtively converted Castiel's controlling interest in the LLC to a minority interest in VGS without affording Castiel a level playing field on which to defend his interest. "[Another] traditional maxim of equity holds that equity

---

[4] I make no ruling here as to whether I believe the merger and the resulting recapitalization of the LLC was in the LLC's best interests, nor do I rule here regarding the wisdom of Castiel's actions had he in fact been able to remove Quinn before the merger.

regards and treats that as done which in good conscience ought to be done."[5] In good conscience, under these circumstances, Sahagen and Quinn should have given Castiel prior notice.

Many hours were spent at trial focusing on contentions that Castiel has proved to be an ineffective leader in whom employees and investors have lost confidence. I listened to testimony regarding delayed FCC licensing, a suggested new management team for the LLC, and the alleged unlocked value of the LLC. A substantial record exists fully flushing out the rancorous relationships of the members and their wildly disparate views on the existing state of affairs as well as the LLC's prospects for the future. But the issue of who is best suited to run the LLC should not be resolved here but in board meetings where all managers are present and all members appropriately represented, and/or in future litigation, if it unfortunately becomes necessary.

Likewise, the parties spent much time and effort arguing over the standard to be applied to the actions taken by Sahagen and Quinn. Specifically, the parties debated whether the standard should be entire fairness or the business judgment rule. It should be clear that the actions of Sahagen and Quinn, in their capacity as managers constituted a breach of their duty of loyalty and that those actions do not,

---

[5] WOLFE & PITTENGER, *supra*, at § 2-3(b)(l)(i), *citing* 2 JOHN NORTON POMEROY, A TREATISE ON EQUITY JURISPRUDENCE § 363 et seq. (5" ed. (1941)).

therefore, entitle them to the benefit or protection of the business judgment rule. They intentionally used a flawed process to merge the LLC into VGS, Inc., in an attempt to prevent the member with majority equity interest in the LLC from protecting his interests in the manner contemplated by the very LLC Agreement under which they purported to act. Analysis beyond a look at the process is clearly unnecessary.  Perhaps, had notice been given and an attempt then made to block Castiel's anticipated action to replace Quinn, the allegedly disinterested and independent member that Castiel himself had appointed, the analysis might be different. However, this, as all cases must be reviewed as it is presented, not as it might have been.

## III.  Conclusion

For the reasons stated above, I find that a majority vote of the LLC's Board of Managers could properly effect a merger.  But, I also find that Sahagen and Quinn failed to discharge their duty of loyalty to Castiel in good faith by failing to give him advance notice of their merger plans under the unique circumstances of this case and the structure of this LLC Agreement. Accordingly, I declare that the acts taken to merge the LLC into VGS, Inc. to be invalid and the merger is ordered rescinded. An order consistent with this opinion, resolving the current claims of the parties is attached.

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| VGS, INC., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| V. | ) C.A. No. 17995 |
| | ) |
| DAVID CASTIEL, VIRTUAL | ) |
| GEOSATELLITE HOLDINGS, INC., | ) |
| and ELLIPSO, INC., | ) |
| | ) |
|     Defendants, | ) |
| | ) |
| VIRTUAL GEOSATELLITE HOLDINGS, | ) |
| INC., and ELLIPSO, INC., | ) |
| | ) |
|     Counterclaim Plaintiffs, | ) |
| | ) |
| and | ) |
| | ) |
| VIRTUAL GEOSATELLITE LLC, | ) |
| | ) |
|     Counterclaim Plaintiff- | ) |
|     Intervenor, | ) |
| | ) |
| V. | ) |
| | ) |
| VGS, INC., PETER D. SAHAGEN, | ) |
| THOMAS QUINN, NEEL HOWARD and | ) |
| SAHAGEN SATELLITE TECHNOLOGY | ) |
| GROUP, LLC, | ) |
| | ) |
|     Counterclaim Defendants. | ) |

*O R D E R*

For the reasons set forth in this Court's opinion entered in this case on August 31, **2000,** it is **ORDERED** that:

1.    The purported merger of Virtual Geosatellite LLC (the "LLC") into VGS, Inc. is invalid and is therefore rescinded, and

2.    VGS, Inc. is enjoined from continuing to assert ownership or control over the LLC's property including its funds and its license application at the FCC, and

3.    Judgment is entered against plaintiff and counter defendant VGS, Inc. and in favor of David Castiel, Virtual Geostellite Holdings, Inc. and Ellipso, Inc., defendants and counterclaim plaintiffs.

4.    Judgment is further entered in favor of Virtual Geosatellite LLC, counterclaim plaintiff intervenor and against counterclaim defendants VGS, Inc., Sahagen, Quinn, Howard and Sahagen Satellite Technology Group, LLC.

5.    The requests for attorneys' fees by David Castiel, Virtual Geosatellite Holdings, Inc., and Ellipso, Inc. are taken under advisement until briefed and supported by appropriate affidavits.

SO **ORDERED** this 3 1 <sup>st</sup> day of August, 2000.

_____
Vice Chancellor (by designation)

16

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| VGS, INC., | § | |
| | § | No. 564, 2000 |
| Plaintiff Below, Appellant | § | |
| | § | |
| v. | § | Court Below:  Court of |
| | § | Chancery of the State of |
| DAVID CASTIEL, VIRTUAL | § | Delaware in and for |
| GEOSATELLITE HOLDINGS, INC., | § | New Castle County |
| and ELLIPSO, INC., | § | C.A. No. 17995 |
| | § | |
| Defendants Below, Appellees. | § | |
| | § | |
| VGS, INC., PETER D. SAHAGEN | § | |
| and SAHAGEN SATELLITE | § | |
| TECHNOLOGY GROUP, LLC, | § | |
| | § | |
| Counterclaim Defendants | § | |
| Below, Appellants, | § | |
| | § | |
| v. | § | |
| | § | |
| VIRTUAL GEOSATELLITE | § | |
| HOLDINGS, INC., and ELLIPSO, INC., | § | |
| | § | |
| Counterclaim Plaintiffs | § | |
| Below, Appellees, | § | |
| | § | |
| and | § | |
| | § | |
| VIRTUAL GEOSATELLITE, LLC, | § | |
| | § | |
| Counterclaim Plaintiff | § | |
| Below, Appellee. | § | |

Submitted:  May 22, 2001
Decided:  May 23, 2001

Before **VEASEY**, Chief Justice, **HOLLAND** and **BERGER**, Justices.

<u>O R D E R</u>

This 23rd day of May, 2001, the Court, having considered the decision of the Court of Chancery dated August 31, 2000, and the briefs and arguments of the parties, has determined that:  to the extent the issues raised on appeal are factual, the record evidence supports the trial judge's factual findings; to the extent the errors alleged on appeal are attributed to an abuse of discretion, the record does not support those assertions; and to the extent that the issues raised on appeal are legal, they are controlled by settled Delaware law, which was properly applied.  *Accord Schnell v. Chris-Craft Industries, Inc.*, Del.Supr., 285 A.2d 437 (1971); *Rossdeutscher v. Viacom, Inc.*, Del.Supr., 768 A.2d 8 (2001).

NOW, THEREFORE, IT IS ORDERED that the judgment of the Court of Chancery Court be, and the same hereby is

AFFIRMED.

BY THE COURT:

<u>/s/ Carolyn Berger</u><br>Justice

EXHIBIT 8: pages from Draim application

# SMITH, DANAMRAJ & YOUST

A PROFESSIONAL CORPORATION

ATTORNEYS AND COUNSELORS
INTELLECTUAL PROPERTY LAW AND RELATED MATTERS

STEVEN W. SMITH
SHREEN K. DANAMRAJ
LAWRENCE R. YOUST

WRITER'S DIRECT DIAL NUMBER
(972) 392-2696

12900 PRESTON ROAD, SUITE 1200, LB 15
DALLAS, TEXAS 75230-1328

TELEPHONE (972) 720-1202
FAX (972) 720-1139

WRITER'S EMAIL ADDRESS
lawrence@sdylaw.com

November 3, 2000

Mr. John Draim
Space Resource America Corporation
1101 Pennsylvania Avenue N.W.
Suite 600
Washington, DC 20004

Re:    Virtual Geostationary Satellite Constellation and Method of Satellite Communications
       Our File No.: 1324-1010

Dear John:

In regard to the above-referenced matter, enclosed please find the following documents filed today with the United States Patent and Trademark Office:

  (1)    Original Patent Application with Formal Drawings;

  (2)    Declaration and Power of Attorney;

  (3)    Assignment with Recordation Cover Sheet; and

  (4)    Fee Calculation Sheet.

We will advise you promptly upon receipt of anything from the Patent and Trademark Office relating to this application. In the meantime if you have any questions, please do not hesitate to give me a call.

Very truly yours,

Lawrence R. Youst

Enclosures

SRA 00208
CONFIDENTIAL
ATTORNEYS EYES ONLY

Attorney Docket No. 1324-1010

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application:     John E. Draim

Serial No.             Unknown

Filed:                 November 2, 2000

Art Unit:              Unknown

Examiner:              Unknown

For:                   Virtual Geostationary Satellite Constellation and Method of Satellite Communications

Status:                Applicant Claims Small Entity Status

Commissioner for Patents
Washington, D.C. 20231

### FEE CALCULATION

|                    | NUMBER |        | NUMBER EXTRA | RATE    | BASIC FEE $ 710.00 |
|--------------------|--------|--------|--------------|---------|--------------------|
| Total Claims       | 40     | - 20 = | 20           | x $18=  | $ 360.00           |
| Independent Claims | 3      | - 3 =  | 0            | x $80 = | $ 0.00             |
|                    |        |        |              | **Total of Above** | $1070.00 |
|                    |        |        | Reduction by 50% for filing by small entity | | ($535.00) |
|                    |        |        |              | **TOTAL FEES** | $535.00 |

The Commissioner is hereby authorized to charge any additional filing fee or credit any over payment to Deposit Account No.: 03-1130. All correspondence related to this application may be addressed to the undersigned at Smith, Danamraj & Youst, P.C., 12900 Preston Road, Suite 1200, LB-15, Dallas, Texas 75230.

Dated this 3rd day of November, 2000

Lawrence R. Youst
Attorney for Applicant(s)
Reg. No. 38,795

Date of Deposit: November 3, 2000.
"EXPRESS MAIL" mailing label number EL593940130US
I certify that the accompanying Patent Application is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service under 37 CFR 1.10 on the date indicated above and is addressed to Box Patent Application; Commissioner for Patents, Washington, DC 20231.

Lawrence R. Youst

SRA 00209
CONFIDENTIAL
ATTORNEYS EYES ONLY

Nov-03-2000  10:47am   From-VGS. INC                    202-533-2370          T-312  P 002/006  F-650

Attorney Docket No. 1324-1010

## DECLARATION AND POWER OF ATTORNEY FOR PATENT APPLICATION

As a below named inventor, I hereby declare that:

This declaration is of the following type: (check one)

(X)   Original
( )   Design
( )   Supplemental
( )   National Stage of PCT

My residence, post office address and citizenship are as stated below next to my name.

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

### Virtual Geostationary Satellite Constellation and Method of Satellite Communications

the specification of which: (check one)

(X)   is attached hereto;
( )   was filed on   , as Application Serial No.   , and was amended on   (if applicable);
( )   was described and claimed in PCT International Application No.   filed on   and amended under PCT Article 19 on   (if any).

I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, Section 1.56(a), and which is material to the examination of this application, namely, information where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.

I hereby claim foreign priority benefits under Title 35, United States Code, Section 119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application of which priority is claimed.

1

SRA 00210
CONFIDENTIAL
ATTORNEYS EYES ONLY

03-2000  10:48am  From-VGS, INC                         202-533-2370           T-312  P 003/006  F-650

## PRIOR FOREIGN APPLICATION(S)

Number          Country          Day/Month/Year Filed          Priority Claimed

This declaration is of the following type: (if applicable)

( )  Divisional
( )  Continuation
( )  Continuation-in-part

I hereby claim the benefit under Title 35, United States Code, Section 120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States Application in the manner provided by the first paragraph of Title 35, United States Code, Section 112, we hereby acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, Section 1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

Application Serial No.          Filing Date          Status (patented, pending, abandoned)

POWER OF ATTORNEY:  As a named inventor, I hereby appoint the following attorney(s) jointly and severally to prosecute this application and transact all business in the Patent and Trademark Office connected therewith and to file any and all International Application(s) with respect thereto and to act on my behalf before the competent International Authorities with respect thereto: Lawrence R. Youst (Reg. No. 38,795); Steven W. Smith (Reg. No. 36,684) and Shreen K. Danamraj (Reg. No. 41,696) of Smith, Danamraj & Youst, P.C., 12900 Preston Road, Suite 1200, LB 15, Dallas, Texas 75230-1328.

### SEND CORRESPONDENCE TO:

Lawrence R. Youst
Smith, Danamraj & Youst, P.C.
12900 Preston Road
Suite 1200, LB 15
Dallas, TX 75230-1328

### DIRECT TELEPHONE CALLS TO:

Lawrence R. Youst
(972) 392-2696
(972) 720-1139 (FAX)

2

SRA 00211
CONFIDENTIAL
ATTORNEYS EYES ONLY

I hereby declare that all statements made herein of our own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

| 1 | John E. Draim<br><br>**Full Name** | *John E. Draim*<br>**Inventor's Signature** | 11/03/00<br>**Date** |
|---|---|---|---|
| | 9310 Telfer Court<br>Vienna, VA 22182<br>**Residence** | | U.S.A.<br><br>**Citizenship** |
| | 9310 Telfer Court<br>Vienna, VA 22182<br>**Post Office Address** | | |

3

SRA 00212
CONFIDENTIAL
ATTORNEYS EYES ONLY

| FORM PTO-1595 | RECORDATION FORM COVER SHEET | U.S. Department of Commerce |
|---|---|---|
| 1324-1010 | PATENTS ONLY | Patent and Trademark Office |

To the Honorable Commissioner of Patents and Trademarks. Please record the attached original documents or copy thereof.

| 1. Name of conveying party(ies): John E. Draim | 2. Name and Address of receiving party(ies): |
|---|---|
| | Name: Space Resource International Corporation |
| | Address: 1101 Pennsylvania Avenue, N.W. Suite 600 |
| | City: Washington |
| | State: DC    Zip: 20004 |
| | Additional name(s) & address(es) attached? ___ Yes _X_ No |

3. Nature of Conveyance:

_X_ Assignment  _____ Merger

_____ Security Agreement  _____ Change of Name

_____ Other _____

Execution Date: November 3, 2000

4. Application number(s) or patent number(s).

_X_ This document is being filed together with a new application.

Execution date of the application: November 3, 2000

Title: Virtual Geostationary Satellite Constellation and Method of Satellite Communications

| A. Patent Application No.(s) | B. Patent No.(s) |
|---|---|
| Additional numbers attached? ____ Yes _X_ No | Additional numbers attached? ____ Yes _X_ No |

| 5. Name and address of party to whom correspondence concerning document should be mailed: | 6. Number of applications and patents involved: __1__ |
|---|---|
| Name: Lawrence R. Youst | |
| Address: Smith, Danamraj & Youst, P.C. 12900 Preston Road Suite 1200, LB-15 | 7. Amount of fee enclosed or authorized to be charged: $40 |
| City: Dallas | 8. Deposit Account No: (Attach duplicate copy if paying by deposit account) This form is submitted in triplicate. |
| State: Texas    Zip: 75230-1328 | |

DO NOT USE THIS SPACE

9. Statement and signature.

*To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.*

Dated the 3rd day of November, 2000

Lawrence R. Youst (Reg. No. 38,795)

Total Number of Pages Including Cover Sheet, Attachments and Document: __3__

SRA 00213
CONFIDENTIAL
ATTORNEYS EYES ONLY

Attorney Docket No. 1324-1010

## ASSIGNMENT

WHEREAS, the undersigned has made an invention entitled "Virtual Geostationary Satellite Constellation and Method of Satellite Communications" for which I have executed a Letters Patent of the United States on even day herewith;

WHEREAS, Space Resource International LTD, a corporation existing under the laws of Bermuda, doing business at 1101 Pennsylvania Avenue N.W., Suite 600, Washington, DC 20004 (hereinafter referred to as "Assignee") desires to acquire the entire right, title and interest in, to and under the above invention and application and any patents which may be granted on said invention in the United States and in any and all foreign countries;

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, I do sell, assign, and transfer, unto Assignee, the full and exclusive right, title and interest in and to any and all patents which may be granted therefor in the United States and its territorial possessions and in any and all foreign countries and to any and all divisions, reissues, continuations and extensions thereof.

I hereby authorize and request the Patent Office of the United States and any and all foreign countries to issue any and all of said patents, when granted to Assignee as the Assignee of my entire right, title and interest in and to the same, for the sole use and enjoyment of Assignee, its successors and assigns.

Further, I agree that I will communicate to Assignee, or its representatives, any facts known to me respecting said invention, and testify in any legal proceedings, sign all lawful papers, execute all divisions, continuation, substitution, renewal and reissue applications, execute all necessary papers to cause any and all of said patents to be issued to Assignee, make all

1

SRA 00214
CONFIDENTIAL
ATTORNEYS EYES ONLY

rightful oaths and generally do everything necessary or desirable to aid Assignee, its successors and assigns, to obtain and enforce proper protection for said invention in the United States and in any and all foreign countries.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my seal on the date indicated below.

EXECUTED at District of Columbia, on this ___3rd___ day of November, 2000.

_John E. Draim_
John E. Draim

BEFORE ME, the undersigned authority, on this day personally appeared **John E. Draim** know to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this ___3rd___ day of November, 2000.

_Erica Piscitelli_
Notary Public

[SEAL]

My Commission Expires:

ERICA PISCITELLI
Notary Public, District of Columbia.
My Commission Expires June 30, 2004

2

SRA 0021
CONFIDENTL
ATTORNEYS EYE

EXHIBIT 9: Settlement Agreement

# S E T T L E M E N T   A G R E E M E N T

This Settlement Agreement ("Settlement Agreement") dated as of July 20, 2005 is made by and among:

PETER D. SAHAGEN ("Sahagen"); SST GLOBAL TECHNOLOGY, LLC ("SST"), a Delaware limited liability company formerly known as SAHAGEN SATELLITE TECHNOLOGY GROUP, LLC ("SSTG"), a Delaware limited liability company; SPACE RESOURCE CORPORATION ("Space Resource"), a Delaware corporation; SPACE RESOURCE INTERNATIONAL ("Space Resource International"), a Bermuda corporation; SPACE RESOURCE AMERICA CORP., a Delaware corporation; VGS, INC. ("VGS"), a Delaware corporation, all of the above c/o Ardustry Entertainment, LLC, 9255 Sunset Boulevard, Suite 1000, West Hollywood, California 90069; JOHN DRAIM ("Draim"), residing at 9310 Telfer Court, Vienna, Virginia 22182; NEEL HOWARD ("Howard"), residing at 200 Skidmore Boulevard, Gaithersburg, Maryland 20877; TOM H. QUINN ("Quinn"), residing at 1217 28th Street, N.W., Washington, D.C. 200007; RICHARD A. INCIARDI ("Inciardi"), residing at 19800 Helmond Way, Montgomery Village, Maryland 20886 (all of the above individuals and corporations collectively, the "Sahagen Parties");

and

DAVID CASTIEL ("Castiel"), residing at 4819 Indian Lane, N.W., Washington, D.C. 20016; ELLIPSO, INC. ("Ellipso"), a Delaware corporation with a principal place of business located at 4410 Massachusetts Avenue, N.W., No. 385, Washington, D.C. 20016; VIRTUAL GEOSATELLITE, LLC ("Virtual Geo"), a Delaware limited liability company with a principal place of business located at 4410 Massachusetts Avenue, N.W., No. 385, Washington, D.C. 20016; MOBILE COMMUNICATIONS HOLDINGS, INC. ("MCHI"), a Delaware



corporation with a principal place of business located at 4410 Massachusetts Avenue, N.W., No.

385, Washington, D.C. 20016; VIRTUAL GEOSATELLITE HOLDINGS, INC. ("Virtual Geo

Holdings"), a Delaware corporation with a principal place of business located at 4410

Massachusetts Avenue, N.W., No. 385, Washington, D.C. 20016; JILL STERN ("Stern"),

residing at 4846 Glenbrook Road, N.W., Washington, D.C. 20016; and JANE K. CHAPMAN

("Chapman"), as executrix of the Estate of John Chapman, deceased, residing at 316 Pine Creek

Avenue, Fairfield, Connecticut 06430 (collectively, the "Castiel Parties")(each, and all of them

individually, a "Party" and collectively, the "Parties"). Individuals Draim, Howard, Inciardi,

Quinn, Stern and Chapman, while parties to one or more of the lawsuits identified below, are not

necessary parties to this Settlement, but only to the settlement of the individual cases in which

they are parties, and they will sign, or counsel for them will sign, only the Release (in the form

of Appendices C-J hereto) and the Stipulation of Dismissal With Prejudice in the case in which

they appear, as appropriate.

## W I T N E S S E T H:

WHEREAS, several of the Parties to this Settlement Agreement are currently

parties to, and participants in, the actions entitled SST Global Technology, LLC v. Chapman, et

al., 02 Civ. 7687 (CSH)(S.D.N.Y.); Draim v. Virtual Geosatellite, LLC, et al., Case No. 01-1588-

A (JR)(D.C.D.C.); MCHI, et al. v. Draim, Case No. 01-08202 (JR)(D.C. D.C.); Ellipso, Inc., et

al. v. Inciardi, Case No. 02-0433 (JR)(D.C.D.C.); and/or Virtual Geosatellite, LLC, et al. v.

Sahagen, et al., Case No. 3286-00 (Super. Ct., D.C.) (each an "Action" and collectively, the

"Actions"); and

WHEREAS, one or more of the Sahagen Parties claims ownership of the

- 2 -



intellectual property set forth and described in Exhibit A to this Settlement Agreement; and

WHEREAS, one or more of the Castiel Parties claims ownership of the intellectual property set forth and described in Exhibit B to this Settlement Agreement; and

WHEREAS, Sahagen currently owns stock and/or membership interests in Ellipso and Virtual Geo; and

WHEREAS, the Sahagen Parties, on the one hand, and the Castiel Parties, on the other, desire to settle and compromise all claims and disputes between them in accordance with the provisions of this Settlement Agreement, including, without limitation, any and all claims that were or could have been raised in the Actions or in any other litigation in which they participated in the past, any and all claims relating to, or arising as a consequence of, their claim of ownership of the intellectual property set forth and described in Exhibits A and B to this Settlement Agreement, and any and all claims relating to, or arising as a consequence of, Sahagen's ownership of stock and/or membership interests in Ellipso and Virtual Geo;

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged by each Party, it is agreed as follows:

## ARTICLE I

### Settlement and Dismissal of the Actions

1.1. Incident to the execution of this Settlement Agreement, each and every Party to this Settlement Agreement who is also a party in one or more of the Actions shall, through their counsel of record in said Action, execute Stipulations of Dismissal With Prejudice in the form deemed appropriate by their counsel. Counsel of record for defendants in each Action



shall, within five (5) business days of the execution of this Settlement Agreement, file said stipulation with the court in which said Action is pending and shall, simultaneously therewith, request that said stipulation be "so ordered" by the Court.

      1.2.  Sahagen represents and warrants that in connection with, and as a condition precedent to, this Settlement Agreement,  SPACE RESOURCE INTERNATIONAL / SPACE RESOURCE CORPORATION shall satisfy any and all claims and/or demands that were and/or could have been asserted by Draim against the Castiel Parties, whether asserted in any Action or otherwise.

      1.3.  Sahagen represents and warrants that in connection with, and as a condition precedent to, this Settlement Agreement, he shall personally satisfy any and all claims and/or demands that were and/or could have been asserted by Inciardi against the Castiel Parties, whether asserted in any Action or otherwise. Inciardi has agreed to, and by signing his Release, does thereby waive and release any and all claims and/or demands that were and/or could have been asserted by Inciardi against the Castiel Parties and/or the Sahagen Parties, or any of them, whether asserted in any Action or otherwise.

      1.4. There shall be no monetary payment from any of the Castiel Parties to any of the Sahagen Parties, or from any of the Sahagen Parties to any of the Castiel Parties, in connection with the consummation of this Settlement Agreement.  Each Party shall bear its own expenses, costs and attorneys' fees in the Actions, as well as in the negotiation and execution of this Settlement Agreement.



## Article II

### Transfer of Stock Interests in Ellipso and Virtual Geo

2.1. Sahagen hereby agrees to transfer and assign to Ellipso and Virtual Geo any and all stock and/or membership interests he currently holds in said entities. In connection with the foregoing, Sahagen agrees that he shall, within five (5) business days of the execution of this Settlement Agreement, return to Ellipso and/or Virtual Geo any and all certificates or other evidences of his ownership interest in said entities. Should Sahagen fail to locate and return such certificates or evidences of ownership within said period, the Parties agree that all such certificates or other evidences shall be deemed cancelled and withdrawn, the intent being that Sahagen shall have no ownership interest in either such entity following the consummation of this Settlement Agreement.

2.2. Notwithstanding the foregoing, should Sahagen reach an agreement with John Keough, or New England Phoenix, and should Sahagen request that Ellipso issue shares pursuant to the letter which appears as Exhibit C hereto, that request shall be honored. Following the cancellation on the corporation's books of the shares or membership interests owned by Sahagen, Ellipso (but not Vitural Geo) shall re-issue an equal number of shares (24,716) to John Keough or New England Phoenix without further action; if John Keough requests transfer to another entity, the Ellipso Board will have to approve that entity as a transferee.

### ARTICLE III

### Acknowledgment of Ownership

3.1. The Castiel Parties, and each of them, hereby acknowledge and agree that one or more of the Sahagen Parties is, to the extent that the Patent Office confers ownership, the



lawful owner of the patents, claims and protectable improvements set forth and described in Exhibit A to this Settlement Agreement. In connection with the foregoing, the Castiel Parties, and each of them, hereby covenant and agree that they will not make commercial use of said technologies or improvements without the express written consent of the relevant Sahagen Parties.

3.2. The Sahagen Parties, and each of them, hereby acknowledge and agree that one or more of the Castiel Parties is, to the extent that the Patent Office confers ownership, the owner of the patents, claims and protectable improvements set forth and described in Exbibit B to this Settlement Agreement. In connection with the foregoing, the Sahagen Parties, and each of them, hereby covenant and agree that they will not make commercial use of said technologies or improvements without the express written consent of the relevant Castiel Parties.

## ARTICLE IV.

### Releases; Covenant Not To Sue

4.1. Incident to the execution of this Settlement Agreement, the Castiel Parties, and each of them, shall execute and deliver to Wayne S. Williams, Esq. general releases of all claims in favor of said parties as against the Sahagen Parties, and each of them, in the form annexed hereto as Exhibit H. It is understood and agreed that said releases are intended to, and shall, fully release and discharge the Sahagen Parties, and each of them, from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, whether know or unknown, and whether in law, admiralty or equity, which the Castiel Parties, or any one of them, ever had,

- 6 -



may now have or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of the execution of this Settlement Agreement including, without limitation, any and all claims that were or could have been raised in the Actions, any and all claims relating to, or arising as a consequence of, the Parties' claim of ownership of the intellectual property set forth and described in Exhibits A and B to this Settlement Agreement, and any and all claims relating to, or arising as a consequence of, Sahagen's ownership of stock and/or membership interests in Ellipso and Virtual Geo.

       4.2.  Incident to the execution of this Settlement Agreement, the Sahagen Parties, and each of them, shall execute and deliver to Tighe Patton Armstrong Teasdale, PLLC, LLP general releases of all claims in favor of said parties as against the Castiel Parties, and each of them, in the form annexed hereto as Exhibit I. It is understood and agreed that said releases are intended to, and shall, fully release and discharge the Castiel Parties, and each of them, from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, whether know or unknown, and whether in law, admiralty or equity, which the Sahagen Parties, or any one of them, ever had, may now have or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of the execution of this Settlement Agreement including, without limitation, any and all claims that were or could have been raised in the Actions, any and all claims relating to, or arising as a consequence of, the Parties' claim of ownership of the intellectual property set forth and described in Exhibits A and B to this Settlement Agreement, and any and all claims relating to,

- 7 -



or arising as a consequence of, Sahagen's ownership of stock and/or membership interests in Ellipso and Virtual Geo.

       4.3.  Separate from, and in addition to, the general releases set forth and described in Articles 4.1 and 4.2., supra, the Castiel Parties and the Sahagen Parties, and each of them, hereby agree and covenant not to sue the other, or any one of the others, by reason of the practice by said other party, its successors or assigns, of inventions covered by the claims of patents owned by way of assignment or otherwise, by said other party, its successors or assigns, in a patent infringement or declaratory judgment action, suit or proceeding in any United States District Court or state court challenging the intellectual property owned by the other party (it being understood that state court actions are not permitted for patent infringement under the Constitution and federal patent statutes, but it being agreed that no state court action shall be commenced by any party hereto against any other party hereto in the nature of a patent infringement suit).

       Each party agrees on behalf of itself and on behalf of its successors and assigns, that with the exception of infringements that may arise out of, in connection with, or incidental to the practice of inventions covered by the claims of patents it owns, by assignment or otherwise, it shall not infringe patents owned by the other party, its successors or assigns.

       In the event a third party takes a controlling interest in a Sahagen Party or a Castiel Party which is the owner, by assignment or otherwise, of patents covered hereunder, this covenant not to sue shall run to such new controlling-interest Party, except for intentional and malicious patent infringement.

This covenant shall apply to any court of competent jurisdiction worldwide, and shall not be construed as a license, nor affect any remedies available under Articles 3.1 or 3.2, supra. This covenant shall apply to any company, partnership or other legal entity, even if not a party hereto, which is owned or controlled by David Castiel or by Peter D. Sahagen.

## ARTICLE V

### Miscellaneous Provisions

5.1. **No Admission.** Each Party to this Settlement Agreement agrees that this Settlement Agreement is not intended as, and does not constitute, an admission by any Party of any fault, liability, or wrongdoing.

5.2. **Further Assurances**. The Parties agree to perform (or procure the performance of) all further acts and things, and execute and deliver (or procure the execution and delivery of) such further documents as may be required by law or as the other Parties may reasonably require to implement and/or give effect to this Settlement Agreement and the transactions contemplated by it.

5.3. **Representations And Warranty As To Authority.** Each of the Parties represents and warrants to the other Parties that such Party has full power and authority to enter into and perform the acts contemplated to be performed pursuant to this Settlement Agreement. The Parties acknowledge and agree that this Settlement Agreement constitutes a valid and legally binding obligation of the Parties, enforceable in accordance with its terms and conditions. The Parties represent and warrant that they need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in

- 9 -



order to consummate the transactions contemplated by this Settlement Agreement. The Parties

further represent and warrant that there is no right, agreement, or law that limits its and/or their

ability to enter into this Settlement Agreement or that would be violated by its entering into this

Settlement Agreement. The execution, delivery and performance of this Settlement Agreement

and all other agreements contemplated hereby have been duly authorized by the Parties.

5.4. **Non-Contravention**. Each of the Parties represents and warrants that

neither the execution and delivery of this Settlement Agreement, nor the consummation of the

transactions contemplated hereby, will violate any constitution, statute, regulation, rule,

injunction, judgment, order, decree, ruling, charge, or other restriction of any government,

governmental agency, or court to which the Parties are subject, or conflict with, result in a

breach of, or constitute a default under any agreement, contract, lease, license, instrument, or

other arrangement to which the Parties are a party.

5.5. **Notices**. All notices, requests, demands and other communications hereunder

shall be in writing and shall be deemed to have been duly given if delivered by hand or mailed,

registered or certified mail, return receipt requested, postage prepaid, to the following

representatives:

     (a)    If to Castiel (or any Castiel Party):

           Thomas Earl Patton, Esq. or
           David J. Taylor, Esq.
           Tighe Patton Armstrong Teasdale, PLLC
           1747 Pennsylvania Ave., N.W. Suite 300
           Washington, DC 20006

     (b)    If to Sahagen (or any Sahagen Party):

           Wayne S. Williams, Esq.
           c/o Ardustry Entertainment, LLC

- 10 -



9255 Sunset Boulevard
Suite 1000
West Hollywood, CA 90069

(c)     If to Draim, with additional notice to:
John F. Anderson, Esq.
Troutman Sanders, LLP
1660 International Drive, Suite 600
McLean, Virginia 22102

Any party may designate a new representative for the receipt of notices under this Settlement Agreement by giving notice to the above representatives in accordance with this article.

5.6. **Binding Effect.** This Agreement shall be binding upon, and shall inure to the benefit of, the Parties, their respective parent entities, subsidiaries and affiliates, and their respective directors, officers, employees, principals, shareholders, owners, agents, representatives, predecessors, successors, administrators and assigns, to the full extent permitted by law.

5.7. **Modifications Must Be In Writing.** This Settlement Agreement, including exhibits, embodies the entire agreement and understanding of the Parties hereto and terminates and supersedes all prior independent agreements and understandings between and among them. This Settlement Agreement shall not be modified or amended except in a writing signed by all the Parties to this Settlement Agreement.

5.8. **Severability.** If any provision of this Settlement Agreement is held to be invalid, void, illegal, or unenforceable for any reason by a court of competent jurisdiction, the validity, legality and enforceability of the remaining provisions of this Settlement Agreement shall not in any way be affected or impaired and shall continue in full force and effect, and the provisions of this Settlement Agreement shall be construed and interpreted, to the fullest extent

- 11 -



legally possible, to give effect to the intent of any provision held invalid, void, illegal, or unenforceable.

5.9. **No Waiver.**  Any waiver of any provision contained in or right provided by this Settlement Agreement is ineffective unless in writing.  The failure of any Party to this Settlement Agreement to insist on strict compliance with any of the terms, covenants, or conditions of this Settlement Agreement by any other Party shall not be deemed a waiver of such term, covenant, or condition and any waiver or relinquishment of any right or power under this Settlement Agreement at anyone time shall not be deemed a waiver or relinquishment of any right or power for all or any other times.

5.10. **Counterparts.**  This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute a single instrument.

5.11. **Headings.**  Headings in this Settlement Agreement are for purposes of reference and convenience only, and shall not be considered in the interpretation of the language herein.

5.12. **Interpretation.**  The Parties to this Settlement Agreement acknowledge that each of them has been represented by counsel of their own choice throughout all of the negotiations which preceded the execution of this Settlement Agreement and in connection with the preparation and execution of this Settlement Agreement.  None of the Parties hereto, nor their counsel, shall be deemed the drafter of this Settlement Agreement for purposes of construing the provisions hereof.  The language in all parts of this Agreement shall be in all cases construed according to its fair meaning, not strictly for or against any of the Parties hereto.

- 12 -



5.13. **Voluntary Agreement: No Duress.**  This Settlement Agreement is executed voluntarily and without any duress or undue influence on the Parties or their employees, agents, or attorneys, and no party is relying upon any inducements, promises, or oral or written representations not contained herein made by any other Party or otherwise.  Each Party has had a full opportunity to review and understand this Settlement Agreement and to receive the advice of independent legal counsel regarding the terms, meaning and execution of this Settlement Agreement.

5.14. **Confidentiality.**  The Parties to this Settlement Agreement shall not disclose to any person, directly or indirectly, any information concerning the terms of this Agreement except to its attorneys, accountants or other professionals who have been advised of the confidential nature of this Settlement Agreement, for the purposes of obtaining necessary professional advice, or as may be required by law, except that nothing herein shall preclude the disclosure of such information on a need to know basis to actual or potential investors in a legal entity which is, or is a successor to, a Party hereto.

5.15. **Governing Law**.  This Agreement and its application shall be governed by the laws of the District of Columbia.

IN WITNESS WHEREOF, the Parties hereto have executed or caused this Settlement Agreement to be executed by their duly authorized representatives as of the date first above written.

_____
PETER D. SAHAGEN



SST GLOBAL TECHNOLOGY, LLC

by: _____

Peter D. Sahagen, Chairman


SAHAGEN  SATELLITE  TECHNOLOGY
GROUP

by: _____

Peter D. Sahagen, Chairman


SPACE RESOURCE CORPORATION

by: _____

Peter D. Sahagen, Chairman


SPACE RESOURCE INTERNATIONAL

by: _____

Peter D. Sahagen, Chairman


SPACE RESOURCE AMERICA CORP.


by: _____

Peter D. Sahagen, Chairman


- 14 -



VGS, INC.

by: _____

Peter D. Smagen, Chairman

_____

DAVID CASTIEL

ELLIPSO, INC.

by: _____

David Castiel, President and CEO

VIRTUAL GEOSATELLITE, LLC

by: _____

David Castiel, Chairman and CEO

MOBILE COMMUNICATIONS

HOLDINGS, INC.


by:_____

David Castiel, President


VIRTUAL GEOSATELLITE HOLDINGS,
INC.


by:_____

David Castiel, President

EXHIBIT 10: Response to Motion for Reconsideration in Opposition to Motion for

Summary Judgment

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELLIPSO, INC.,                                        )
a Delaware Corporation,                        )
                                                              )
and                                                       )
                                                              )
VIRTUAL GEOSATELLITE LLC,          )          Civil Action No. 1:06cv01373 (JR)
a Delaware Limited Liability Company,  )
                                                              )
          Plaintiffs,                                   )
                                                              )
                              v.                          )
                                                              )
JOHN E. DRAIM,                                  )
                                                              )
          Defendant.                                )
                                                              )

## DEFENDANT'S RESPONSE TO MOTION FOR RECONSIDERATION
## IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

John E. Draim ("Mr. Draim"), by counsel, submits this response to the "motion for

reconsideration in opposition to motion for summary judgment" filed by the plaintiffs on

August 17, 2007.  As shown below, this "motion for reconsideration in opposition" is not

only untimely, it is without merit.  The opposition fails to identify any specific facts

establishing a genuine issue for trial on any of the multiple grounds upon which this

case should be dismissed.  This belated and insufficient opposition only supports Mr.

Draim's motion for summary judgment and his request for an award of attorneys fees

and costs under D.C. Code § 36-404.

## PROCEDURAL BACKGROUND

Following the entry of the Final Judgment on May 23, 2006 in the earlier

consolidated action before Magistrate Judge Facciola, plaintiffs filed this complaint on

July 20, 2006, reasserting a claim for misappropriation of trade secrets under D.C. Code

§ 36-401 et seq.  Mr. Draim filed and served a motion to dismiss on August 9, 2006

through the Court's electronic case filing system [4].  Plaintiffs filed their opposition to

the motion on August 22, 2006 [6] and Mr. Draim filed a reply on August 28, 2006 [7].

On March 20, 2007, the Court entered a Memorandum Order denying the motion to

dismiss [8].  Mr. Draim filed his answer to the complaint on April 2, 2007 [9].

On April 12, 2007, an initial scheduling conference was held with the Court.

During that conference counsel discussed the filing of a motion for summary judgment

in order to present the Court with a record on which it could decide the issues that were

presented initially in the motion to dismiss.  Pursuant to the discussions at the

conference on April 12, Mr. Draim filed and served a motion for summary judgment and

for an award of attorneys fees and costs through the Court's electronic case filing

system on May 15, 2007 [10].  In accordance with Local Civil Rule 56.1, the

memorandum in support of the motion for summary judgment included a statement of

material facts containing 22 paragraphs of facts with citations to the record.  A courtesy

copy of the motion for summary judgment was delivered to the Court and a copy of the

cover letter referring to the motion for summary judgment was mailed to plaintiffs'

counsel at the address provided in the pleadings.

Even though the Court previously had provided plaintiffs with an enlarged period

of thirty days to respond to the motion for summary judgment, no opposition was filed.

On June 25, 2007 (forty-one days after the motion for summary judgment was filed and

served), Mr. Draim filed a notice of failure to respond to motion for summary judgment

[11].  Plaintiffs then filed a motion to extend period for opposition until July 20, 2007,

stating that counsel had not received electronic service of the motion for summary

2

judgment filed on May 15, 2007 [12].  Mr. Draim responded to the motion to extend on June 26 pointing out that the motion for summary judgment was filed in accordance with the discussions held during the conference the previous month; that it was filed and served electronically through the Court's electronic case filing system in the same manner as the other pleadings previously filed in this case; and, that plaintiffs' counsel was sent a copy of the cover letter to the Court indicating that a motion for summary judgment had been filed [13].  On June 28, 2007 the Court entered a Memorandum and Order denying the motion to extend time, granting the motion for summary judgment and allowing the plaintiffs until July 9, 2007 to file a response to the motion for attorneys fees [14, 15].

On July 9, 2007, plaintiffs filed a motion to vacate the Order granting the motion for summary judgment [16] and an opposition to the motion for attorneys fees and costs [17, 18].  On July 12, 2007, Mr. Draim filed a reply in support of his motion for attorneys fees and costs [19] and an opposition to the motion to vacate order [20].  On July 13, 2007, the Court entered an Order denying the motion to vacate but providing that the plaintiffs could file a motion for reconsideration containing the memorandum they would have filed in opposition to the motion for summary judgment [21].  This Order provided that Mr. Draim did not need to respond to the motion for reconsideration unless the Court called for a response.  Thirty-five days after the entry of the Order allowing the filing of a motion for reconsideration, plaintiffs filed a "motion for reconsideration in opposition to motion for summary judgment" [22].  On August 22, 2007, the Court entered an Order calling for a response to the motion for reconsideration in opposition to motion for summary judgment within 30 days from the date of the Order [23].

**ARGUMENT**

**The motion for reconsideration in opposition is untimely**.

On July 13, 2007, the Court entered an Order allowing plaintiffs to file a motion for reconsideration containing the memorandum they would have filed in opposition to the motion for summary judgment [21]. The plaintiffs had previously requested an enlargement of time to July 20, 2007 to file an opposition to the motion for summary judgment or 15 days from the granting of the motion [12].

The time period for filing a motion for reconsideration is ten days. Fed.R.Civ.P. 59(e); W.C. & A.N. Miller Companies v. United States of America, 173 F.R.D. 1, 3 (D.D.C. 1997); Derrington-Bey v. District of Columbia, 39 F.3d 1224, 1225 (D.C. Cir. 1994). The Court granted plaintiffs leave to file a motion for reconsideration on July 13. Plaintiffs did not file their motion for reconsideration until August 17 – thirty-five days after the Order was entered allowing the filing of a motion for reconsideration and twenty-eight days after the previously requested time for filing an opposition (July 20). As shown by the belated filing of this opposition, the granting of the motion for summary judgment after plaintiffs failed to file a timely response has not altered their cavalier approach to the Court's rules and procedures. Under these circumstances, this motion could, and should, be denied as untimely.

**Plaintiffs have failed to set forth specific facts showing a genuine issue for trial on any of the grounds contained in the motion for summary judgment.**

The motion for summary judgment filed by Mr. Draim contained a ten-page statement of material facts section with 22 paragraphs referring to the two declarations and 21 exhibits identified in the declarations filed with the motion. Those facts,

declarations and exhibits established that plaintiffs' claims were time-barred, that plaintiffs had publicly disclosed the inventions claimed in the subject patent applications, that Mr. Draim had been released of all claims by the plaintiffs and that plaintiffs had previously brought and dismissed the same misappropriation of trade secrets claim against Mr. Draim.

In order to overcome summary judgment, plaintiffs are required to identify "specific facts showing there is a *genuine issue for trial*." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original). The plaintiffs must do more than "simply show there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. A party opposing a motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ.P. 56, Celotex Corp. v. Catrett, 477 U.S. 317, 321-26 (1986).

Plaintiffs' opposition in this case does not contain a separate, concise statement of material facts as to which they contend a genuine issue exists with references to any part of the record as required by the Local Rules. As such, Mr. Draim's statement of material facts may and should be deemed admitted. Local Civil Rule 56.1. As shown below, to the extent the opposition addresses the substantive issues presented in the motion for summary judgment, it merely contains bare, unsupported allegations and denials without any reference to specific facts or evidence that would support those allegations and denials.

**The basis of plaintiffs' trade secret claim.**

Plaintiffs filed this complaint reasserting a cause of action against Mr. Draim for "theft of trade secrets" under D.C. Code § 36-401 et seq. Plaintiffs claim that Mr. Draim misappropriated their trade secrets when he applied for and obtained U.S. Patent No. 6,701,126 (the '126 patent) and when that patent application was assigned to Mr. Draim's new employer.[1] A copy of the '126 patent is attached as Exhibit 8 to the motion for summary judgment. This patent issued from application number 09/709,280 filed on November 13, 2000 (the '280 application). The invention described in the '126 patent is a constellation of non-geostationary satellites arranged in a manner that would provide the potential of having 2880 active slots without interfering with the existing geostationary satellite ring. This constellation has been called the COBRA system.

Plaintiffs claim that Mr. Draim misappropriated trade secrets contained in provisional patent application number 60/153,289 (the '289 provisional application) filed on September 10, 1999 and provisional patent application number 60/180,025 (the '025 provisional application) filed on February 3, 2000. (Draim Decl. ¶¶ 2, 3 and MSJ Exhibit 1 and 2).[2] Even after the filing of this motion for summary judgment, plaintiffs have not

---

[1] While the complaint mentions other patent applications filed by Mr. Draim on behalf of his employer, the complaint acknowledges that they were either made public more than three years before the filing of this action or were abandoned. Complaint ¶¶ 22 and 25 (the '047 application was published on September 19, 2002) and ¶¶ 24-26 (the '411 application was published on September 26, 2002 and abandoned). Plaintiffs state on page 3 of the opposition that their claim relates "particularly, but not limited to" the '126 patent but they do not identify or address any other patents or patent applications.

[2] Plaintiffs' opposition also refers to the non-provisional applications that were filed based on the '289 provisional application and the '025 provisional application **after** Mr. Draim left his employment with the plaintiffs. There is no allegation that Mr. Draim had access to these non-provisional patent applications that were filed in September 2000 and February 2001 -- months after he left the plaintiffs' employment in May 2000. Complaint ¶¶ 10, 17, 23.

identified any specific information in either of these two provisional patent applications that they claim was a trade secret.  Instead, they merely state that the patent applications themselves were "trade secrets" and that while "it may have been theoretically possible to derive all the material in the '289 and '215 applications from a combination of previously available sources," they do "not need to show that material in the patent applications" because they include a "value added" combination of characteristics.  (Opposition, pg. 10).  However, "simply asserting that a trade secret resides in some combination of otherwise known information by itself is not sufficient to satisfy the requirements for a trade secret."  <u>Catalyst & Chemical Services, Inc. v. Global Ground Support</u>, 350 F. Supp.2d 1, 9 (D.D.C. 2004), *citing*, <u>Strategic Directions Group, Inc. v. Bristol-Myers Squibb Co.</u>, 293 F.3d 1062, 1065 (8th Cir. 2002).

Before examining each of the four grounds upon which summary judgment is appropriate in this case, two other items relating to the "trade secret" claim should be noted.  First, plaintiffs acknowledge that the patent applications containing the alleged trade secrets were published on October 31, 2002 and that Mr. Draim would have been able to copy that information as of that date.  (Opposition, pg. 10).  Given that this "trade secret" information has been in the public domain for over four years, there is no reason why plaintiffs could not set forth with specificity the elements of the claimed trade secret.

The second point is that even though plaintiffs sued Mr. Draim again on July 20, 2006, claiming that he misappropriated trade secrets in applying for and assigning the '126 patent to his new employer, **a year before this lawsuit was filed**, plaintiffs agreed that Mr. Draim's new employer is the "lawful owner of the patents, claims and protectable improvements" set forth in the '126 patent.  In the Acknowledgement of

Ownership section of the Settlement Agreement that plaintiffs entered into in July 2005, the plaintiffs agreed that the "Sahagen Parties" are the lawful owners of the patents described in Exhibit A, which lists the '126 patent as a patent owned by the Sahagen Parties. (MSJ Exhibit 16).

**The trade secret claim is barred by the statute of limitations.**

Plaintiffs admit in their opposition that in April 2003 (more than three years before this action was filed) documents were provided to their counsel during discovery in the earlier matter that contained copies of the '280 patent application filed with the U.S. Patent and Trademark Office by Mr. Draim's new employer on November 13, 2000 (along with the file history) and the corresponding International Patent Application that was published and available to the public in May 2002. (MSJ Statement of Facts ¶ 6). Plaintiffs also do not dispute that on December 26, 2002 they wrote a threatening letter to Mr. Draim concerning the filing of the November 13, 2000 patent application (MSJ Exhibit 10) and that the pretrial statement they filed in the earlier action on April 24, 2003, specifically referred to the November 13, 2000 patent application claiming that Mr. Draim had used plaintiffs' proprietary information in submitting that application and that he had sold that information to his new employer (MSJ Exhibit 14, ¶¶ 28-30).

Plaintiffs argue that even in light of these admissions, some element of their misappropriation claim is not time-barred because they were not aware of the full extent and particularity of the misappropriation until the applied for patent actually issued. Plaintiffs claim that since the '126 patent did not issue until March 2, 2004, this case is not "entirely" untimely. A review of the definition of "misappropriation" contained in the

D.C. Trade Secrets Act and the law relating to the accrual of a cause of action reveals the lack of merit to this argument.

D.C. Code § 36-401 (2)(B) defines misappropriation as the "[d]isclosure or use of a trade secret of another without express or implied consent."  There is nothing in the D.C. Trade Secrets Act that supports the argument that when a party misappropriates a trade secret and files a patent application using that information, the cause of action for misappropriation does not arise until the patent issues.[3]  The cause of action for misappropriation accrues upon the disclosure or use of the alleged trade secret and not upon the issuance of any property right or other benefit based on that disclosure or use.

D.C. Code § 36-406 provides that "[a]n action for misappropriation must be brought with 3 years after the misappropriation is discovered or, by exercise of reasonable diligence, should have been discovered."  There is no dispute that in 2002 plaintiffs were aware that Mr. Draim had filed a patent application on November 13, 2000 allegedly disclosing and using their trade secrets -- as shown in their threatening letters and the allegations in their earlier lawsuit for misappropriation of trade secrets against Mr. Draim.  (MSJ Ex. 10-12).  In addition, in April 2003 a copy of the '280 patent application and prosecution file (including the International Patent Application that had been published on May 23, 2002) was produced in discovery.[4]  While plaintiffs actually

_____

[3] At one point plaintiffs state that they are not seeking to recover for revealing trade secrets by using them in filing patent applications – however that is precisely what they allege in the complaint and is the only basis for asserting a misappropriation of trade secrets claim – the disclosure or use of the trade secret.

[4] Plaintiffs argue that the International Patent Application may be different from the U.S. Patent Application, but they do not show that there was any difference between the two in this case.  As shown in Exhibits 8 and 9 to the motion for summary judgment, there are no actual differences between the International Application and the issued patent.

acknowledge on page 14 of their opposition that they were aware of the alleged

disclosure and use of their trade secrets by April 24, 2003 and admit that a least a

portion of their trade secret claim is barred by the statute of limitations, they still argue

their claim is not barred because the '126 patent did not issue until March 2004.

The law in the District of Columbia concerning the accrual of a cause of action for

a misappropriation of trade secrets claim and the law relating to the running of the

statute of limitations is clear.  Under D.C. Code § 36-406, a cause of action for

misappropriation of trade secrets accrues when the disclosure or use of the trade secret

is discovered or, by the exercise of reasonable diligence, should have been discovered.

The law is equally clear that once there is knowledge of **some injury**, its cause and

related wrong doing, the cause of action exists and the statute of limitations begins to

run.  It is not necessary that all or even the greater part of the damages have to occur

before the cause of action arises.  Any appreciable and actual harm from the

complained of conduct establishes a cause of action upon with the client may sue.

Colbert v. Georgetown University, 641 A.2d 469, 473 (D.C. App. 1994); Knight v.

Furlow, 553 A.2d 1232, 1235 (D.C. App. 1989); Baker v. A.H. Robins Co., 613 F. Supp.

994 (D.D.C. 1985).

In this case, there is no dispute that more than three years prior to the filing of

this action the plaintiffs were aware that Mr. Draim had filed the '280 patent application

and they were aware of the contents of that application.  In fact, more than three years

before this action was filed, plaintiffs filed an earlier lawsuit against Mr. Draim alleging

misappropriation of trade secrets relating to the '280 patent application.  As such, the

plaintiffs were aware of the "disclosure or use of a trade secret of another without

express or implied consent." The issuance of the '126 patent based on that application does not form a new cause of action for misappropriation or allow a new statute of limitations to begin. Since this complaint was filed more than three years after the plaintiffs discovered the disclosure and use of the alleged trade secret, this claim is barred by the statute of limitations and must be dismissed.

**Plaintiffs have failed to establish the existence of a trade secret.**

Plaintiffs opposition argues that a trade secret **can** exist even if it is a "combination" of information that may be derived from publicly available material and that patent applications **may** contain information that is entitled to trade secret protection if the matter otherwise meets trade secret protection. (Opposition pg. 8). However, notably absent from the opposition, is any **specific** description of what information in the patent applications the contend constitutes the alleged trade secret; how that trade secret was not disclosed in the FCC application and various articles and presentations made public by the plaintiffs; how that trade secret derives actual or potential independent economic value from not being generally known to or ascertainable by another; what reasonable efforts were used to maintain its secrecy; and, how Mr. Draim used that specific information. In opposing a properly supported motion for summary judgment, the opposing party cannot merely rely on its allegations and unsupported argument but is required to present affirmative **evidence** showing a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). To preclude summary judgment, the non-movant must proffer **evidence** on which a jury could reasonably return a verdict for the non-moving party. Laningham v. U.S. Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In opposition to Mr. Draim's properly supported

motion for summary judgment, the plaintiffs have not presented any specific facts or

evidence to support the existence or misappropriation of any trade secrets.[5]

At best, the opposition states that information contained in the provisional patent

applications **may** be entitled to trade secret protection but they do not attempt to show

what specific information in those patent applications is entitled to trade secret

protection.[6]  In addition, Mr. Castiel's declaration does little to help their case.  Mr.

Castiel states that patent protection was a critical part of his business plan, that the

plaintiffs "attempted to keep all pending patent applications as confidential" and that "to

my knowledge" the plaintiffs took "all necessary steps to not reveal the contents of

confidential pending patent applications to third parties."  The issue is not whether

copies of the pending patent applications were distributed publicly, but whether the

inventions claimed in those applications were disclosed to the public.  The position

taken by Mr. Draim in the motion for summary judgment is that the inventions described

and claimed in both the '289 and '025 provisional patent applications were made public

through the FCC license application and various articles and presentations made by the

plaintiffs.  (MSJ Statement of Facts ¶¶ 19-22, Draim Decl. ¶ 5-9, MSJ Exhibits 17-21).

As stated in Mr. Draim's declaration (and not contested by the plaintiffs), it was the

practice of the plaintiffs to publicize their inventions once a patent application had been

---

[5]  Plaintiffs were allowed an opportunity to file "the memorandum they would have filed
in opposition to defendant's motion for summary judgment" and any additional
submission by the plaintiffs relating to the merits of the summary judgment motion or an
attempt to supplement their opposition based on this response would be improper.

[6] Curiously, plaintiffs state that on October 31, 2002, these applications became public
and that Mr. Draim could have used any of the information contained in those
applications as of that date but fail to address how this impacts the statute of limitations
arguments it also makes since it became "public information" more than three years
before this action was filed.

filed and the date of invention established. Draim Decl. ¶ 9. As shown in Exhibit 20,

Mr. Castiel was a co-author of one of the articles describing the VIRGO system. To

further rebut Mr. Castiel's statement that to the best of his knowledge his companies

took all necessary steps not to reveal the contents of pending patent applications,

attached as Exhibit 22 is an email from Mr. Draim to Mr. Castiel referring to Mr. Castiel's

comments on an article they co-authored and that was distributed to the public at the

50th International Astronautical Congress in October 1999. As shown in the attached

article, not only is the VIRGO system described in detail, references are made to the

FCC filing for the VIRGO system and indicates that a U.S. Patent is pending on this

"innovative" system. Like the article distributed a month later to the European

Conference on Satellite Communication (MSJ Exhibit 20, Statement of Fact ¶ 21), this

article describes the same satellite constellation that is claimed in the '289 provisional

application.

     The motion for summary judgment establishes that the inventions claimed in the

subject provisional patent applications were disclosed to the public before Mr. Draim left

his employment with the plaintiffs. Plaintiffs' vague and unsupported claim that the

provisional patent applications contain trade secrets because of some unidentified

"combination" of publicly available information is not sufficient to overcome Mr. Draim's

fully supported motion for summary judgment. In addition, plaintiffs have made no effort

whatsoever to show that Mr. Draim used anything other than publicly available

information when he filed for and obtained the '126 patent.

**The July 20, 2005 Settlement Agreement and General Release**

Plaintiffs characterize Mr. Draim's argument that the General Release executed on July 20, 2005 as a part of the global settlement between the Castiel and Sahagen entities released him from these claims as "the most bizarre and erroneous" because Mr. Draim did not sign the Settlement Agreement.  In support of this claim, plaintiffs have attached a copy of the Settlement Agreement between Ellipso and SRA to their opposition (Opp. Exhibit 1).  A review of the Settlement Agreement shows that it was to be executed by Peter Sahagen personally and on behalf of his various companies and by David Castiel personally and on behalf of his various companies.  (Opp. Exhibit 1, pg. 13-16).  There is no "signature page for John Draim that clearly remains unsigned" as stated in plaintiffs' opposition.  Each and every signature block to the Settlement Agreement has been executed by either Peter Sahagen or David Castiel.  Mr. Draim was not a party to this Settlement Agreement and neither he nor his counsel was involved in its negotiation, drafting or execution.

Plaintiffs do not contest that as a part of the global settlement with the Sahagen entities (Mr. Draim's employer) they executed a General Release in which they acknowledged receipt of "good and valuable consideration" and thereby released and discharged several entities and persons, **specifically including John Draim**, from "all actions, causes of action suits, debts… in law, admiralty or equity… whether known or unknown, from the beginning of the world to the day of the date of this release."  A copy of the General Release is attached to plaintiffs' opposition as Exhibit 1, following page 16 of the Settlement Agreement.  It appears that plaintiffs take the position that Mr.

14

Draim needed to sign this General Release and provide consideration in order for its express terms to apply to him.

As a part of the global settlement between the Castiel and Sahagen entities, there was an Acknowledgement of Ownership section (Article III) in which the Castiel entities acknowledged and agreed that the Sahagen entities were the lawful owner of the patents, claims and protectable improvements in Exhibit A. Exhibit A includes the '126 patent – the patent that plaintiffs now claim Mr. Draim obtained through the use of plaintiffs' trade secrets and assigned to his employer. (MSJ Exhibit 16). As set forth in Article IV of the Settlement (paragraph 4.1), as incident to the execution of the Settlement Agreement, the Castiel Parties were to execute this General Release fully releasing the Sahagen Parties, including claims of ownership of the intellectual property set forth in Exhibit A.

While plaintiffs are correct that a settlement agreement is a type of contract and that general principals of contract law apply to settlement agreements, there is no requirement that each person who is **released** under the terms of a settlement agreement be a signatory to the settlement agreement or a general release that is executed releasing that person. In this case Mr. Draim's employer (one of the Sahagen entities) entered into a settlement agreement with the Castiel entities under which good and valuable consideration was provided by the Sahagen entities and the Castiel entities agreed to release the Sahagen entities and several of its employees.[7]   There is

---

[7] John Draim, Neel Howard and Richard Inciardi were all employees of one or more of the Sahagen entities at some point in time. It is interesting to note the difference in paragraphs 1.2 and 1.3 of the Settlement Agreement in which paragraph 1.3 relating to Mr. Inciardi indicates that he has agreed to release the Castiel parties from any and all claims and there is no such statement in paragraph 1.2 relating to Mr. Draim.

no requirement that an employee such as Mr. Draim sign a settlement agreement or provide independent consideration when his employer undertakes to settle various claims relating to his employment.  The agreement between the Castiel entities and the Sahagen entities contemplated the release of those persons contained in the General Release and it was executed by the Castiel entities as a part of that binding Settlement Agreement.  As such, these claims against Mr. Draim were released under the express terms of the General Release.

**Plaintiffs agreed to dismiss these claims in the earlier action.**

While plaintiffs do not dispute that they asserted the same misappropriation of trade secrets claim against Mr. Draim in the earlier action and that they agreed to the dismissal of that claim prior to trial, they are "startled" by the argument that they are estopped from refiling and pursuing these claims after they decided not to proceed to trial with them in the earlier action.  The refiling of these claims after the plaintiffs agreed to dismiss them in the earlier action only goes to show the bad faith nature of this action.

As stated in paragraph 10 of Mr. Draim's statement of material facts and as shown in Exhibits 11 and 12, the plaintiffs' earlier complaints included a claim for misappropriation of trade secrets under the D.C. Uniform Trade Secrets Act.  Plaintiffs do not controvert the statements in paragraph 14 of Mr. Draim's statement of material facts indicating that they agreed to dismiss their claims against Mr. Draim and to proceed to trial on the sole issue of whether Mr. Draim was entitled to payment for certain patent bonuses.  They also do not contest that the Joint Pretrial Statement filed with the Court in the earlier action is correct in stating that they "agreed to dismiss the

claims asserted Draim in their complaint." (Exhibit 15). Plaintiffs also admit that their counsel told the Court in the earlier action at the beginning of the trial that the "other issues in the case have gone by the board".

Plaintiffs argue that these filings and statements should be nothing more than "remarks indicating which evidence would be presented." If plaintiffs contend that these statements merely reflect a statement concerning the evidence that would be presented at trial, then the claims asserted but not prosecuted would be dismissed "as an adjudication on the merits" pursuant to Fed.R.Civ.P. 41(b). In either case, plaintiffs are precluded from re-litigating these claims.

Plaintiffs also make the argument that Judge Facciola issued no conclusion of any kind relating to the misappropriation of trade secrets claim. A review of his Findings and Conclusions reveals otherwise. (Opp. Ex 4). As an initial matter, Judge Facciola starts his Findings and Conclusions by stating that the "consolidated cases" were referred to him for trial and that prior to trial the parties agreed to the dismissal of all claims except Mr. Draim's claim for patent bonuses. In addition, Judge Facciola found that the evidence was insufficient to show that Mr. Draim was involved in any conspiracy to destroy or steal from the Castiel entities or that Mr. Draim agreed to take part in an unlawful action. (Opp. Exhibit 4, ¶ 16).

There is no question that the claims asserted in this case were raised in the earlier action and were either dismissed or abandoned and that plaintiffs are estopped from re-litigating these claims. The filing of this action was nothing more than a tactic to attempt to force Mr. Draim to forego the judgment he obtained in the trial before Judge Facciola.

## **Conclusion**

For the reasons stated in the motion for summary judgment and for an award of

attorneys fees and costs and for the reasons stated above, Mr. Draim requests that the

Court re-affirm the granting of summary judgment in this matter and enter an Order

awarding Mr. Draim his attorneys fees and costs in accordance with D.C. Code § 36-

404.

JOHN E. DRAIM

By Counsel

TROUTMAN SANDERS, LLP
1660 International Drive, Suite 600
McLean, Virginia  22102
(703) 734-4356

By:    /s/ John F. Anderson
       John F. Anderson
       (D.C. Bar No. 393764)

EXHIBIT 11: Notice that all parties, except Draim, executed the releases per the

Settlement Agreement

**David Castiel**

---

**From:**      David J. Taylor [DTaylor@tighepatton.com]
**Sent:**      Wednesday, August 03, 2005 1:33 PM
**To:**        dcastiel@ellipso.com; Jerry Helman; Jim.Bailey@verizon.net
**Cc:**        Thomas Earl Patton
**Subject:** Releases received

Some of this is redundant, but just to let you know the status:
1. I have signed, notarized Releases from Peter Sahagen, David Castiel, Jill Stern and Neel Howard (received today).
2. Rich Inciardi says his is in the mail to me.
3. Jill Stern told me when here Monday to sign that she has a company that might be able to help track down Jane Chapman; I will forward that to David C. and Jim B. for action.
4. Have not heard anything from/about Draim. Anyone else hear anything?
5. Anyone hear from Keough?

I'll let you know when Inciardi's releases arrive. I am going to go ahead and send the Stipulation of Dismissal to New York now that I have Neel Howard's signed releases. No of the others are parites in that case.
Best regards,
David Taylor

EXHIBIT 12: Letter to SRA attorney regarding Draim's refusal to join the Settlement

Agreement of July 20, 2005

September 17, 2005

Brian Wille, Esq.
Kostelanetz & Fink
530 Fifth Avenue                          Via FAX to: (212) 808-8108
New York, NY 10036

                    RE: SST v. Chapman

Dear Brian:

I have your e-mail of September 16 in which you state that if you received a comfort
letter from me, you "would expect Mr. Sahagen to authorize the filing of the Stipulation
of Dismissal in New York".

It is my belief that Mr. Sahagen is already under an obligation to file the Stipulation of
Dismissal in New York. The Castiel Parties have done all that is required of them under
the Settlement Agreement. Whereas Mr. Sahagen, through Space Resource
International/Space Resource Corporation, is supposed to "satisfy any and all claims
and/or demands that were and/or could have been asserted by Draim" he has not, to date,
done so, although I understand that he has made a seemingly reasonable offer of
settlement in that matter which Mr. Draim and his attorney, John Anderson, have so far
rejected.

That fact notwithstanding, I do not believe that the global settlement should be held up by
Mr. Draim's refusal to settle, and I am prepared to appear before Judge Facciola, as he
has instructed, on September 30 at 3:30 pm to present our position on the Draim patent
bonus issue. Our position, simply restated, is that there were obligations on the part of
both parties and we are prepared to put the performance of each to date before Judge
Facciola and whatever he determines will more nearly define the obligations of the
Castiel Parties (now Space Resources's obligations) to Mr. Draim. That should bring
settlement of that case within reach. However, that case should not be allowed to
jeopardize closure on the other four.

I agree with your sentiment that the holdup in the Draim matter should not be allowed to
jeopardize other aspects of the settlement, and represent to you that, as far as I am
concerned, Draim's refusal to join in the settlement "in no way alters, affects and/or

abrogates either side's rights and obligations under the Settlement Agreement", including the Sahagen Parties' obligation to resolve the Draim matter. I do not, in other words, see anything in the Draim matter which affects anything else, except within the four corners of that suit, and believe strongly that Mr. Sahagen, and you, have both an interest and a duty to file the Stipulation in SST v. Chapman in the Southern District of New York forthwith. We will deal with the Draim matter a step at a time, starting with the status conference on September 30. I think it is in the interests of the Sahagen Parties and the Castiel Parties to bring as much to bear on the resolution of the Draim matter expeditiously as we/they can within the bounds of legal and ethical propriety.

Sincerely yours,

David J. Taylor

Cc: Wayne Williams, Esq.
    Jim Bailey, Esq.
    Thomas Earl Patton, Esq.
    Ellipso, Inc. Directors